Rebecca Bridges (Est. Cody Healey)

vs.

David Morgan, Sheriff of Escambia County

---

Deposition of:

Eric Anderson

June 09, 2020

*Vol 1*

PHIPPS REPORTING

*Raising the Bar!*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO.:  3:18-CV-00406-RV-CJK

REBECCA BRIDGES, as personal
representative of the estate
of CODY HEALEY, deceased, for
the benefit of his survivors
and estate,

        Plaintiff,

vs.

DAVID MORGAN, in his official
capacity as SHERIFF, ESCAMBIA
COUNTY, FLORIDA; ERIC ANDERSON,
individually; and JOHN BEARD,
individually,

        Defendants.

_____/


WEB CONFERENCE DEPOSITION OF

ERIC ANDERSON


Tuesday, June 9, 2020
4:08 p.m. - 6:32 p.m.


LOCATION: Via Web Conference

Stenographically Reported By:
JO LANGSTON, RPR


Job No. :  139166

```
 1   APPEARANCES:  (All appearances via web conference)

 2        ON BEHALF OF THE PLAINTIFF:

 3              Marie A. Mattox, P.A.
                203 North Gadsden Street
 4              Tallahassee, FL 32301
                850-383-4800
 5              BY:  MARIE A. MATTOX, ESQUIRE
                marie@mattoxlaw.com
 6

 7              Tanner Law Group, LLC
                6601 Memorial Highway, Suite 310
 8              Tampa, FL 33615
                813-322-3565
 9              BY: JAMES TANNER, ESQUIRE
                jrt@jimtannerlaw.com
10

11
        ON BEHALF OF THE DEFENDANTS DAVID MORGAN AND
12      ERIC ANDERSON:

13              Quintairos, Prieto, Wood & Boyer, P.A.
                114 East Gregory Street, 2nd Floor
14              Pensacola, FL 32502
                850-434-6490
15              BY: J. ANDREW TALBERT, ESQUIRE
                atalbert@qpwblaw.com
16

17
        ON BEHALF OF THE DEFENDANT JOHN BEARD:
18
                Andrews, Crabtree, Knox & Longfellow, LLP
19              1558 Village Square Blvd., Suite 1
                Tallahassee, FL 32309
20              850-297-0090
                BY:  RAMSEY REVELL, ESQUIRE
21              rrevell@andrewscrabtree.com

22

23      ALSO PRESENT:

24              CRAIG HEALEY

25
```

1                    I N D E X

2    TESTIMONY OF ERIC ANDERSON                      PAGE

3         Direct Examination by Ms. Mattox            4

4         Cross-Examination by Ms. Revell            74

5         Cross-Examination by Mr. Talbert           80

6         Redirect Examination by Ms. Mattox         93

7         Recross-Examination by Ms. Revell         106

8         Recross-Examination by Mr. Talbert        109

9         Further Redirect Examination by Ms. Mattox  111

10        Further Recross-Examination by Mr. Talbert  114

11        Further Redirect Examination by Ms. Mattox  115

12

13   Certificate of Oath                            117
     Certificate of Reporter                        118
14   Errata Sheet                                   119
     Notification Letter                            120
15

16                    EXHIBITS

17   EXHIBIT              DESCRIPTION                PAGE

18   47    Disciplinary records of Anderson          13

19   48    FDLE investigative summary                94

20   (Reporter's Note: Exhibits not attached to
     transcript.)
21

22

23

24

25

1          The proceedings began at 4:08 p.m.

2          STENOGRAPHER:  Please raise your right hand.

3      Do you swear or affirm the testimony you're about

4      to give will be the truth, the whole truth, and

5      nothing but the truth?

6          THE WITNESS:  I do.

7  Thereupon,

8                    ERIC ANDERSON

9  was called as a witness and, having been first duly

10  sworn, was examined and testified as follows:

11                 DIRECT EXAMINATION

12  BY MS. MATTOX:

13      Q    Mr. Anderson, if you can identify yourself

14  for the record, please, sir.

15      A    Eric Anderson.

16      Q    Mr. Anderson, you are presently employed

17  with Escambia County Sheriff's Office?

18      A    Yes, ma'am.

19      Q    And I know that you're at the sheriff's

20  office right now; is that right?

21      A    Yes, ma'am.

22      Q    Is anyone present with you in that office

23  other than the attorney for the sheriff's office, Mr.

24  Talbert?

25      A    No, ma'am, just me and him.

1      Q    Mr. Anderson, how long total have you been

2  with the Escambia County Sheriff's Office?

3      A    Nine years, nine months.

4      Q    And how long have you been a law enforcement

5  officer?

6      A    Ten years.

7      Q    Did you work anywhere else other than the

8  Escambia County Sheriff's Office after becoming

9  certified in law enforcement?

10     A    Yes, ma'am.  I worked for the City of Quincy

11  for a couple of months before I got hired over here.

12     Q    And are you from that area?

13     A    Yes, ma'am, I am.

14     Q    You're from Quincy?

15     A    Yes, ma'am.

16     Q    Were you terminated from the Quincy -- was

17  it the City of Quincy Police Department?

18     A    Yes, I worked for the City of Quincy.  No,

19  ma'am.  What happened is I got accepted or I got

20  employed by the sheriff's office over here.  I was

21  part time for the City of Quincy, and they couldn't

22  offer me a full-time position, so I left for a

23  full-time job.

24     Q    Who was the chief at the time?  Was it

25  McNeil?

1       A    No, ma'am, it was not.  This was in 2010.

2  Ferman Richardson was the chief.

3       Q    And you've been with the Escambia County

4  Sheriff's Office ever since?

5       A    Yes, ma'am.  September 13th of 2010.

6       Q    What disciplinary action have you had since

7  you've been at the sheriff's office?

8       A    I had an incident where a suspect got out

9  from the hospital, and I was disciplined for that.

10      Q    Escaped while he was in your custody?

11      A    Yes, ma'am.

12      Q    Okay.

13      A    I got a six-month probation extension for

14  that.  I got written up for failure to do a report on

15  time, in a timely manner.

16      Q    You're talking about failure to submit

17  reports and documents?

18      A    Yes, ma'am.

19      Q    Okay.

20      A    I got written up for -- there's been a few

21  things.  There's been a couple of things.  I don't

22  remember what every single thing was.

23      Q    How about a violation in 2014, 11/6 of 2014,

24  violation of standards of care, rules and regulations

25  and neglect of duty offenses, willful disregard of

1  duties, neglect, not endangering.  Do you remember

2  receiving a notice of disciplinary action less than a

3  month before this incident that happened with Mr.

4  Healey?

5      A    Yes, ma'am.

6      Q    And what was that for?  What were the

7  allegations against you?

8      A    That was in reference to not doing a police

9  report when a criminal action was alleged.

10     Q    And you received a suspension for some

11 sustained violations back on 10/22 of 2014?

12     A    Yes, ma'am.

13     Q    And was that for the same --

14     A    That was the disciplinary action for that,

15 ma'am.

16     Q    For the neglect of duty and willful

17 disregard?

18     A    Yes, ma'am.

19     Q    And in June of 2014 you got disciplined for

20 the failure to respond to a dispatch when they

21 attempted to reach you on 6/29/2014 and you had not

22 responded to dispatch; is that right?

23     A    Yes, ma'am.

24     Q    You were verbally warned about that in the

25 past, about not monitoring your radio, and you were

1    then disciplined with a counseling form --

2         A     Yes, ma'am.

3         Q     -- a counseling for not answering your

4    radio.

5         A     Yes, ma'am.

6         Q     You also were disciplined in 2014 for an

7    incident that happened December 12th of 2013 for --

8    you should not have attempted to catch up or pursue

9    the suspect vehicle.

10        A     Yes, ma'am.

11        Q     You got a counseling for that?

12        A     Yes, ma'am.

13        Q     You violated the pursuit policy; is that

14   right?

15        A     Yes, ma'am.

16        Q     You got a letter of reprimand for an

17   incident that happened December 26, 2013.  You failed

18   to complete a property receipt for the property and

19   lost one of the items, a passport, during the course

20   of your shift?

21        A     Yes, ma'am.

22        Q     In May of 2013 you were involved in a

23   traffic crash and got another written reprimand?

24        A     Yes, ma'am.

25        Q     The agency determined it was a preventable

1    accident, and you were disciplined for that?

2       A    Yes, ma'am.

3       Q    In 2011 you had another preventable accident

4    and you were issued a general counseling form for

5    another preventable accident?

6       A    Yes, ma'am.

7       Q    In 2011 you were suspended for four days for

8    neglect of duty, negligence, endangering others or

9    property through neglect.  Do you remember that one?

10      A    Yes, ma'am.

11      Q    And is this where the prisoner escaped while

12   he was under your supervision?

13      A    Yes, ma'am.  I never actually got days off

14   for that.  I got a six-month probation extension,

15   because it got -- I went to the sheriff and spoke to

16   the sheriff about the incident.

17      Q    Even though it happened, the sheriff then --

18   was that Morgan at the time?

19      A    Yes, ma'am.

20      Q    So all of these disciplinary actions have

21   been under David Morgan?

22      A    Yes, ma'am.  I've never worked for any other

23   sheriff.

24      Q    How many disciplinary review boards, DRBs,

25   have you been before?

1    A    Two.

**2    Q    What were they for?**

3    A    One was for the incident with the prisoner,

4  and the next one was for misuse of our master name

5  index and another incident that was involved with

6  that.  That was about a year ago, 2018, I believe.

**7    Q    What was the issue there?**

8    A    It was alleged that I disseminated

9  information in a case to someone that was not

10  privileged, and then the misuse of our master name

11  index.

**12    Q    What did you do to misuse the master index?**

13    A    I used our master name index to look a

14  person up that was in our county.

**15    Q    For a personal reason rather than a business**
**16  reason?**

17    A    Yes, ma'am.

**18    Q    And did you go on DAVID to do that?**

19    A    No, ma'am, I did not.  I've never used DAVID

20  in that way.

**21    Q    And so what happened?  What was the**
**22  recommended discipline for you for that?**

23    A    I received two days off, two days

24  suspension.

**25    Q    And whose name did you look up?**

1    A    I don't remember it right now.

2    **Q    Who was this person?  Why were you looking**

3    **him up?**

4    A    It was an attorney that my wife worked for.

5    **Q    And you were looking him up, him or her?**

6    A    It was a him.

7    **Q    Why were you looking him up?**

8    A    Because of some of the actions he had taken

9    and the way he had spoken to my wife was very

10   inappropriate.

11   **Q    And is he in Pensacola?**

12   A    Yes, ma'am.

13   **Q    You don't remember what his name is?**

14   A    His first name is James.  It's been a while,

15   so I don't remember what his last name is.

16   **Q    It was 2018, right?**

17   A    Yes, ma'am.

18   **Q    Two years ago, less than two years ago?**

19   A    Less than two years.

20   **Q    You still don't remember his name.  Do you**

21   **want to take a minute to think about it?**

22   A    I just can't remember his last name right

23   this second.  I'm trying.  I know his first name is

24   James.

25   **Q    What kind of work does he do?**

1      A      It's criminal defense and the State.

2      **Q      During your FTO program, in phase three you**

3   **were consistently having problems with officer safety**

4   **as well as handling suspects and prisoners.  Your FTO**

5   **gave you a daily score of one or two on your DORs,**

6   **right?**

7      A      Yes, ma'am.

8      **Q      Then you had remediation while you were in**

9   **FTO.**

10     A      Yes, ma'am.

11     **Q      Other than the discipline that I've gone**

12  **through, any other discipline that you can think of?**

13     A      No, ma'am.

14     **Q      How many IA investigations have there been**

15  **of you?**

16     A      The two, the one where the suspect left the

17  hospital and then the second one with the misuse of

18  the master name index.

19            MS. MATTOX:  I'm going to mark your

20        disciplinary records, the ones that I just read.

21        I'm going to mark it as our next numbered

22        exhibit.  And these are documents, Andy, that you

23        produced to me, that I just got.  The next

24        numbered exhibit would be 47.

25            MR. TALBERT:  Marie, before these documents

1      are filed, since they may contain personal

2      information of law enforcement officers, we'd ask

3      that if you're going to file them, you do so

4      under seal and that --

5           MS. MATTOX:  I will certainly do that.  Will

6      you remind me about that, in the event that you

7      think that I might use them for something?

8           MR. TALBERT:  I'll do my best.  Thank you

9      very much.  I will.  We'll work as a team on

10      that.

11           (Exhibit No. 47 was marked.)

12  BY MS. MATTOX:

13      **Q    Okay.  What Taser, sir, did you have back on**

14  **December 1st, 2014?**

15      A    It was the M26.

16           MS. MATTOX:  Okay.  And, Andy, do you have

17      the document -- and I don't have the number that

18      we marked it.  Here it is.  It's Exhibit 36.

19           MR. TALBERT:  I've got a copy of it,

20      obviously.  I've got the one I wrote the thing

21      on.  It's in front of him.

22  BY MS. MATTOX:

23      **Q    If you could take a minute and look at**

24  **Exhibit 36, sir.**

25      A    Yes, ma'am.

1      Q    Are you looking at it now?

2      A    Yes, ma'am, I am.

3      Q    And the date that I've got as the last date

4  that the Taser was used on that Taser was 11/19 of

5  2014; is that right?

6      A    Yes, ma'am.  Well, I do a daily check, per

7  our policy.  And through the record, it was, I guess,

8  determined that there may have been an issue.  But

9  during my daily check, you do a spark test, and then

10  you check the back screen to see if there are any

11  warning signs or anything like that.  And I did not

12  observe any at all, so I didn't know that there was an

13  issue with it.

14      Q    And when did you find out that there was an

15  issue with your Taser?

16      A    When my attorney, Mr. Talbert, had provided

17  me this documentation on the Taser, whenever the

18  information was pulled.

19      Q    Have you had more than one Taser?  Were you

20  given another Taser?

21      A    Yes, ma'am.  I've had three Tasers while

22  I've been with the agency.

23      Q    Okay.  And did you get another Taser around

24  the time period 11/19 of 2014?

25      A    I do not believe so.

1       Q    So when you said you had a problem with your

2  Taser, what do you mean?

3       A    Well, through this, you see that there were

4  times where data was not recorded or data record not

5  initialized.  So that would indicate that there would

6  possibly be an issue with the Taser.  And it goes from

7  line 208 to line, multiple pages, line 585.

8       Q    Okay.  Could you have gotten a different

9  Taser at that time, so when they did the download on

10  that one, that the download showed that the data was

11  not recorded or data record not initialized?

12            MR. TALBERT:  Marie, I'm sorry.  Are you

13       asking him whether it's possible that he got a

14       new Taser on the 19th of November?

15            MS. MATTOX:  Right.

16            MR. TALBERT:  Somewhere there around?

17            MS. MATTOX:  Right.

18       A    There was no way I -- I did not get a new

19  Taser until the X26, the Taser that used two

20  cartridges.  I didn't get a new one until I was

21  trained on the X26.

22  BY MS. MATTOX:

23       Q    And why did you trade out from the M26 to

24  the X26?

25       A    Because they were no longer servicing the

1  M26s, and they went to the X26.  So they were getting

2  all the officers in the agency moved to the new Taser.

3  So you had to take a different training class for it

4  and sign off that you're certified and take the test

5  for it, and then they would issue the new Taser to

6  you.

7      Q    Do you know whether there were problems with

8  the M26 and that's the reason they changed to the X26?

9      A    I do not know.

10      Q    Did you ever get notified that Taser had

11  recalled M26s or that there was some other problem

12  that Taser had notified your agency about?

13      A    No, ma'am.  I was not in the department that

14  dealt with that.  I've been on patrol.

15      Q    But at no time prior to getting the X26 were

16  you notified that there was a problem with the M26; is

17  that right?

18      A    No, ma'am.  I'm sorry.  Sorry.  I misstated.

19          MR. TALBERT:  She asked you if that was

20      right, and you said no.

21      A    I was not notified of there being any

22  issued, is what I should have said.  I'm sorry.

23  BY MS. MATTOX:

24      Q    And when did you get the X26?

25      A    It was sometime after the incident, but I

1    could not tell you when because I don't -- I don't

2    remember the dates of when I did certain things.

3        Q    What is the date of the download, the Taser

4    download --

5        A    The date of the download is December 4th of

6    2014.  So it would be after that time I got the new

7    Taser.  When after that time I cannot tell you.

8        Q    The date of the Taser download that you're

9    looking at right now that's marked as Exhibit 36, the

10   date the run was done on that document is 12/4 of

11   2014; is that right?

12       A    Yes, ma'am.

13       Q    And between 11/19 of 2014 and 12/1, had you

14   checked your Taser?

15       A    Yes, ma'am, I did.

16       Q    And you don't know why it's not noted on the

17   document, the --

18       A    No, ma'am.  I do not know why it's not

19   there.

20            MR. TALBERT:  Try to let her finish her

21       question before you answer.

22            THE WITNESS:  I'm sorry.

23            MS. MATTOX:  I'm sorry.  I don't know what

24       was said.

25            MR. TALBERT:  I said to try to let her

1    finish her question.  Even if you know what she's

2    saying, let her finish so the court reporter can

3    take it down.

4        MS. MATTOX:  Andy, if you would say the

5    things that you're saying -- I don't have a

6    problem with it -- out loud so that I don't think

7    you're whispering to the witness, that would help

8    me.

9        MS. REVELL:  I could hear what was said.

10       MR. TALBERT:  I didn't want to interrupt

11   your train of thought.  That's fine.

12       MS. MATTOX:  Thank you.

13 BY MS. MATTOX:

14   **Q    And, sir, on December 1st, 2014, did you use**

15 **your Taser either in the prong mode or in drive stun**

16 **mode on Cody Healey?**

17   A    No, ma'am.  I never got my Taser out of its

18 holster and I never used it.

19   **Q    And you are not the person who contacted**

20 **dispatch or contacted EMS or contacted dispatch to**

21 **call EMS or called EMS; is that right?  You never did**

22 **that?**

23   A    I never did, no.

24   **Q    Tell me about your educational background.**

25 **Where did you go to high school?**

1        A    I went to Greensboro High School in

2   Greensboro, Florida.  I was dual enrolled.  I went to

3   TCC and got some classes at TCC.  I received my state

4   law enforcement certification from Pat Thomas Law

5   Enforcement Academy, and I have an associate's degree

6   from Troy University in general education.

7        Q    Did you play any sporting activities while

8   you were in high school?

9        A    Yes, ma'am.  I played football.

10       Q    Was that for Greensboro High School?

11       A    Yes, ma'am.

12       Q    And is your height -- obviously your height

13   is going to be the same, but is your weight the same

14   today as it was back in 2014?

15       A    No, ma'am.

16       Q    What's different about your weight today?

17       A    I've lost some weight.

18       Q    And how much do you weigh today?

19       A    309 pounds.

20       Q    And how tall are you?

21       A    Six-foot-five.

22       Q    And how much did you weigh back in December

23   of 2014?

24       A    Between 325 and 330.

25       Q    And obviously you were still six-five,

1   right?

2        A    Yes, ma'am.

3        Q    And today you weigh 309 and you're six-five?

4        A    Yes, ma'am.

5        Q    Now, at some point in time when Mr. Healey

6   was on the ground, you put your knee on his back,

7   didn't you?

8        A    Yes, ma'am.

9        Q    And were the handcuffs, the front handcuffs

10  on him or not on him at the time?

11       A    He was never handcuffed in the front.  He

12  was handcuffed in the back.

13       Q    I'm sorry.  At some point you put your knee

14  on his back, right, while he was laying down?

15       A    Yes, ma'am.

16       Q    Were the handcuffs already on him when you

17  put your knee on his back?

18       A    No, ma'am.  It was when we were trying to

19  handcuff him and then after we had him handcuffed, I

20  had my knee on his back.

21       Q    After you had him handcuffed and you had

22  your knee on his back, what did you do?  Let me find

23  my paper.  Hold on one second.

24       A    Okay.

25       Q    After you had gotten Mr. Healey into a prone

1  position, after he had been Tased, he got into that

2  prone position where you were able to handcuff him,

3  how many times had he been Tased at that point?

4      A   I do not know.  The only way I know is from

5  what the report says.

6      Q   And do you recall whether he was Tased

7  another time after your knee was already on his back?

8      A   I believe there was twice while my knee was

9  on his back during handcuffing.

10     Q   That he was drive stun Tased -- while your

11  knee was on his back, he was drive stun Tased and

12  handcuffed while he was in a prone position?

13         MR. TALBERT:  Objection.  That's not what he

14     said.

15 BY MS. MATTOX:

16     Q   Let me make sure that I understand.  He's in

17  a prone position, right, and you've got your knee on

18  his back?

19     A   Lower back, towards his buttocks.

20     Q   All right.  And he was then Tased at that

21  point?

22     A   Drive stun between the shoulder blades.

23     Q   And who did the drive stun Tasing on his

24  shoulder blades?

25     A   Deputy Beard.

1    Q   Was Deputy Beard also on him at the same
2  time that you were with his knee?

3    A   To my recollection, no.

4    Q   Do you know whether he was sitting on him at
5  that time that he was doing the drive stun Tase?

6    A   To my recollection, no.

7    Q   So you've got your knee on his back.  Deputy
8  Beard is drive stun Tasing him.  And what are you
9  doing?

10    A   Trying -- I have his left hand and arm in my
11  left hand, and I'm trying to get his other arm so that
12  we can effectively handcuff him.

13    Q   So did that take two Tasings, two drive stun
14  Tasings of him, while you had your knee on his back,
15  in order to get control of his other hand?

16    A   Yes, ma'am.

17    Q   And so you remained on his back for how
18  long?

19    A   I honestly don't know the time.  It was a
20  short period of time, but I can't tell you how many
21  minutes because I didn't look at my watch during the
22  time of this event.

23    Q   Well, how long were you on his back before
24  the drive stun Tase that occurred, the first one that
25  occurred while your knee was on his back?

1      A    It was a very short period of time, less

2  than maybe 10 seconds, 15 seconds.  Long enough for

3  Deputy Beard to get his Taser out and drive stun him.

4      **Q    Well, he'd already drive stunned him before**

5  **that, hadn't he?**

6      A    No, ma'am.  He never drive stunned him

7  before the drive stuns to the back.

8      **Q    It looks like there are three drive stuns to**

9  **the back.  I've got one that occurred, on this log, at**

10  **4:55:29.  The second one would have been at 4:55:38,**

11  **and the third one, the drive stun would have been at**

12  **4:55:54.  Does that help refresh your recollection?**

13      A    I do not remember if there were three.  I'm

14  pretty certain there were only two.

15      **Q    But there could have been three?**

16      A    Yes, ma'am.

17           MS. REVELL:  Form.

18  BY MS. MATTOX:

19      **Q    If the Taser log shows, the download for**

20  **Mr. Beard's Taser shows that there were three, you**

21  **wouldn't have any reason to disagree with that, right?**

22      A    I wouldn't have any reason to disagree with

23  the log, no, ma'am.

24      **Q    So you were on his back during the entirety**

25  **of the time that he was being drive stun Tased,**

1  whether it was two times or whether it was three

2  times; is that right?

3      A    Yes, ma'am.

4      Q    So I'll represent to you that that would

5  have been 4:55:29 through 4:55:54 plus five seconds,

6  because that would make it 4:55:59, because the Taser

7  would show it would be five seconds, right?

8      A    Yes, ma'am.

9      Q    So 4:55:29 through 4:55:59 would be the time

10  that you were on his back while he was being drive

11  stun Tased?

12     A    Yes, ma'am.

13     Q    And you said no more than ten seconds before

14  the first drive stun Tase.

15     A    Correct.

16     Q    And then how long did you remain on his back

17  after the last drive stun Tase by Mr. Beard?

18     A    It didn't take long for Deputy Beard to get

19  his leg restraints so he could hobble.

20     Q    I'm sorry?

21     A    I don't know how long.  I know that it

22  wasn't a very long period of time, because Deputy

23  Beard ran to his Tahoe to get his leg restraints and

24  then ran back and we restrained him.

25     Q    So while Mr. Beard is drive stun Tasing him

1    and you have your knee on his back, you're a

2    considerable weight, you're a big man, aren't you?

3        A    Yes, ma'am.

4        Q    And Mr. Healey was, what, 139 pounds, a

5    small man?

6        A    Yes, ma'am.

7        Q    So you stayed on his back for at least a

8    half a minute, right?

9        A    Yes, ma'am.

10        Q    Or maybe longer?

11        A    Maybe longer.

12        Q    And then so what were you doing while he was

13    drive stun Tasing him?

14        A    I was attempting to get his other hand, and

15    when I got his other hand, then John, Deputy Beard,

16    helped me get the handcuffs, get him cuffed, and

17    Deputy Beard ran and got the hobble so we could hobble

18    him.

19        Q    He went to get the leg restraints --

20        A    Yes.

21        Q    -- or did you already have those?

22        A    He had to go get those from his Tahoe.

23        Q    So you stayed on his back during that entire

24    time; did you not?

25        A    Yes, ma'am.  But there was very little

1    weight I put on his back.  Most of my weight was on my

2    knee that was on the ground.

3         Q    But your knee was still on his back; was it

4    not?

5         A    Lower back and buttocks, yes, ma'am.

6         Q    Well, you didn't put that in your report,

7    did you?

8         A    No, ma'am.

9         Q    That you were on his back with your knee,

10   did you?

11        A    No, ma'am.

12        Q    It's omitted from your report, right?

13        A    Yes, ma'am.

14        Q    And so you stayed on his back while Deputy

15   Beard went to his car to go get the leg restraints and

16   the hobble cord, right?

17        A    Yes, ma'am.

18        Q    And then after he put the leg restraints on,

19   then his hands, his hands and his legs were then tied

20   together; were they not?

21        A    Yes, ma'am.

22             MS. REVELL:  Form.

23   BY MS. MATTOX:

24        Q    And that's called hobble restraining

25   somebody?  What's it called?

1    A    Yes, ma'am.  It's a hobble restraint.

2    Q    A hobble restraint.  And that's your hands

3  behind your back, tied to your feet, right?

4    A    Yes, ma'am.

5    Q    And do you know how much distance there was

6  between the hands, Mr. Healey's hands and his feet?

7    A    No, ma'am, I do not.

8    Q    Well, there wasn't very much room.  Was

9  there more than five inches?

10         MS. REVELL:  Form.

11   A    I can't speculate on that because I don't

12  remember how much room there was.  There wouldn't be a

13  whole lot, but can't tell you exactly how much.

14  BY MS. MATTOX:

15   Q    Well, show me by the distance of your hands

16  in front of the camera so I can see.

17         MR. TALBERT:  Are you talking about between

18         his feet or his ankles where the things are

19         attached?

20         MS. MATTOX:  I'm talking about from where

21         his hands are behind his back, between the

22         handcuffs and the leg restraints when you pull

23         the hands up to meet with the feet to do the

24         hobble restraint.

25         MR. TALBERT:  Well, you've got two chains

1        that are being tied together, right?

2             MS. MATTOX:  Andy, I'm going to tell you

3        something.  No affecting his testimony.  Okay?

4        Only objections to form.

5   BY MS. MATTOX:

6        **Q    So, sir, when you've got the hands that are**

7   **coming up behind his back and you've got the feet**

8   **meeting, how much space between the hands and the**

9   **feet?**

10            MS. REVELL:  Object to form.

11            MR. TALBERT:  Join.

12  BY MS. MATTOX:

13       **Q    Go ahead.**

14       A    I guess approximately this (indicating).  I

15  don't have an effective real distance.

16       **Q    That looks like it's about six inches.  Am I**

17  **right?**

18            MR. TALBERT:  Not from my vantage point

19       that's not six inches.

20            MS. MATTOX:  Andy, you cannot affect this

21       witness's testimony.  Okay?

22            MR. TALBERT:  You're telling the record how

23       much to put down.  I can say that I think you're

24       wrong.

25            MS. MATTOX:  Well, then you can come back

1    and ask him questions about it.

2        A    Maybe 12 inches.

3    BY MS. MATTOX:

**4        Q    Well, that doesn't look like 12 inches to**

**5    me.**

6        A    I'm an extremely wide fellow, and it's a

7    little bit wider than my head.

**8        Q    Well, you've moved it out now.  Before, when**

**9    you first started showing me, the space was about,**

**10   let's say -- you want to say 10 inches?**

11            MR. TALBERT:  Objection.

12            MS. REVELL:  Form.

13            MR. TALBERT:  I disagree with what you're

14       saying.

15            MS. MATTOX:  You can disagree, but you

16       cannot do speaking objections.  You can object to

17       the form.

18            MR. TALBERT:  I'm not putting a speaking

19       objection.  You're telling the record that he

20       moved his hands.  That's not a question.  You're

21       directing the record as to what happened.

22            MS. MATTOX:  I'm watching him.  I can watch

23       him and see that he moved his hands.  From my

24       vantage point, he moved his hands.

25            MR. TALBERT:  From my vantage point, he

1    didn't.  And if you're putting something on the

2    record, I'm going to put something on the record

3    that says my vantage point.

4         MS. MATTOX:  You can clear it up on your

5    cross-examination of him, or direct exam, because

6    I'm the cross.

7  BY MS. MATTOX:

8         Q    Sir, what do you have in front of you in

9  terms of documents?

10        A    The only document I have is the Taser log.

11        Q    Did you bring any documents with you today?

12        A    No, ma'am, I did not.

13        Q    So can we say safely -- I don't know how

14  many inches that was between your hands.  You had said

15  12.  It looked like it was closer to six to me.  So

16  can we say 10 inches, that that sounds right that it

17  was 10 inches?

18        MS. REVELL:  Object to form.

19        MR. TALBERT:  Objection.

20  BY MS. MATTOX:

21        Q    Don't look at him, sir.  Don't look at your

22  lawyer.  You've got to look at me.  So 10 inches, does

23  that sound about right?

24        MR. TALBERT:  Objection.

25        MS. MATTOX:  You can object.

1          MR. TALBERT:  I just did.  Asked and

2     answered.

3  BY MS. MATTOX:

4          Q    Go ahead.  You can go ahead, sir.

5          MR. TALBERT:  Just answer the question.

6          THE WITNESS:  Okay.  I'm sorry.  I'm a

7     little new to this objection -- all this, because

8     I've never had this happen in a deposition, so I

9     sort of don't know what to do.

10         MR. TALBERT:  You can answer her questions.

11         THE WITNESS:  I'm sorry, Ms. Mattox.  I'm

12    sorry.

13         MR. TALBERT:  She'll ask you a question and

14    you can answer her question.

15         THE WITNESS:  Yes, sir.  Like I said, I'm

16    sorry.

17         MR. TALBERT:  It's not you.

18         A    Approximately between 10 inches, yes, ma'am.

19  BY MS. MATTOX:

20         Q    All right.  And so at the time that the

21  first drive stun Tase was used, after that, Mr. Healey

22  went limp at that point; did he not?

23         A    No, ma'am.

24         Q    After the second drive stun Tase he went

25  limp?

1    A    No, ma'am.

2    Q    Was it the third drive stun Tase that he

3  went limp after that?

4    A    No, ma'am.

5    Q    Well, he went limp at some point; did he

6  not?

7    A    Yes, ma'am.

8    Q    And so he gets handcuffed.  Y'all put him

9  into the hobble restraint, right?

10    A    Yes, ma'am.

11    Q    Where his hands and his feet are tied

12  together behind his back.

13    A    Yes, ma'am.

14    Q    And do you know how long, did you note

15  anywhere how long he stayed in that position?

16    A    No, ma'am, we did not.

17    Q    And today do you know whether it was longer

18  than three minutes?

19    A    I honestly do not know how long it was.

20    Q    It could have been three minutes, could have

21  been four minutes, you don't know?

22    A    Correct.

23    Q    And at some point in time then, you noticed

24  that he was having labored breathing; is that right?

25    A    Yes, ma'am.

1     Q   And that was while he was still in the

2 hobble restraint, right?

3     A   Yes, ma'am.

4     Q   And what did you do after you found that he

5 had labored breathing?

6     A   We immediately released the hobbles and

7 continued to let him lay on his side.  And in our

8 training, that's what we're trained to do.

9     Q   Well, didn't you notice that while he was

10 still in the prone position on his stomach or on his

11 chest, that he was having labored breathing?

12     A   He never had labored breathing while he was

13 laying on his chest.

14     Q   You don't know how long, though, he laid on

15 his chest?

16     A   I do not know how long he laid on his chest.

17     Q   And so then you rolled him over to his side,

18 right?

19     A   Yes, ma'am.

20     Q   And how long did he stay laid on his side

21 before you removed the restraints?

22     A   I honestly could not tell you a time.

23     Q   And you don't know when EMS was first

24 called, do you?

25     A   No, ma'am, I do not.  All I know is from

1    what the dispatch log says.

2        Q    And have you reviewed the dispatch log

3    before your deposition today?

4        A    I've looked at it on a couple of occasions,

5    but I did not have a copy of it to review it.

6            MS. MATTOX:  I have no idea what I did with

7        it.  Hang on.  Let me print another copy of it

8        because I have lost it.  Okay.  Exhibit 5, I'm

9        printing it out.  Andy, if you can give him

10       Exhibit 5.

11           MR. TALBERT:  Exhibit 5 or 6?  They seem

12       like they're the same one.  Exhibit 5 you said?

13           MS. MATTOX:  I think we've been using

14       Exhibit 5.

15           MR. TALBERT:  Okay.  I'm pulling that out.

16       Is it a four-page document?

17           MS. MATTOX:  Yes.

18   BY MS. MATTOX:

19       Q    It's Exhibit 5, and I'm on page 3.

20       A    Yes, ma'am.

21       Q    Now, can you tell on that document, sir,

22   what time that you actually arrived, and what was your

23   call number?

24       A    My call number at the time was 341.

25       Q    Can you tell on this document what time you

1  arrived?

2      A    Mine is not on this document.

3      Q    So we can't tell, from looking at Exhibit 5,

4  what time you got there; is that right?

5      A    Correct.

6      Q    I have another document that will tell us

7  what time.  I have CAD unit --

8      A    It's on page 4, ma'am.  That has my time on

9  scene.  I'm sorry.  I didn't look at page 4.

10      Q    Okay.  What time did you arrive on scene?

11      A    It says 6:15:56.

12      Q    So let's look back on this.  So you are

13  arriving at 6:15:56, shortly before EMS was notified;

14  is that right?

15      A    Yes, ma'am.

16      Q    So if you'll go to the Taser log, it

17  shows -- and, again, this is Exhibit No. 3.  It shows

18  between 4:53, there are three -- we don't know what

19  time these occurred because the times are not

20  accurate.

21          MR. TALBERT:  I'm sorry.  What exhibit are

22      you looking at?

23          MS. MATTOX:  Exhibit 3.

24          MR. TALBERT:  Let me get that for him.  Are

25      you asking him to look at the exhibit, or are you

1        just talking about it?

2             MS. MATTOX:  No.  I'm asking him to look at

3        the exhibit.

4        A     Yes, ma'am.

5   BY MS. MATTOX:

6        Q     So go again to the time that you arrived,

7   and that would be 6:15:56.

8        A     Yes, ma'am.

9        Q     And then go to -- okay, 6:16:56.  Now go to

10  the Taser log.

11       A     Yes, ma'am.

12       Q     The first three Tasings that occurred on

13  here, do you agree with me that those would all be

14  prong Tasings, at 6:53:13, 6:53:24 and 6:53:34?

15            MR. TALBERT:  Objection, foundation.

16            MS. REVELL:  Join.

17  BY MS. MATTOX:

18       Q     You can go ahead.  Are those all three the

19  Taser using the prongs?

20       A     To my knowledge, yes, ma'am.

21       Q     So between the time 6:15:56, the time that

22  you are shown as arriving, and 6:16:53 is how much

23  time?

24            MR. TALBERT:  I think you have your numbers

25       mixed up a little bit.  You said 6:16:53?

1          MS. MATTOX:  Yes.  The time that EMS is

2     notified.

3     A    About a minute between.

4 BY MS. MATTOX:

5     Q    Okay.  A minute between the time that you

6 arrived at 6:15:56 and the time that EMS is notified

7 at 6:16:53, a minute, right?

8     A    Yes, ma'am.

9     Q    Now, the Tasing between 4:53:13 and

10 4:53:34 -- add five, because you have to add five to

11 the last one, five seconds, right?

12    A    Yes, ma'am.

13    Q    So that would be 4:53:34, which is on line

14 465.  You'd have to add five seconds to 34, so that

15 would be 39.

16    A    Yes, ma'am.

17    Q    So how many seconds then between 4:53:13 and

18 4:53:39?

19    A    There's 20 seconds.

20    Q    Okay.  So you could have been there, because

21 you were there for a minute before EMS is called,

22 right?

23         MR. TALBERT:  Objection.

24         MS. REVELL:  Form.

25    A    Yes, ma'am.

1    BY MS. MATTOX:

2         Q    So all three of these Tasings, do you

3    recall, the ones at 4:53:13, 4:53:24 and 4:53:34, all

4    three of those occurred before EMS was called; is that

5    right?

6              MS. REVELL:  Form.

7              MR. TALBERT:  Objection.

8         A    I don't believe so, but I can't -- I'm not

9    certain.

10   BY MS. MATTOX:

11        Q    Okay.  They could have?

12             MS. REVELL:  Form.

13        A    They could have.  I don't know.

14   BY MS. MATTOX:

15        Q    EMS was called because of the Tasings,

16   though; isn't that right?

17             MS. REVELL:  Form.

18             MR. TALBERT:  Objection.

19        A    Again, I'm not certain.  I know that our

20   policy states that when multiple Taser applications

21   are used, that you call EMS.  But, again, I'm not

22   certain as to why --

23   BY MS. MATTOX:

24        Q    Do you know of any other reason that EMS

25   would have been called other than multiple Tasings?

```
 1              MR. TALBERT:  Objection.

 2              MS. REVELL:  Form.

 3      A    Possibly his actions.  But again, like I

 4   said, I don't --

 5   BY MS. MATTOX:

 6      Q    So the policy requires that EMS be notified

 7   after there are multiple Tasings, right?

 8      A    Yes, ma'am.

 9      Q    And that's what y'all did.  Y'all notified

10   EMS after there were multiple Tasings, right?

11              MS. REVELL:  Form.

12              MR. TALBERT:  Objection.

13      A    Yes, ma'am.

14   BY MS. MATTOX:

15      Q    And you don't know of any other reason for

16   EMS to have been contacted other than the multiple

17   Tasings?

18              MR. TALBERT:  Objection.

19              MS. REVELL:  Form.

20   BY MS. MATTOX:

21      Q    Go ahead.

22      A    Correct.

23      Q    Nobody ever told you that EMS was being

24   called for any reason other than the fact that Mr.

25   Healey had already been Tased multiple times; is that
```

1    right?

2         A    Correct.

3         Q    So then EMS has been contacted the first

4    time then at -- or I guess y'all would notify

5    dispatch -- oh, I see.  Dispatch --

6         A    We call dispatch, and then dispatch calls

7    EMS.  There's a lag between the two.

8         Q    Do you know whether EMS -- do you know

9    whether he had already been Tased at the time that EMS

10   was contacted?  Do you believe that he'd already been

11   Tased at the time that EMS was contacted?

12        A    It's a possibility.

13        Q    Do you believe that?  Based upon your

14   recollection of the events, had Mr. Healey already

15   been Tased at the time that EMS was contacted?

16             MS. REVELL:  Form.

17        A    I do believe so.

18   BY MS. MATTOX:

19        Q    All right.  Now, at no time did you or

20   Mr. Beard ever do anything to try to save Mr. Healey's

21   life medically, meaning a chest compression or CPR or

22   anything like that; is that right?

23             MR. TALBERT:  Objection.

24             MS. REVELL:  Form.

25   BY MS. MATTOX:

1      Q    Until EMS got there.

2           MR. TALBERT:  Object to form.

3           MS. REVELL:  Form.

4    BY MS. MATTOX:

5      Q    Is that right?

6           MR. TALBERT:  Object.

7    BY MS. MATTOX:

8      Q    You can go ahead.

9      A    I am uncertain.  I know that I didn't.

10     Q    And you did not see Mr. Beard do any chest

11   compressions of Mr. Healey before EMS arrived; is that

12   right?

13          MS. REVELL:  Form.

14     A    Again, I'm uncertain because of the timing

15   of everything.

16   BY MS. MATTOX:

17     Q    Sir, before EMS got there, okay, did you see

18   Mr. Beard at any time do any kind of CPR or chest

19   compressions on Mr. Healey?

20     A    There's a possibility he did.

21     Q    I'm not talking about possibilities.  Can

22   you remember today ever seeing Mr. Beard, before EMS

23   got there, ever do any chest compressions or anything

24   like that, chest compressions, CPR, before EMS got

25   there?

 1             MR. TALBERT:  Object to form.

 2             MS. REVELL:  Form.

 3        A    At this time, no.

 4    BY MS. MATTOX:

 5        Q    **And do you remember giving a statement to**

 6    **FDLE, the Florida Department of Law Enforcement, in**

 7    **this case?**

 8        A    Yes, ma'am, I do.

 9        Q    **And do you remember what you told law**

10    **enforcement, FDLE?**

11        A    I believe it's that chest compressions were

12    started prior to EMS's arrival or at the same time as

13    EMS's arrival.

14        Q    **Well, do you recall actually that there was**

15    **nothing -- let me read it so I'm accurate.  Hold on**

16    **just a second.  You testified, you said in this**

17    **report, it says, Deputy Anderson held Healey down**

18    **while Deputy Beard got his leg shackles and hobble**

19    **cord.  You held him down by putting your knee on his**

20    **back; isn't that right?**

21             MR. TALBERT:  Object to form.  You said he

22        testified, Marie?

23    BY MS. MATTOX:

24        Q    **Well, you participated in your sworn**

25    **statement with FDLE.  Do you remember that?**

1    A    Yes, ma'am.

2    Q    Then it says, Deputy Anderson had one knee

3  on the ground and one knee across Healey's back.

4    A    Yes, ma'am.

5    Q    It says, But Deputy Anderson did not put all

6  of his weight on Healey.

7    A    Correct.

8    Q    But you still had a knee on his back for

9  around a minute, if not more.

10    A    Yes, ma'am.

11         MS. REVELL:  Form.

12  BY MS. MATTOX:

13    Q    Now, after he was hobble restrained, he was

14  not fighting or kicking anymore, was he?

15    A    Correct.

16    Q    Then it goes through and it says -- who is

17  Deputy Kyle Haber?

18    A    He was another person on our shift.

19    Q    And did he arrive -- by the way, was there

20  any reason that EMS was not called when this incident

21  first started --

22         MS. REVELL:  Object to form.

23  BY MS. MATTOX:

24    Q    -- at 6:08:25?

25         MS. REVELL:  Form.

1    A    The only thing I could speculate is the fact

2   that --

3    **Q    I'm sorry.  At 6:11.  Do you know why EMS**

4   **was not contacted at 6:11, even when Beard arrived?**

5    A    Like I said, I can only speculate.

6    **Q    I don't want you to speculate.**

7    A    Then I can't give you an answer.

8    **Q    Okay.  And crisis intervention was never**

9   **called either, were they?**

10   A    No, ma'am.

11   **Q    You had the ability to call crisis**

12  **intervention, but y'all didn't?**

13        MR. TALBERT:  Object to form.

14  BY MS. MATTOX:

15   **Q    Go ahead.**

16   A    I've never had an incident where I've called

17  crisis intervention, and I've never known of an

18  incident where you called crisis intervention.

19   **Q    Have you been trained in crisis**

20  **intervention?**

21   A    No, ma'am, I have not.

22   **Q    And have you been trained on how to**

23  **de-escalate situations?**

24   A    Yes, ma'am.

25   **Q    What training have you received?**

1    A    Just training through the academy and

2    through the sheriff's office and block training.

3    **Q    What kind of training do you get on**

4    **de-escalation?**

5    A    Just pretty much where you talk about things

6    you can do to de-escalate and possibly change the

7    situation you're in.

8    **Q    Do you know of anyone who has been trained**

9    **on crisis intervention, when to call the crisis**

10   **intervention team with the sheriff's office?**

11   A    I do not.

12   **Q    It says, At one point they noticed that**

13   **Healey started having trouble breathing, difficulty**

14   **breathing.  Deputy Beard checked Healey for a pulse**

15   **and said Healey had a weak one.  Kyle Haber also**

16   **checked Healey for a pulse but did not feel a pulse.**

17   **Deputy Beard checked again and found a weak pulse, at**

18   **which time all of Healey's restraints were removed.**

19   **Deputy Anderson did not know how long Healey was**

20   **restrained.  Would you agree with that?**

21            MR. TALBERT:  Object to form.

22            MS. REVELL:  Form.

23   A    I agree with that.

24   BY MS. MATTOX:

25   **Q    It says, According to Deputy Anderson, they**

1    were about to start CPR when EMS arrived.

2        A    If that's what it says, then, yes, that's

3    what I said.

4        Q    So no CPR was started before EMS arrived,

5    would you agree with me, based upon the statement you

6    gave to FDLE?

7              MR. TALBERT:  Object to form.

8              MS. REVELL:  Form.

9    BY MS. MATTOX:

10       Q    You can go ahead.

11       A    Based upon that statement, correct.

12       Q    Did you assist at all in CPR of Mr. Healey

13   after EMS got there?

14       A    I don't remember, but by my report, yes.

15       Q    Well, this says, The only time Deputy

16   Anderson did not see Healey breathing was just before

17   EMS arrived.  Deputy Anderson made contact with EMS

18   and told them that Healey had been Tased and had just

19   stopped breathing.  Several of the on-team deputies

20   then assisted EMS with CPR.  And do you recall whether

21   you had assisted at all based on --

22             MR. TALBERT:  Object to form.

23             MS. REVELL:  Form.

24       A    I do not remember.

25   BY MS. MATTOX:

1    Q    Have you been disciplined at all for the

2    events that happened regarding Cody Healey?

3    A    No, ma'am.

4    Q    Have you been told that you acted consistent

5    with the policies and customs of the sheriff's office

6    in your interactions with Mr. Healey here?

7         MR. TALBERT:  Form.

8    A    Yes, ma'am.

9    BY MS. MATTOX:

10   Q    And who told you that you acted consistent

11   with the policies and customs of the sheriff's office

12   in how you and Mr. Beard handled Mr. Healey on

13   12/1/2014?

14   A    Well, it's an inference due to the fact that

15   I never received any discipline for that incident.

16   Q    Now, have you been trained at all -- I've

17   read the policies of the sheriff's office.  Have you

18   been trained at all in terms of how to use the hobble

19   restraints within the sheriff's office?

20   A    No, ma'am.

21   Q    Do you know of any training at all that's

22   ever occurred regarding the hobble restraints within

23   the sheriff's office?

24        MS. REVELL:  Form.

25   A    I do not remember any.

1    BY MS. MATTOX:

2        Q    And have you read the policies to see that

3    hobble restraints are only authorized under the policy

4    in one circumstance, and that is when you put somebody

5    in a car and they're trying to kick the windows and

6    doors out?

7              MR. TALBERT:  Objection.

8              MS. REVELL:  Form.

9    BY MS. MATTOX:

10       Q    Did you know that?

11       A    Yes, ma'am.

12       Q    So why did y'all hobble restrain Mr. Healey

13   on 12/1/2014 if it was not authorized by policy?

14             MR. TALBERT:  Objection.

15             MS. REVELL:  Form.

16       A    Because we were going to place him in a car,

17   but due to the fact of him needing to be checked by

18   EMS, we were going to wait with EMS.  And with how

19   much that we had to fight to get him into restraints,

20   that is why we got them.

21   BY MS. MATTOX:

22       Q    I'm sorry.  Why?  I'm not understanding you.

23       A    Okay.  So due to the fact of the fight we

24   had to have with him to get him into restraints, we

25   believed at the time that for his safety and for our

1  safety, to use the restraints.  And we believed that

2  at a certain point in time, after EMS checked him,

3  that he would be placed in a vehicle and transported.

4      Q    But you knew that the policy only allowed

5  you to use them while he was in the car.

6          MR. TALBERT:  Objection.

7          MS. REVELL:  Form.

8  BY MS. MATTOX:

9      Q    Isn't that right?

10     A    You have to take him out of the car to put

11  the restraints on him.  You can't put the restraints

12  on him in the car.

13     Q    Well, EMS can't check him if he's in a

14  hobble restraint, can they?

15         MS. REVELL:  Form.

16     A    But you can release the restraints to let

17  EMS check him.

18  BY MS. MATTOX:

19     Q    I understand.  But it would be after EMS

20  would check him that you would be putting him into the

21  vehicle, right?

22         MS. REVELL:  Form.

23     A    Correct.

24  BY MS. MATTOX:

25     Q    So under the policies, you couldn't put him

1    in hobble restraints to wait on EMS to get there.

2    That wasn't authorized, was it?

3            MS. REVELL:  Form.

4            MR. TALBERT:  Objection.

5        A    The way you stated it, no.

6    BY MS. MATTOX:

7        Q    And so what you would do, the policy would

8    authorize, after EMS got there and you were about to

9    put him into a car, then you could put the hobble

10    restraints on him.

11            MR. TALBERT:  Objection.

12    BY MS. MATTOX:

13        Q    That's what would be authorized, right?

14            MR. TALBERT:  Objection.

15            MS. REVELL:  Form.

16        A    Yes, ma'am.

17    BY MS. MATTOX:

18        Q    Who suggested getting the hobble restraints,

19    you or Mr. Beard?

20        A    Deputy Beard.

21        Q    That wasn't something that you came up with

22    independently, it was something that Mr. Beard said he

23    was going to go do?

24        A    Yes, ma'am.

25            MS. REVELL:  Form.

1    BY MS. MATTOX:

2        Q    **Have you used hobble restraints before?**

3        A    Yes, ma'am.

4        Q    **And was that strictly on a transport of the**

5    **person, as the policy allows, to transport somebody in**

6    **hobble restraints?**

7             MR. TALBERT:  Objection.

8             MS. REVELL:  Form.

9        A    The situation that I used them in was

10   different than this situation.  The situation was --

11   BY MS. MATTOX:

12       Q    **Excuse me?**

13       A    The situation was different than this

14   situation.  The person was kicking the back of my

15   patrol car.  At that point, I stopped, got another

16   officer out with me.  We got the person out of the

17   car, put the person in hobbles and put them back in

18   the car.

19       Q    **Right.  And so what the policy says is if**

20   **the person is kicking the door out.  You don't**

21   **anticipate in advance, for every single person you're**

22   **going to put in the back of a patrol car, that they're**

23   **going to need a hobble restraint, do you?**

24             MR. TALBERT:  Objection.

25             MS. REVELL:  Form.

1      A    Correct.

2   BY MS. MATTOX:

3      Q    Right.  So there would be no need to put Mr.

4   Healey in hobble restraints.  He's just like everybody

5   else.  You wouldn't do the hobble restraints until you

6   get him in the car and you see that he's kicking, and

7   then you put the hobble restraints on him, right?

8            MS. REVELL:  Object to form.

9            MR. TALBERT:  Objection.

10     A    Correct.

11  BY MS. MATTOX:

12     Q    All right.  And so here with Mr. Healey,

13  though, you put them on him way in advance, before he

14  even got in the car to figure out whether he was going

15  to kick the car.

16     A    Correct.

17     Q    Okay.  So the only other time that you used

18  the hobble restraints was when they were actually

19  authorized under the policy, right?

20            MS. REVELL:  Form.

21     A    Yes, ma'am.

22  BY MS. MATTOX:

23     Q    And have you ever used the hobble restraints

24  in a way that you used them on Mr. Healey?

25     A    No, ma'am.

1      Q    And how about other officers?  Have you seen

2    other officers use the hobble restraints as you used

3    them, not in the way that the policy allowed, in a car

4    where they're kicking the doors out or the windows

5    out, but as you used it here with Mr. Healey?

6              MR. TALBERT:  Objection.

7              MS. REVELL:  Form.

8    BY MS. MATTOX:

9      Q    Have you ever seen that done by any other

10   officer with the Escambia County Sheriff's Office?

11             MS. REVELL:  Object to form.

12             MR. TALBERT:  Objection.

13     A    No, ma'am.  But there's a possibility it

14   happened, but I wasn't there.

15   BY MS. MATTOX:

16     Q    Have you ever heard about it happening?

17             MS. REVELL:  Form.

18     A    No, ma'am.

19   BY MS. MATTOX:

20     Q    Have you ever been trained as to how to

21   properly use the hobble restraint?

22     A    No, ma'am.

23     Q    Do you know of anybody who's ever been

24   trained about how to properly use the hobble restraint

25   at the sheriff's office?

1        A     No, ma'am.

2               MS. REVELL:   Form.

3    BY MS. MATTOX:

4        Q     Do you know how much -- in the Department of

5    Corrections, do you know how much room they have

6    between the feet and the legs?

7        A     No, ma'am.  I do not work for Corrections.

8        Q     In retrospect, between 6:22, when EMS was

9    notified to step up, subject had problems breathing,

10   between 6:22 and the time that EMS actually arrived at

11   6:26:58, in retrospect, don't you think you should

12   have done some kind of chest compression or something

13   to try to keep Mr. Healey alive?

14       A     No, ma'am.  Chest compressions were not

15   needed.

16       Q     Chest compressions were not needed.  Okay.

17   He was not breathing, was he?  He had labored

18   breathing?

19       A     Labored breathing, correct.

20       Q     Were you aware of a Department of Justice

21   letter that was sent to the sheriff back in September

22   of 2012 that dealt with use of force by the sheriff's

23   office?

24               MR. TALBERT:  You don't have to tell her

25           anything that results from our conversation.

1      Okay?

2      A    No, ma'am.  I'm not aware of one.

3  BY MS. MATTOX:

4      **Q    Do you know whether any policies or**

5  **procedures or practices of the sheriff's office**

6  **changed after 12/9 of 2012?**

7      A    I'm not aware because I'm not in the

8  training department.  There may have been a slight

9  policy change by wording, but how many policy changes

10 I've been through since then, I couldn't tell you if

11 there's been a change between that time period.

12     **Q    Okay.  Well, between September of 2012 and**

13 **December of 2014, do you know of any policy changes**

14 **that occurred with respect to use of force, the use of**

15 **force, how you restrain somebody, anything like that,**

16 **anything that you can recall that was changed during**

17 **that time period?**

18     A    I cannot recall.  But like I said, if they

19 changed a line or a word, I'm not certain if they

20 changed any words in that time period.

21     **Q    Now, there was no supervisor on the scene of**

22 **this incident, was there?**

23     A    No, ma'am.

24     **Q    And you and Mr. Beard did not have to**

25 **contact the supervisor in order to have the discretion**

```
1   as to how to act and how to treat Mr. Healey, right?

2       A    Correct.

3       Q    And so in essence here, you're the final

4   decision-maker, final policy-maker regarding how you

5   interact with Mr. Healey, correct?

6            MR. TALBERT:  Objection.

7            MS. REVELL:  Object to form.

8   BY MS. MATTOX:

9       Q    Go ahead.

10      A    Yes, ma'am.

11      Q    And your supervisor at the time, she's now

12  Ms. Ramos, she was Ms. Wilson then?

13      A    Yes, ma'am.

14      Q    And is she still a supervisor with the

15  Escambia County Sheriff's Office?

16      A    Yes, ma'am, she is.

17      Q    And what position is -- do you know who

18  Robert Randolph Greene is?

19      A    I know he's a deputy.

20      Q    Have you ever worked with him?

21      A    No, ma'am, I have not.

22      Q    And are you still currently a deputy?

23      A    Yes, ma'am, I am.

24      Q    Have you applied for any ranked positions?

25      A    I have.
```

1    Q    And you have not gotten those yet?

2    A    No, ma'am.

3    Q    And Joanna Wilson, now Ramos, is she still a

4    sergeant?

5    A    Yes, ma'am, she is.

6    Q    And you never used OC spray on Mr. Healey,

7    right?

8    A    Correct.

9    Q    You could have?

10    A    We could have, yes.

11    Q    And you were carrying it on your person at

12    the time?

13    A    Yes, ma'am.

14    Q    And how about Mr. Beard, was Mr. Beard also

15    carrying OC spray on his person at the time?

16    A    I believe he was.

17         MS. REVELL:  Form.

18    BY MS. MATTOX:

19    Q    And how about an ASP baton, did you have an

20    ASP baton on your person as well?

21    A    Yes, ma'am, I did.

22    Q    How about Mr. Beard, did he also have an ASP

23    baton on his person?

24         MS. REVELL:  Form.

25    A    I believe he did.

1    BY MS. MATTOX:

2        Q    And when you say you believe he did, why do

3    you believe that he had both OC spray and the ASP

4    baton in addition to his Taser?

5        A    I'm pretty sure he carried the three

6    less-lethal items that I carried.  I know that we are

7    required by policy to carry at least two.  But I do

8    not know for certain what is on Deputy Beard's belt.

9    That's Deputy Beard.  I know what's on my belt.

10       Q    And your belt would have all three of them?

11       A    Yes, ma'am.

12       Q    And do you know of any time when Beard that

13   day -- well, did you see him with an ASP baton?

14       A    I don't honestly remember.  It wasn't used,

15   so I can't tell you from the usage part of it.

16       Q    And OC spray was also not used, was it?

17       A    Correct.

18       Q    You could have used the OC spray but didn't?

19       A    Correct.

20       Q    Is there any reason you can give me as to

21   why you didn't, after you knew that after three

22   applications of the Taser through the prongs, it

23   wasn't effective?

24            MR. TALBERT:  Object to the form.

25            MS. REVELL:  Form.

1      A    I did not use the OC spray due to the fact

2    of how we were trying to detain Suspect Healey.  We

3    knew that -- or at least I knew that it would be a

4    high likelihood that we would get OC on us and then

5    contaminate ourselves and then inhibit us from being

6    able to effectively do our jobs.

7    BY MS. MATTOX:

8      Q    There's also a chance that Healey could have

9    gotten control of the Taser as well, right?

10     A    Yes, ma'am.

11     Q    So you've got risk whether you are using OC

12   spray or whether you're using the Taser, right?

13     A    Correct, yes, ma'am.

14     Q    If you can go to Exhibit 2, I think your

15   report starts on page 8.

16     A    Yes, ma'am.

17     Q    And did you write this report?  Is this what

18   would be called a supplemental report?

19     A    Yes, ma'am.  We did a supplemental report.

20     Q    And you would have Beard's report as the

21   main report at the time that you do your report,

22   right?

23     A    Yes, ma'am.

24     Q    So you would have an opportunity to review

25   Beard's report before the preparation of your report?

1      A     There's a possibility, yes, ma'am.

2      **Q     Well, it is, because you're writing behind**

3  **him or on a document that he's already written on,**

4  **right?**

5      A     Yes, ma'am.

6      **Q     And were you actually dispatched to 501**

7  **Cherokee Street?**

8      A     Yes, ma'am.  I was dispatched first

9  technically.

10     **Q     Were you the first person dispatched, or was**

11  **it Mr. Beard?**

12     A     I was the first person dispatched, but

13  Deputy Beard canceled me because I was working on a

14  report during the time period I got dispatched to this

15  call.

16     **Q     What do you mean canceled you?  Because he's**

17  **going first and then you're --**

18     A     One person was dispatched due to the nature

19  of this call.  I came as a backup officer, because

20  he's an officer in the area I worked, and you usually

21  back up your fellow officer, even sometimes when calls

22  don't require two officers.

23     **Q     Right.  But you weren't called to come and**

24  **back him up, though?**

25     A     No, ma'am, I was not.

1      Q    Just looking at your report, it has very

2    similar wording.  For example, While using the Taser

3    for the third time, Healey's rolling movement caused

4    the Taser cables to become wrapped around his legs,

5    pulling them from the Taser cartridge and dislodging

6    one of the Taser probes from his leg, those kinds of

7    comments.  Did you just cut and paste some of Beard's

8    report into your report?

9               MR. TALBERT:  Objection.

10              MS. REVELL:  Form.

11     A    No, ma'am, I did not.  I do my report

12   myself.  I call it in to a report taker, and then the

13   report taker types it as I verbally give it.

14   BY MS. MATTOX:

15     Q    But you could also be reading from the

16   report that Beard had given at the time that you're

17   reading your report to the report taker.

18     A    I could not, because the way our program

19   works, two people cannot be in the same report at the

20   same time.  So I couldn't be in the report while the

21   report taker was typing, adding to the report.  That's

22   why we couldn't do our -- like he couldn't give his

23   initial and I give a supplement at the same time.

24     Q    Right, I understand.  But you could have had

25   a copy.  If Beard puts his in, you could have a copy

1  of his, and then you're making your report verbally to

2  a report taker.  That could happen.

3      A    I could have got a copy, correct, but I did

4  not.

5      Q    Why did you not put down six incidents of

6  Mr. Healey being Tased if that's what the Taser log

7  showed?

8          MS. REVELL:  Form.

9      A    Because I didn't remember there being six.

10 BY MS. MATTOX:

11     Q    You conveniently remembered the same number

12 of Tasings as Deputy Beard?

13         MR. TALBERT:  Objection.

14         MS. REVELL:  Form.

15         MR. TALBERT:  Argumentative and form.

16 BY MS. MATTOX:

17     Q    You can go ahead.

18     A    I did remember the same as Beard, yes,

19 ma'am.

20     Q    And certainly, if you had started any kind

21 of chest compression or any kind of CPR before EMS

22 arrived, then you would have noted that in your

23 report, right?

24     A    Yes, ma'am.

25         MR. TALBERT:  Marie, we've been at this for

1      a little more than an hour.  Whenever you're

2      ready for a break, I'd like one.

3           MS. MATTOX:  I'm almost finished.  If you

4      want to give me about three minutes, then --

5           MR. TALBERT:  Sure.  I want to take a break

6      before cross.

7           MS. MATTOX:  Well, let's take a break.

8           (Recess from 5:17 p.m. until 5:25 p.m.)

9  BY MS. MATTOX:

10     Q    A couple of last things.  On what's been

11  marked as Exhibit 9, it shows that you have -- this is

12  pertaining to you.  It looks like it is an injury

13  form.  Officer killed or assaulted, report supplement.

14     A    Yes, ma'am.

15     Q    It has your name on it, and then it has,

16  Officer assaulted, minor injury.

17     A    Yes, ma'am.

18     Q    You go down and you say, Extent of injury,

19  it says, Was officer aware offender had a weapon?  He

20  did not have a weapon, did he?

21     A    No.  Where is that?

22     Q    It's like in the middle of the page.  Was

23  officer aware offender had a weapon?  Not applicable

24  because he did not have a weapon, right?

25     A    Correct.

1      Q    And then it says, Was a firearm discharged

2   on the offender?  No.  But wouldn't that be the space

3   where you would put that a Taser was deployed on him?

4      A    I honestly don't know.  This form was

5   created by somebody else.  So the way they create it

6   and what they do I have no say in, and I don't know

7   how their formatting works.

8      Q    And then it goes on to say that offender

9   was -- offender injured, yes, and extent of injury,

10   and you put minor.

11          MR. TALBERT:  Objection.  Did you establish

12      that this person filled out this report?

13          MS. MATTOX:  Andy, you can go back and ask

14      him questions.

15          MR. TALBERT:  Well, you said, You put it.  I

16      object to that.

17   BY MS. MATTOX:

18      Q    Extent of injury, minor, do you see that?

19      A    Yes, ma'am.

20      Q    Do you know who completed this report?

21      A    I did, through report takers.

22      Q    And you put down that the extent of injury

23   of Mr. Healey was minor, right?

24      A    Yes, ma'am.

25      Q    He died, right?

```
 1            MS. REVELL:  Form.
 2        A   Yes, ma'am.
 3   BY MS. MATTOX:
 4        Q   He had stopped breathing, right?
 5            MR. TALBERT:  Objection.
 6            MS. REVELL:  Form.
 7   BY MS. MATTOX:
 8        Q   And he was taken by ambulance to the
 9   hospital, right?
10        A   Yes, ma'am.
11        Q   And you still put that he had minor
12   injuries.
13        A   Yes, ma'am.
14        Q   All right.  And so how did you know that
15   this was Mr. Healey, that this was Cody Healey?
16   Mr. Beard had been to his house before.  He knew who
17   he was, didn't he?
18            MS. REVELL:  Object to form.
19            MR. TALBERT:  Objection.
20   BY MS. MATTOX:
21        Q   You can go ahead.
22        A   Yes, ma'am, he did.
23        Q   And did he tell you that, that he'd been
24   there before and he knew that that was Cody Healey?
25        A   During this incident, no.
```

1     Q    Right after the accident.

2    A    Yes, ma'am.

3    Q    He told you that he knew who he was.

4    A    Yes, ma'am.

5    Q    And what did he say to you?

6    A    He was able to identify who we were dealing

7  with.  That was it.

8    Q    Did he say Cody Healey?

9    A    Yes, ma'am.

10    Q    And did you ask him how he knew that?

11    A    No, ma'am.

12    Q    And did you go then directly to Mr. Healey's

13  home right after that?

14    A    No, ma'am.

15    Q    Then how did that make a difference, that he

16  knew that this was Cody Healey?  Did that mean that

17  y'all could look up other information about him or

18  something?

19    A    We had to identify who the person was that

20  we were dealing with, and Deputy Beard was able to

21  identify him.

22    Q    And he said, I've been to his home before?

23         MS. REVELL:  Form.

24    A    Yes, ma'am.

25  BY MS. MATTOX:

1     Q   Did he tell you how many times he'd been to

2  Mr. Healey's house right after this incident occurred

3  with Mr. Healey?

4     A   No, ma'am.

5     Q   And did he tell you why he'd been to his

6  house?

7     A   No, ma'am.

8     Q   Do you know anything about Mr. Healey having

9  been burned in a fire?

10     A   No, ma'am.

11     Q   Were you able to see close enough to see

12  that Mr. Healey was disfigured as a result of that

13  fire?

14     MR. TALBERT:  Objection.

15     MS. REVELL:  Form.

16     A   He had a shirt on, so I wasn't able to see

17  if there was anything.  I didn't see anything from the

18  buttocks down.

19  BY MS. MATTOX:

20     Q   Okay.  And did anybody ever tell you that he

21  had ingested any illegal substances?

22     A   No, ma'am.

23     Q   You thought that he probably had because of

24  the way that he was acting, right?

25     A   Yes, ma'am.

1      Q    And that's how somebody acts when they

2    have -- they have like superhuman strength when they

3    have ingested some other substance, like acid or

4    something like that, right?

5              MR. TALBERT:  Objection.

6              MS. REVELL:  Form.

7      A    Yes, ma'am.

8    BY MS. MATTOX:

9      Q    And do you know what excited delirium is?

10     A    Yes, ma'am.

11     Q    How do you know what that is, other than

12   talking to your lawyer?

13     A    Through training.

14     Q    And there's never been a finding that Mr.

15   Healey suffered from excited delirium, has there?

16             MS. REVELL:  Form.

17             MR. TALBERT:  Objection.

18     A    To my knowledge, no.

19   BY MS. MATTOX:

20     Q    Did you go over to Mr. Healey's home, to go

21   inside the home to go see what was found, what items

22   and stuff were found in the home?

23     A    No, ma'am.  I never went to his home.

24     Q    Were you ever put on a leave of absence in

25   accordance with the policy 337.14, I think it is, 41?

1     A    No, ma'am.

2     Q    And do you know whether Mr. Beard was ever

3  put on a leave of absence as a result of this?

4     A    He was not, to my knowledge.

5     Q    Did you ever have a fitness-for-duty

6  evaluation after this incident regarding Mr. Healey?

7     A    Yes, ma'am, we did.

8     Q    Who had a fitness for duty?

9     A    Me and Deputy Beard.

10    Q    And what kind of fitness for duty was it?

11    A    We went to the sheriff's office, I guess,

12  therapist, psychologist.  I don't remember what his

13  title is.  And he talked to us about the incident.

14    Q    Who was that?  What's his name?

15    A    I do not remember.

16    Q    Was that after Mr. Healey had died?

17    A    Yes, ma'am, it was.

18    Q    Was that a fitness for duty or was that a

19  debriefing?

20    A    I'm uncertain what it was.  I know that we

21  were told we had to go.  I don't know if the specific

22  wording was fitness for duty or if it was a

23  debriefing.

24    Q    Okay.  And it could have just been to go to

25  talk to a counselor for a minute and see -- you know,

1  to make sure that there's nothing you need to talk

2  about, right?

3       A    It could have been, yes, ma'am.

4       Q    And do you know what a fitness-for-duty

5  evaluation is?

6       A    Yes, ma'am.

7       Q    And did you have to have a fitness-for-duty

8  evaluation before you became employed with the

9  Escambia County Sheriff's Office?

10      A    Yes, ma'am.

11      Q    And talking to this guy that you were told

12  to talk to after Cody Healey passed away, was that the

13  same kind of an evaluation that you had, a fitness for

14  duty, when you first started working for the Escambia

15  County Sheriff's Office?

16      A    No, ma'am.  It was a little different.

17      Q    Okay.  And it was different to the extent

18  that you didn't have to fill out a test, you didn't

19  have to do any tests or things like that, did you?

20      A    Correct.

21      Q    And on a fitness for duty that you have been

22  involved in, you would have to fill out tests, right,

23  and you would have to get a score on those tests?

24      A    To my knowledge, yes, ma'am.

25      Q    And you didn't have to do that after the

1   Cody Healey death, right?

2        A    Correct.

3        Q    So it sounds like it wasn't a fitness for

4   duty, it was just y'all go talk to a counselor if you

5   need one.

6             MR. TALBERT:  Objection.

7             MS. REVELL:  Form.

8   BY MS. MATTOX:

9        Q    Is that right?

10            MR. TALBERT:  Objection.

11       A    I'm uncertain as to, you know, the whole

12  details of it.

13  BY MS. MATTOX:

14       Q    You've already said that the fitness for

15  duty that you had when you first began employment,

16  that was qualitatively and quantitatively different

17  than what you went and talked to this therapist about,

18  right?

19       A    Correct.  But the thing could have changed

20  in my four years afterwards.

21       Q    All right.  But did you have to do any

22  tests?  Did you get a score?  Did you get any kind of

23  a passing, that you passed and you're fit to go?

24       A    I don't know if the doctor did a test

25  without our knowledge by asking us questions during

1  the testing or during us speaking with him.  So I'm
2  uncertain if he scored us or any other information
3  that the doctor may have given the sheriff's office.
4      Q    But you didn't have to take a test like you
5  would normally do in a fitness-for-duty evaluation.
6      A    We did not take a written exam, correct.
7      Q    And you had to do that when you originally
8  became an employee, to do a fitness for duty, right?
9      A    Yes, ma'am.
10     Q    Now, there was a woman who was there filming
11  y'all with her telephone.  Do you remember that?
12     A    No, ma'am, I do not.
13     Q    Katrina Gardner?
14     A    I have no recollection of her filming it.
15     Q    And do you remember seeing somebody there
16  with a camera?
17     A    I do not.
18     Q    And did Mr. Beard ever say anything to you
19  about Katrina Gardner being there filming it?
20     A    No, ma'am.
21     Q    Do you know how she became known to the
22  agency, that she was someone who would be a witness to
23  this?
24     A    I do not, because during the time period
25  where other officers were canvassing the area, I was

1   not involved with that.

2       Q    Do you know whether Mr. Greene or your

3   supervisor, Ms. Wilson, canvassed the area?

4       A    I do not know, ma'am.

5       Q    And you said you don't know Mr. Robert

6   Randolph Greene other than just that he's another

7   deputy with the sheriff's office?

8       A    Correct.

9       Q    Have you ever worked with him?

10      A    No, ma'am.  I don't believe I have.  Let me

11  rephrase that.  I've never worked on shift with him.

12  He may have relieved me in an extra duty detail, but

13  I've never worked on a patrol shift with him.

14      Q    And have you seen the video that Katrina

15  Gardner took?

16      A    No, ma'am, I have not.

17      Q    Have you been made aware that a video

18  exists?

19      A    Yes, ma'am.

20      Q    Who told you that?

21           MR. TALBERT:  Don't tell her anything we

22       talked about.  If you've been told that by

23       another source, you can tell her that.

24      A    It was from another source.

25  BY MS. MATTOX:

1    Q    It was from another source?

2    A    Yes, ma'am.

3    Q    Okay.  From who?

4         MR. TALBERT:  If the other source is me,

5    she's not asking you that.  If it's your

6    attorney, just say that.

7    A    Attorney.

8    BY MS. MATTOX:

9    Q    Did you learn of the existence of the video

10   from anybody other than your attorney?

11   A    No, ma'am.

12   Q    Have you seen the video?

13   A    Again, no, ma'am.

14        MS. MATTOX:  Nothing further.

15        MR. TALBERT:  Any questions from you,

16   Ramsey?

17        MS. REVELL:  I have just a couple of

18   questions real quick.

19                  CROSS-EXAMINATION

20   BY MS. REVELL:

21   Q    Deputy Beard did not tell you at what point

22   he identified who Cody Healey was, correct?

23   A    Correct.

24        MR. TANNER:  Form.

25   BY MS. REVELL:

1    Q    And you don't know through some other source

2  when Deputy Beard actually identified Cody Healey; is

3  that right?

4         MS. MATTOX:  Form.  Any leading questions

5         that you're asking y'all's own witnesses, I'm

6         going to object to them.

7    A    I do not, Ms. Ramsey.

8  BY MS. REVELL:

9    Q    Was it later after the incident that you

10  found out that Deputy Beard had at some point been to

11  Cody Healey's house?

12         MS. MATTOX:  Form.

13    A    Yes, ma'am, it was.

14  BY MS. REVELL:

15    Q    Do you know what time EMS was called on the

16  date of the subject incident outside of the call

17  history log?

18    A    No, ma'am, I do not.

19    Q    I was going to see if I could just share it

20  with you.

21    A    There we go.

22    Q    You've got the call history log?

23    A    Yes, ma'am, I do.

24    Q    And you previously went through the time

25  that you arrived.  What time was it that you

1    determined you arrived?  I don't know if you have that

2    in front of you or not.

3            MR. TALBERT:  I'm presenting him with

4        Exhibit No. 5, the last page.

5        A    6:15:56 is when I arrived.

6    BY MS. REVELL:

7        Q    And according to the ECSO CAD report that's

8    on the screen, was EMS notified prior to the time that

9    you arrived?

10       A    Yes, ma'am.

11           MS. MATTOX:  Form.

12   BY MS. REVELL:

13       Q    When was EMS notified for the first time,

14   according to the CAD log?

15       A    6:15:47.

16       Q    Do you know if the Taser log designates

17   between Tasers that make contact with an individual

18   and Taser usage that doesn't make contact with an

19   individual?

20           MS. MATTOX:  Form.

21       A    Per the documentation I was provided, it

22   does not.

23   BY MS. REVELL:

24       Q    How was this interaction?  Was it a

25   fast-paced interaction, was it a slow-motion

1    interaction, through the course of your involvement

2    with Mr. Healey?

3        A    In terms of what it felt like in time, it

4    seemed like it was very slow, but things progressed

5    extremely fast.

6        Q    And by the end of it, was it faster towards

7    the end?

8            MS. MATTOX:  Form.

9        A    It seemed to slow down some.

10    BY MS. REVELL:

11        Q    With regard to CPR being administered, would

12    you agree that once CPR was needed, it was

13    administered?

14        A    Yes, ma'am.

15            MS. MATTOX:  Form.

16    BY MS. REVELL:

17        Q    And you said previously that it didn't occur

18    sooner solely because it was not needed because he was

19    breathing and he had a pulse?

20            MS. MATTOX:  Form.

21        A    I couldn't hear what you said.  I'm sorry.

22    BY MS. REVELL:

23        Q    You said earlier that CPR did not occur

24    sooner because it wasn't needed since Mr. Healey was

25    breathing and he had a pulse, right?

1          MS. MATTOX:  Form.

2      A    Correct.

3  BY MS. REVELL:

4      Q    **Each time Mr. Healey was Tased, was that in**

5  **response to active resistance on the part of Mr.**

6  **Healey?**

7      A    Yes, ma'am, it was.

8      Q    **With regard to the Taser log again, do you**

9  **have the Taser log in front of you?**

10     A    Which Taser log?  My Taser log or Deputy

11  Beard's Taser log?

12     Q    **It doesn't matter.  My question is more**

13  **general, just to clarify on something about the Taser**

14  **log.**

15     A    I have mine in front of me, Exhibit 36.

16     Q    **As far as how the Taser log processes data,**

17  **are you able to say what each entry on the Taser log**

18  **means by any means other than deductive reasoning,**

19  **from just looking at it yourself?**

20     A    Yes, ma'am.

21     Q    **You're just reading off of it and assuming**

22  **that it means what it says it means?**

23     A    Yes, ma'am.

24          MS. MATTOX:  Form.

25  BY MS. REVELL:

1     Q   Are you aware of how much data -- do you

2  know how much data or can you tell me how much data a

3  Taser log can store at any time?

4     A   No, ma'am.  I'm not a Taser expert.

5     Q   Do you know that when a Taser is used less

6  than the maximum number of times that can exist on a

7  given log, if the log is pulled prior to that, that

8  would mean -- that would be what triggers the response

9  "data record not initialized"?

10        MS. MATTOX:  Form.

11     A   I do not have any information in response to

12  that.

13  BY MS. REVELL:

14     Q   Okay.  So you can't provide any further

15  explanation of what "data record not initialized" --

16  or can you provide any further explanation about --

17     A   I cannot.  I don't know what that means.

18     Q   And you would defer to someone else within

19  the department as to what that message means?

20     A   Yes, ma'am.

21        MS. REVELL:  I think that's all the

22        questions that I have.  Thank you.

23        MR. TALBERT:  I have a couple of questions,

24        but I want to take a break to discuss with my

25        client for a second.  So let's take less than two

1    minutes.

2          (Recess from 5:44 p.m. until 5:45 p.m.)

3                 CROSS-EXAMINATION

4    BY MR. TALBERT:

5        Q    Deputy, I wanted to go back over some of the

6    testimony that you just talked about, and I think

7    probably the appropriate place to start would be, can

8    you tell us what you were doing when you received the

9    call or when you heard the call sending Deputy Beard

10   to the scene of the interaction with who turned out to

11   be Cody Healey?

12       A    I was calling in a report that I received

13   from the night prior.

14          MS. MATTOX:  I'm sorry.  I couldn't hear

15       that.

16       A    I was calling in a report.

17          MR. TANNER:  Excuse me.  I want to ask a

18       question, because your client keeps looking at

19       you when you're asking questions.  Could you have

20       him look at the camera, please?

21          MR. TALBERT:  I don't know if it's possible

22       for him to look at the camera while I'm asking a

23       question.  I'll ask him to turn and face the

24       camera when he gives his response.  It would be

25       unnatural for him to look straight ahead and then

1      respond, so he's probably going to look at me

2      while I'm asking questions.  So that's what we'll

3      plan to do.  Just do whatever feels comfortable

4      to you.  All right?

5            THE WITNESS:  Good enough.

6            MS. MATTOX:  I just need his last answer.  I

7      couldn't hear what he said.

8            MR. TALBERT:  Can you read it back, Madam

9      Court Reporter?

10           (Requested portion read back.)

11   BY MR. TALBERT:

12      **Q    There was discussion about the time of**

13   **arrival and lots of different times.  I wanted to go**

14   **over that with you, if I could.  I'm going to show you**

15   **Exhibit No. 5.  So you're going to have to look away**

16   **from the camera to look at this exhibit.  So Exhibit**

17   **No. 5, can you tell me what that is?**

18      A    It's the call history record that the

19   sheriff's department provides.

20      **Q    So I'd like you to focus your attention on**

21   **pages 3 and 4 of that document.  So if you'd set them**

22   **side by side, that might be helpful.  Have you got**

23   **them?  All right.  So let's go through this.  What**

24   **time did you arrive at the scene?**

25      A    I arrived on scene at 6:15:56.

1      Q    And that's on the right-hand sheet, the

2 fourth page; is that right?

3      A    Yes, sir.

4      Q    And how do you know that refers to you?

5 What does it say?

6      A    It has my radio number at the time, 341.

7      Q    And now can you look at either one of those

8 documents and -- I'm going to be using two terms.

9 Okay?  I'm going to ask you what time EMS was called

10 for.  And that's really what I'm asking you for, is

11 what time did Deputy Beard call for EMS, requested it

12 be sent.  And then the other term that's been used is

13 what time was EMS notified.  And that may not be

14 directly by Beard.  When Beard would be asking for

15 EMS, would he be calling EMS directly?

16      A    No, sir, he would not.

17      Q    Who would he call?

18      A    He would call dispatch, who would in turn

19 call EMS.

20      Q    So you mentioned that you arrived at

21 6:15:56.

22      A    Yes, sir.

23      Q    Are you able to tell, from looking at that

24 document, what time Deputy Beard radio called to

25 seek -- to ask that EMS be sent?

1        A    Yes, sir, I am.

2        Q    What time did he call for that?

3        A    He asked at 6:15:47.

4        Q    So as I look at those two times, there

5    appears to be a difference of about nine seconds, that

6    the call by Beard was nine seconds before you arrived

7    on scene; is that right?

8        A    Yes, sir.

9        Q    Now, Ms. Mattox asked you what time EMS was

10   notified.  Am I correct to understand that that

11   wouldn't have been a notification by Beard but instead

12   by the dispatcher whom Beard had contacted?

13       A    Correct.

14       Q    And at what time did the dispatcher notify

15   EMS?

16       A    At 6:16:53.

17       Q    So it looks like it took the dispatcher

18   almost a minute to get in contact with EMS.

19       A    Yes, sir.

20       Q    Now, as long as we're talking about that

21   document, there's another time that I wanted to ask

22   you about.  Is there a record of a second request for

23   EMS by Beard?

24       A    Yes, sir, there is.

25       Q    And what time is that request?

1      A    6:22:42.

2      Q    Is that the call where there's a notation

3   that Beard is asking them to have EMS step it up?

4      A    Yes, sir, it is.

5      Q    So when Ms. Mattox was asking you if the

6   Tasing had occurred before EMS was notified, let me

7   ask you this question.  Did the Tasing occur before

8   you arrived?

9      A    It did not.

10     Q    So did the Tasing occur before Beard called

11  and asked for EMS?

12     A    It did not.

13     Q    Beard called and requested EMS before you

14  even got to the scene?

15          MS. MATTOX:  Form.

16     A    Yes, sir.

17  BY MR. TALBERT:

18     Q    Had Beard already called EMS when you got to

19  the scene?

20     A    Yes, sir, he did.

21          MS. MATTOX:  Form.  How does he know?

22  BY MR. TALBERT:

23     Q    Do you have any reason to believe that there

24  was any Tasing done before you arrived at the scene?

25          MS. MATTOX:  Form.

1     A    I do not believe there was any Tasing before

2    I arrived on scene.

3    BY MR. TALBERT:

4     Q    And if I could have that document back,

5    Exhibit 5.  Now I'd like you to look, if you could, at

6    Exhibit 3.  And I want you to focus on the -- it's the

7    Taser log for Deputy Beard, correct?

8     A    Yes, sir.

9     Q    And Ms. Mattox was going over that with you.

10    A    Yes, sir.

11    Q    And if you would look at the page, I think,

12    that is relevant to December 1st.

13    A    Page 8?

14    Q    It's page 8, that's right.  How long does it

15    appear that the time difference is between the

16    first -- it looks like there's six discharges; is that

17    right?

18    A    Yes, sir.

19    Q    The first discharge is at what time?

20    A    04:53:13.

21    Q    And when is the last discharge?

22    A    04:55:54.

23    Q    And it appears after the third Tasing, the

24    Taser discharge, there was a break that's longer than

25    the other breaks; is that right?

1      A    Yes, sir.

2      Q    Do you remember that occurring?

3      A    Yes, sir.

4      Q    Let's go back, and tell me what was

5  happening, what you observed when you arrived on the

6  scene that morning.

7      A    When I arrived on the scene, I observed

8  Deputy Beard trying to detain Suspect Healey, and they

9  were actively at his Tahoe, and they were banging

10  against it as he was trying to detain him.

11      Q    At that point was Deputy Beard's Taser in

12  his hand?

13      A    No, sir, it was not.

14      Q    What did you do upon exiting the vehicle?

15      A    I ran to assist him in trying to detain

16  Suspect Healey.

17      Q    Describe what you encountered in Suspect

18  Healey.

19      A    A man of very short stature, and he was

20  extremely strong, and it caught me by surprise at his

21  strength.

22      Q    Were you able to get him under control using

23  open-hand control?

24      A    No, sir, I was not.

25      Q    Were you trying as hard as you could?

1       A    Yes, sir, I was.

2       Q    And were you also being assisted by Deputy

3   Beard in doing that?

4       A    Yes, sir, I was.

5       Q    And together, the two of you-all, using

6   open-hand control, were you able to bring him under

7   control just with open-hand control?

8       A    No, sir, we were not.

9       Q    You were asked about the Taser discharges

10   while attempting to place handcuffs on Mr. Healey.

11      A    Yes, sir.

12      Q    At one point Ms. Mattox asked you a series

13   of questions about did Mr. Healey go limp, and I think

14   she asked you did he go limp after the first time he

15   was Tased, the second time, the third time.  Do you

16   remember that series of questions?

17      A    Yes, sir, I do.

18      Q    Then she asked you, at any point did he go

19   limp or at some point did he go limp, and you said

20   yes.  What did you mean by that?

21      A    I meant limp, that I was able to regain

22   control of him and that he stopped actively resisting

23   myself.

24      Q    Was that while you were -- where were you

25   positioned at the time that he stopped resisting?

1    A    I had my knee on his lower back and my shin

2  going across his buttocks, and I had my hands holding

3  his hands, attempting to handcuff him.

4    Q    **In relation to where someone might wear**

5  **their belt, where was your knee?**

6    A    My knee was almost right near his beltline.

7    Q    **And then your shin would have been below**

8  **that?**

9    A    Yes, sir.

10        MS. MATTOX:  Form.  I couldn't get that fast

11    enough.

12        MR. TALBERT:  Sure.  I got it.

13  BY MR. TALBERT:

14    Q    **I got your answer with respect to the**

15  **beltline.  Where was your shin located?**

16    A    Below the beltline, across the buttocks.

17    Q    **Which knee was that?**

18    A    It was my right knee on his lower back.  My

19  left knee was on the ground.

20    Q    **And where was the focus of your weight?**

21    A    On my left knee.

22    Q    **When you mentioned that Cody Healey went**

23  **limp, was he conscious at that point?**

24    A    Yes, sir, he was.

25    Q    **When you said he went limp, did you mean he**

1   stopped resisting?

2      A    Yes, sir.

3      Q    And did that occur after he had been Tased?

4      A    Yes, sir.

5      Q    Did you believe the Tasing had made it

6   possible for you to gain control?

7      A    Yes, sir, I did.

8      Q    You were asked a number of questions about

9   the Taser log.  In your daily practice as a deputy, do

10  you have access to the Taser log?

11     A    I do not.

12     Q    That would be training or some other

13  department that would have that?

14     A    To my knowledge, it would be training.

15     Q    But it's not something that you can go and

16  just pull and look anytime you want?

17     A    Correct.  There's one person assigned by the

18  agency, to my knowledge.

19     Q    You were asked about when Deputy Beard or

20  whether Deputy Beard had at some point identified that

21  he was dealing with Cody Healey.

22     A    Yes, sir.

23     Q    During the time that you and Deputy Beard

24  were interacting with Cody Healey, did you get any

25  sign from Deputy Beard that he recognized the

1   individual you were dealing with?

2       A    No, sir, I did not.

3       Q    Did he ever call Mr. Healey by name?

4       A    No, sir, he did not.

5       Q    After Mr. Healey was restrained and you-all

6   were waiting -- were monitoring him while you waited

7   for an ambulance, at that point did Deputy Beard say,

8   Oh, I know who this is?

9       A    No, sir.

10      Q    Did he give you any indication at that point

11  that he knew who Cody Healey was?

12      A    No, sir.

13      Q    As EMS personnel arrived and were giving

14  deputies direction as to how to assist them, did you

15  hear Deputy Beard tell EMS personnel that he knew who

16  this was, that he identified him?

17      A    No, sir, I did not.

18      Q    At the time of this incident, you'd been

19  with the force about four years, is that right, five

20  years?

21      A    It would have been four years, three months,

22  approximately.

23      Q    Had you ever seen any -- had you ever been

24  involved in anything like this incident before?

25      A    No, sir.

1    Q    Had you ever seen anyone exhibit the type of

2  strength that Cody Healey exhibited?

3         MR. TANNER:  Object to the form.

4    A    No, sir, I had not.

5  BY MR. TALBERT:

6    Q    I wanted to take you through the time

7  periods that Ms. Mattox was going through with regard

8  to the time when you are able to gain control of Mr.

9  Healey.

10   A    Yes, sir.

11   Q    And I think you mentioned that -- I think

12 she went through some math, and you may remember it.

13 And I'm not criticizing.  It was very helpful to me.

14 I appreciate that.  When she was sort of discussing

15 how long you may have been positioned on Mr. Healey's

16 lower back?

17   A    Yes, sir.

18   Q    Do you remember that?

19   A    Yes, sir.

20   Q    And she had you talk about the times on the

21 Taser.  One was at 4:55:29 and then the last one

22 initiated at 4:55:59?

23   A    Yes, sir.

24   Q    Which would be a period of about 30 seconds?

25   A    Yes, sir.

1     Q    Or I guess exactly 30 seconds?

2     A    Yes, sir.

3     Q    And then she added, I guess that was with

4  the extra five seconds.  The last one was at 54, so

5  the last, with the five seconds, would be 59.  So

6  total span of time there, from the initial of those

7  three Tases at the 29 mark to the end of the cycle,

8  from the one that started at the 54 mark, would have

9  been 30 seconds total?

10    A    Yes, sir.

11    Q    You testified that during that 30-second

12  time period, you would have been, as previously

13  described, left knee on the ground, right knee on his

14  lower back and buttock.

15    A    Yes, sir.

16    Q    You mentioned that for the ten seconds

17  before that, you had probably been in that same

18  position.

19    A    Yes, sir.

20    Q    After you secured Cody Healey with the

21  restraints, did you stay on top of him?

22    A    No, sir.

23    Q    What did you-all do after he had been

24  secured with restraints?

25    A    We rolled him on his side, to give him the

1    ability to freely breathe.

2        Q    How close to the position where you-all were

3    was the Tahoe that was Beard's Tahoe?

4        A    I'm not certain to an exact distance.

5    Probably two or three hundred feet.

6        Q    And did he sprint to the Tahoe and return

7    the same way?

8        A    Yes, sir.

9        Q    Have you ever been trained to begin chest

10    compressions when there's a detectable pulse?

11        A    I've not been trained to do that.

12        MR. TALBERT:  No more questions.  Thank you.

13        These other counsel may have follow-up questions.

14        MS. MATTOX:  I do.

15                    REDIRECT EXAMINATION

16    BY MS. MATTOX:

17        Q    First, I thought you told me that while

18    y'all were at the scene, that Mr. Beard had told you

19    that he knew who Cody Healey was.  Didn't you tell me

20    that?

21        MS. REVELL:  Form.

22    BY MS. MATTOX:

23        Q    While y'all were still at the scene, before

24    you left, that Mr. Beard had told you who Cody Healey

25    was; isn't that right?

1          MS. REVELL:  Form.

2     A    I did.

3 BY MS. MATTOX:

4     Q    And he told you while y'all were still at

5 the scene, before you left the scene, after Mr. Healey

6 was taken off by ambulance, he told you, Mr. Beard

7 told you he'd been to the house two times before,

8 didn't he?

9          MS. REVELL:  Form.

10    A    Yes, ma'am.  After the incident.

11 BY MS. MATTOX:

12    Q    Right.  Okay.  Now, let's talk about the

13 position that you were in.

14    A    Yes, ma'am.

15    Q    You testified with your counsel that where

16 you were, okay, was you were on his buttocks, down

17 below the belt, right?

18    A    Yes, ma'am.

19         (Exhibit No. 48 was marked.)

20 BY MS. MATTOX:

21    Q    Well, I'm going to mark as our next numbered

22 exhibit your statement or the investigative report

23 that went to FDLE.  I'm going to mark the

24 investigative summary as the next numbered exhibit.

25 And let me just read to you what you told FDLE.

1          MR. TALBERT:  Can you give us a minute to

2     get to it, Marie?

3          MS. MATTOX:  Sure.

4          MR. TALBERT:  The FDLE document, what page

5     are you on?

6          MS. MATTOX:  It's serial 27.

7          MR. TALBERT:  You're reading the summary?

8     Is that what you're reading?

9          MS. MATTOX:  I'm reading the summary.

10          MR. TALBERT:  Go ahead.

11 BY MS. MATTOX:

12     Q    You truthfully testified before FDLE when

13 they were doing the investigation of this incident;

14 isn't that right, sir?

15     A    Yes, ma'am.

16     Q    And if you can go down to the --

17          MR. TALBERT:  He does not have it in front

18     of him.  You can go ahead.

19 BY MS. MATTOX:

20     Q    I'll read it.  The sixth paragraph, I'm

21 going to read the paragraph.  It says, Both Deputy

22 Anderson and Deputy Beard participated in handcuffing

23 Healey.  Deputy Anderson held Healey down while Deputy

24 Beard got his legs shackles and hobble cord.  Deputy

25 Anderson had one knee on the ground and one knee

1  across Healey's back.

2          Okay.  You didn't tell FDLE that you had

3  your knee on his buttocks, did you?

4          MR. TALBERT:  Objection.

5          MS. REVELL:  Form.

6  BY MS. MATTOX:

7      Q    Isn't that right, sir?

8      A    I did not.

9      Q    As a matter of fact, you told them it was

10  across his back.  And that is different than the

11  testimony that you're offering today; is it not?

12          MS. REVELL:  Form.

13      A    Yes, ma'am.

14  BY MS. MATTOX:

15      Q    So the testimony that you gave before FDLE

16  was also under oath.  Do you need me to read it to you

17  again?

18      A    No, ma'am.

19          MR. TALBERT:  Just to be clear, Marie,

20      that's not his testimony.  That's a summary,

21      right?

22  BY MS. MATTOX:

23      Q    Well, the summary, you don't disagree, sir,

24  that you told FDLE that you had one knee across

25  Healey's back.  You did not tell them that your knee

1   was on his buttocks, did you?

2       A    I never said my knee was on his buttocks,

3   but --

4       Q    You told them that your knee was across

5   Healey's back, correct?

6       A    Yes, ma'am.  It wasn't across his back.

7       Q    So you could easily have told them, FDLE,

8   that it was across on his buttocks rather than his

9   back, but you didn't tell them that, did you?

10      A    Correct.

11      Q    So, again, your testimony today is in

12  contrast to what you told FDLE; isn't that right?

13           MS. REVELL:   Form.

14      A    It is not.

15  BY MS. MATTOX:

16      Q    Well, before, you said -- today, just a

17  minute ago, you told me that it was in contrast.

18      A    By the wording, my knee was on his back,

19  yes, ma'am.

20      Q    It was across his back.

21      A    My shin was across his buttocks.

22      Q    Well, then your knee was on his back.

23      A    Yes.  And I said that, and I said that

24  numerous times.

25      Q    Your shin was on his buttocks?

1       A    Yes, ma'am.

2       Q    So it was all the way across, your knee on

3   his back and then your shin was on his buttocks.

4       A    Yes, ma'am.

5       Q    All right.  And so let's go to Exhibit No.

6   2, okay, about when EMS was called and when it wasn't

7   called.

8       A    Yes, ma'am.

9            MR. TALBERT:  And, Marie, if you would --

10           and it's your questioning, but, boy, it would

11           make it a lot easier if, when you're talking

12           about people calling EMS or notifying EMS, that

13           we're being precise about that, because you know

14           that there's a difference.  So I'd just invite

15           you to be specific on that.

16           MS. MATTOX:  I agree.

17   BY MS. MATTOX:

18      Q    Let's go to page 6.  And I agree that I

19   messed up on the other exhibit, looking at the time

20   that it was called versus the time that EMS was --

21   that the dispatcher notified them.  But let's go to

22   the report that was prepared by Mr. Beard.

23      A    Yes, ma'am.

24      Q    And by the way, on Exhibit 5, the last page,

25   where it shows that you arrived at 6:15:56 --

1        MR. TALBERT:  Hang on.  Do I need to be

2     there for this?

3        MS. MATTOX:  No.

4  BY MS. MATTOX:

5     Q    It just shows that you arrived at 6:15:56,

6  right?

7     A    Yes, ma'am.

8     Q    That's the time that dispatch said that you

9  arrived there, right?

10    A    Yes, ma'am.

11    Q    We don't know whether there was a delay in

12 dispatch putting in that you arrived at 6:15:56.  You

13 could have arrived at 6:14:56 for all we know, right?

14    A    I'm uncertain as to how the call history

15 would work in relation to what you've asked.

16    Q    Looking on page 3, EMS is notified at -- 381

17 notified that EMS is needed at 6:15:47, right?

18    A    Yes, ma'am.

19    Q    But we know from the call log that it was

20 not until 6:16:53 that dispatch actually notified EMS,

21 almost a minute later.

22    A    Correct.

23    Q    Okay.  So it could be the same would be true

24 for the time that you arrived.  Where it says 6:15:56,

25 that's the time that dispatch put in that you arrived.

1       A    Correct.

2       Q    It could have been earlier, correct?

3       A    Correct.

4       Q    Right.  So let's then go to, if you could,

5    go to Exhibit 2.

6       A    Yes, ma'am.

7       Q    Page 6.

8       A    Yes, ma'am.

9       Q    And go down three-quarters down on the page.

10   And you're welcome, by the way, to read the remainder

11   of this document if you need to.  Okay.  Where it

12   says, quote, At this time I requested EMS, Sergeant

13   Wilson, number 113, as well as crime scene.  Do you

14   see that?

15      A    Yes, ma'am.

16      Q    Okay.  And do you know whether -- and you're

17   welcome again to look at this -- whether at any other

18   time Mr. Beard references that he's contacted EMS

19   until after he has Tased him six times, Tased Mr.

20   Healey six times?

21           MR. TALBERT:  Marie, the document speaks for

22      itself.

23      A    In the report, that is the only time I see

24   that they were asked for.

25   BY MS. MATTOX:

1       Q    Okay.  And so EMS, consistent with the

2    testimony that you gave previously when I asked you,

3    EMS was called the first time after Mr. Healey had

4    been Tased all six times; isn't that right?

5            MS. REVELL:  Form.

6    BY MS. MATTOX:

7       Q    You can go ahead.  Just look at me, sir, if

8    you could.

9       A    I'm trying to get the call log.

10      Q    Somebody is holding something up to show

11   you, and I object to that.  I'm questioning you

12   about --

13           MR. TALBERT:  You don't want him to be able

14       to see the documents that you've been talking to

15       him about?  You don't want him to see the call

16       log?

17           MS. MATTOX:  No.  I'm asking him about this

18       document.  I'm asking him about Exhibit 2.  I'm

19       not asking you to show him --

20           MR. TALBERT:  You're asking him about

21       someone else's statement, Marie.

22           MS. MATTOX:  No.  I'm asking him -- this is

23       my questioning, Andy.  You can come back and

24       cross him if you want to.

25           MR. TALBERT:  As long as I can get back and

1      cross him again, that's great.

2  BY MS. MATTOX:

3      Q    According to this document, Exhibit 2, the

4  first time that EMS was contacted was after he had

5  been Tased six times; isn't that right?

6          MR. TALBERT:  Let's be clear about what

7      you're referring to in Exhibit 2.  You're

8      referring to someone else's statement in Exhibit

9      2.  Exhibit 2 is pretty big.

10         MS. MATTOX:  Andy, you can object to the

11     form of the question.  That's it.  I'm done.  No

12     more speaking objections.

13 BY MS. MATTOX:

14     Q    Sir, according to what Mr. Beard wrote on

15 Exhibit 2, it said, At this time I requested EMS.

16 That was after all of the Tasings had occurred; isn't

17 that right?

18         MS. REVELL:  Object to the form.

19         MR. TALBERT:  Join.

20 BY MS. MATTOX:

21     Q    Go ahead.

22     A    Per the report, yes, ma'am.

23     Q    Okay.  And you don't remember EMS being

24 called prior to -- obviously, you would not know

25 whether EMS was ever contacted prior to your arrival

1  or not, right?

2         MS. REVELL:  Form.

3    A    I would have heard on the radio, but I do

4  not remember.

5  BY MS. MATTOX:

6    Q    So the first time that Mr. Beard notes that

7  EMS was called was after all the Tasing, isn't that

8  right, according to Exhibit 2?

9    A    Per the report, yes, ma'am.

10   Q    Okay.  Let's go down to your report, because

11  by the way, you testified -- don't go to yours yet.

12  By the way, you testified and said that EMS was

13  contacted twice, to your knowledge, right?

14   A    Yes, ma'am.

15   Q    The second time would be in the last

16  paragraph on page 6, Therefore I requested EMS -- that

17  would be Mr. Beard -- to step up their response.  That

18  would be number two, right?

19   A    Yes, ma'am.

20   Q    Let's go then to your report, and I'm on

21  page 9.  All the way down below the first part of the

22  page, in that huge paragraph, it talks about putting

23  the leg cuffs on him, the Tasing for the third time,

24  the fourth time, the fifth time, although you don't

25  mention the sixth time.

1              But then after all the Tasings have

2    occurred, you then say, At this time EMS, Sergeant

3    Wilson, 113, and crime scene were requested.  Exactly

4    what Mr. Beard said.  Isn't that right?

5        A    Yes, ma'am.

6             MR. TALBERT:  Object to the form of your

7        question.

8    BY MS. MATTOX:

9        Q    And then you go on to say then, EMS was

10   requested to step up their response, in the same

11   paragraph, right?

12       A    Yes, ma'am.

13       Q    And you don't know of any time that EMS was

14   contacted prior to Mr. Healey being Tased, do you?

15            MS. REVELL:  Form.

16   BY MS. MATTOX:

17       Q    You can go ahead.  Did you say correct?

18       A    Per my report, correct.

19       Q    Right.  And you would expect your report to

20   be accurate; would you not?

21       A    Yes, ma'am.

22       Q    And you accurately put down everything

23   regarding what happened with Mr. Healey in this

24   report; did you not?

25       A    Yes, ma'am.

1     Q   So all of the Tasings that occurred could

2  have occurred prior to 6:15:47.

3         MS. REVELL:  Form.

4  BY MS. MATTOX:

5     Q   Isn't that right?

6         MS. REVELL:  Form.

7     A   I'm uncertain of the time, due to the fact I

8  did not look at my watch during the incident.

9  BY MS. MATTOX:

10    Q   But they all could have occurred prior to

11  6:15:47, right?  They could have?

12    A   Yes, ma'am.

13        MS. REVELL:  Form.

14    A   But only due to the fact of the call log

15  telling me that.

16        MS. MATTOX:  Nothing further.

17        MR. TALBERT:  You have nothing further?

18        MR. TANNER:  I want to confer with Ms.

19  Mattox for a moment.

20        MR. TALBERT:  Please do that.  That's fine.

21        MR. TANNER:  Let's take one minute.

22        MR. TALBERT:  Take your time.

23        (Recess from 6:18 p.m. until 6:20 p.m.)

24  BY MS. MATTOX:

25    Q   Sir, Mr. Healey was never arrested for or no

1  charges were ever brought against him for resisting

2  arrest with or without violence; isn't that right?

3      A    Hold on.  Can I look at the report?

4      Q    Sure.

5      A    The charge that we have is resisting arrest

6  with violence.

7      Q    With violence?

8      A    Yes, ma'am.

9      Q    And that's on what page?  You're looking at

10  the --

11      A    I'm looking at page 3, at the very bottom of

12  that page, and it's resist officer with violence, two

13  counts.

14          MS. MATTOX:  All right.  Thank you so much.

15      Nothing further.

16          MR. TALBERT:  Ramsey, do you have any

17      questions?

18          MS. REVELL:  I just have very quickly one or

19      two questions.

20                      RECROSS-EXAMINATION

21  BY MS. REVELL:

22      Q    If you could, please, clarify for us the

23  difference between the "EMS needed" call at 6:15:47,

24  this is on the CAD call log -- I'll give you the times

25  if you want to grab it in front of you.

1       A    Sorry.  I have a lot of papers in front of

2   me.

3       Q    You have a lot of papers in front of you.

4   I'll represent the times to you.

5       A    I've got it in front of me.

6       Q    If you could clarify the difference between

7   the "EMS needed" call at 6:15:47 and the "notified

8   EMS" time entry at 6:16:53.

9       A    The first call is when we tell dispatch that

10  we need it.  The second call, the notification is when

11  dispatch has actually gotten ahold of EMS, let them

12  know that we need them, and then they put it in the

13  notes to document that they have notified them and EMS

14  has been informed of what we need.

15      Q    So is that two separate calls?

16      A    No, because we do not have a direct contact

17  to EMS.

18      Q    Right.

19      A    Our dispatch has to call them, so we have to

20  ask our dispatch to call EMS.

21      Q    Okay.  And to clarify, does that mean that

22  it was a call -- effectively a call from a deputy to

23  dispatch and then another separate call from dispatch

24  to EMS, two separate events, correct?

25      A    Yes, ma'am.

1     Q   Okay.  So based on that information, does

2  that mean that the two separate entries on the time

3  log does not indicate a delay in actually entering the

4  time that the events occurred on the part of dispatch,

5  from your understanding of the logs?

6         MS. MATTOX:  Form.

7     A   Yes.

8  BY MS. REVELL:

9     Q   Does that then mean that there's nothing in

10  the log to indicate that there was a delay in dispatch

11  entering the time that certain events occurred?

12        MS. MATTOX:  Form.

13    A   Correct.

14        MS. MATTOX:  He said he didn't know.

15        MR. TALBERT:  I thought we weren't doing

16     speaking objections, Marie.

17        MS. MATTOX:  We weren't until I needed to.

18        MR. TALBERT:  Okay.  You just let me know

19     which applies to you and which applies to me.

20     I'll write it all down.

21        MS. MATTOX:  What's good for the goose is

22     good for the gander.  I agree with that.

23  BY MS. REVELL:

24     Q   Which would indicate that there's nothing

25  from the CAD log that you have in of front you to tell

1  you or to indicate to you that the time that you

2  arrived on scene was not entered correctly on the CAD

3  log.

4          MS. MATTOX:  Form.

5  BY MS. REVELL:

6      Q    Would that be fair?

7          MS. MATTOX:  Form.

8      A    I agree with you.

9          MS. REVELL:  That's all I have.

10                  RECROSS-EXAMINATION

11  BY MR. TALBERT:

12      Q    And I know we've almost beaten this to

13  death, but I'm going to try again.  Here we go.  You

14  were asked whether all the Tasings could have occurred

15  before 6:15:47, and I recall you answered yes to that

16  question.

17      A    Yes, sir.

18      Q    What time did you arrive?

19      A    I arrived at 6:15 --

20          MR. TALBERT:  Did you just object to form?

21          MS. MATTOX:  Asked and answered.

22  BY MR. TALBERT:

23      Q    What time did you arrive?

24      A    6:15:56.

25      Q    And were you present during the discharge of

Page 110

1    a Taser in connection with Cody Healey?

2         A    Yes, sir, I was.

3         Q    So to your knowledge, did any discharge of a

4    Taser in connection with Cody Healey occur before your

5    arrival at 6:15:56?

6              MS. MATTOX:  Objection, asked and answered.

7         A    The Taser was never discharged before my

8    arrival, to my knowledge.

9    BY MR. TALBERT:

10        Q    Why did you respond that the Tasings could

11   have all occurred before 6:15:47?

12        A    I heard that the question asked did the

13   Tasings occur between or before 6:47.  I did not hear

14   the 15.

15        Q    Looking at the call log -- you don't

16   generate the call log, do you?

17        A    No, sir, I do not.

18        Q    The call log identifies 381 as asking for

19   EMS at 6:15:47.  Do you see that?

20        A    Yes, sir, I do.

21        Q    And who is 381?

22        A    Deputy Beard.

23        Q    And that occurs 10, 15 seconds before you

24   arrive, whatever that is, nine seconds before you

25   arrive?

1      A    Yes, sir, it does.

2      Q    And then there's a second call at

3  6:22:42 requesting EMS.

4      A    Yes, sir.

5      Q    And who makes that call?

6      A    Deputy Beard asked for them.

7      Q    Was that call to EMS made after the last

8  time that the Taser was discharged?

9      A    Yes, sir, it was.

10          MR. TALBERT:  Nothing further.

11              FURTHER REDIRECT EXAMINATION

12  BY MS. MATTOX:

13     Q    All right.  Sir, you heard Beard call EMS

14  twice; is that right?

15     A    Yes, ma'am.

16     Q    So if EMS is only contacted -- or actually

17  he's not contacting EMS.  He's contacting his

18  dispatcher about getting EMS there.  Okay.  So you

19  hear him call the first time, and then you hear him

20  call a second time and ask them to speed it up; is

21  that right?

22          MR. TALBERT:  Object.

23          MS. MATTOX:  I'm sorry.  Don't look at him.

24      I don't want your testimony affected by something

25      that your lawyer is doing.  Look directly at me.

1          MR. TALBERT:  All I said was I object to the

2     form of the question.  That's all I said.

3  BY MS. MATTOX:

4     Q    Okay.  You see him -- you know that Beard --

5  you heard Beard call them twice, call dispatch to have

6  EMS come twice.

7     A    Yes, ma'am.

8     Q    Okay.  The first time they're called, and

9  then the second time you hear Beard call and say can

10  they step it up; is that right?

11     A    Yes, ma'am.

12     Q    You told me before, on the fourth page of

13  Exhibit No. 5, that the time that you arrived there --

14          MR. TALBERT:  Give him one minute.  Sorry.

15     A    I have it, yes, ma'am.

16  BY MS. MATTOX:

17     Q    6:15:56, and that shows 341.  That would be

18  you, right?

19     A    Yes, ma'am.

20     Q    And we don't know whether that number was

21  accurately recorded as to what time you got there, do

22  we?

23          MS. REVELL:  Form.

24  BY MS. MATTOX:

25     Q    We don't know that.  You told me you didn't

1   have a watch on.  You were not --

2        A    I had a watch, but I did not look at my

3   watch.

4        Q    So you don't know what time you got there,

5   and you don't know whether this number, the 6:15:56,

6   is correct or not, do you?

7        A    I do not.

8        Q    Okay.  And I asked you and you then

9   retracted your testimony, I asked you, I said, you

10  don't know whether all of the Tasings occurred before

11  6:15:47 or not.  And you told me that you didn't know,

12  they could have occurred before then.  Do you remember

13  that?

14       A    I do remember that, ma'am, yes.

15       Q    And they could have all occurred before

16  6:15:47, right?

17       A    They did not occur before 6:15:47.

18       Q    Well, you told me that before, though.  Do

19  you remember that?

20       A    I understand, but I misheard what you said,

21  and I'm sorry that I did.

22       Q    What did you mishear?  I'm sorry.

23       A    I thought you said 6:47.  I did not hear the

24  15.

25       Q    Okay.  And that was after we took a break

1    and after you had a chance to talk to counsel, that

2    you came back and changed your testimony?

3         A    That's what I heard.

4         Q    Right.  6:47.  Where is 6:47 on here?

5         A    There's no --

6         Q    Is 6:47 anywhere?

7         A    No, ma'am, it's not.

8         Q    And remember I was pointing to and

9    showing -- you were looking at this log as you were

10   testifying about that, as you were testifying?

11        A    I do not remember if we were looking at that

12   log, because we were jumping back and forth between

13   the two different things, the report and this log.

14        Q    Do you know whether they all occurred before

15   6:15:47?  Do you know?

16        A    I do know they occurred before then, per the

17   call history record.

18             MS. MATTOX:  That's it.  Thank you.

19             FURTHER RECROSS-EXAMINATION

20   BY MR. TALBERT:

21        Q    You just said that they all occurred before

22   6:15:47.  Did you know that?

23        A    No, sir.  I thought that she said again the

24   6:47.

25             MS. MATTOX:  Sir, I want this -- Jo, I want

1           you to keep the tape of this, so that I can go

2           back on both of those questions.

3                MR. TALBERT:  Let me just finish my

4           questions, Marie.  Then you can give whatever

5           instructions you want to to the court reporter.

6           I'm sure she has a tape running.

7      BY MR. TALBERT:

8           Q    Did you understand just now that you just

9      told her that all the Tasings could have occurred

10     before 6:15:47?

11               MS. MATTOX:  Object to the form.

12          A    I thought she asked 6:47 again.

13               MR. TALBERT:  All right.  No more questions.

14                    FURTHER REDIRECT EXAMINATION

15     BY MS. MATTOX:

16          Q    Sir, have you misunderstood anything that

17     I've said in this deposition other than the 15?

18          A    The time, because of the three different

19     numbers, there being seconds and milliseconds.

20          Q    Well, I just asked you, and you were looking

21     at the document as I was asking you about 6:15:47, and

22     you came back and you changed your testimony again.

23               MR. TALBERT:  Marie, he's just trying to get

24          the record --

25               MS. MATTOX:  I have no further questions.

1   And, Jo, I want you to keep that --

2       MR. TALBERT:  He'll read it.  He'll read it.

3   We're done.  We'll take it if it's ordered.

4       (Thereupon, the taking of the deposition

5   concluded at 6:32 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF LEON

5            I, JO LANGSTON, RPR, Notary Public, State

6    of Florida, certify that ERIC ANDERSON remotely

7    appeared before me on June 9, 2020, and was duly

8    sworn.

9            Signed this 20th day of June 2020.

10

11

12    _____

13    JO LANGSTON, RPR
      Notary Public, State of Florida
      My Commission No. GG 918183
14    Expires: 11/26/2023

15

16

17

18

19

20

21

22

23

24

25

1                 CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF LEON

5

6              I, JO LANGSTON, RPR, do hereby certify

7    that I was authorized to and did stenographically

8    report the foregoing web conference deposition of

9    ERIC ANDERSON; that a review of the transcript was

10   requested; and that the transcript is a true record

11   of my stenographic notes.

12             I FURTHER CERTIFY that I am not a

13   relative, employee, attorney, or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties' attorney or counsel connected with

16   the action, nor am I financially interested in the

17   action.

18             Dated this 20th day of June 2020.

19

20

21   _____

22             JO LANGSTON, RPR

23

24

25

# ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

REBECCA BRIDGES V. DAVID MORGAN, ET AL.
Deponent:  ERIC ANDERSON
Date of :  June 9, 2020
Case No.:  3:18-cv-00406-RV-CJK

PAGE    LINE         REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

Signature of Witness _____

Dated this _____ day of _____, _____.

Job No. :  139166

Page 120

June 20th, 2020

Quintairos, Prieto, Wood & Boyer, P.A.
114 East Gregory Street, 2nd Floor
Pensacola, FL 32502
ATTN:  J. ANDREW TALBERT, ESQUIRE
atalbert@qpwblaw.com

Re:  Rebecca Bridges v. David Morgan, et al.
Case No.:  3:18-CV-00406-RV-CJK

Enclosed please find your copy of the deposition of
ERIC ANDERSON, which was taken in the above-styled
cause on June 9, 2020.  Please have deponent execute
the Errata Sheet, which can be found at the back of
the transcript, when reading your copy, and have it
returned to us for distribution to all parties.

If deponent does not read and sign the deposition
within 30 days, the original, which has already been
forwarded to the ordering attorney, may be filed with
the Clerk of the Court.

If deponent wishes to now waive signature, please have
deponent sign his/her name in the blank at the bottom
of this letter and return to the address listed below.

Very truly yours,

_____
JO LANGSTON, RPR
Phipps Reporting, Inc.
www.PhippsReporting.com


I do hereby waive my signature.

_____
ERIC ANDERSON



Job No. :  139166

## 0

**04:53:13**
85:20

**04:55:54**
85:22

## 1

**10**
23:2 29:10
30:16,17,22
31:18 110:23

**10/22**
7:11

**11/19**
14:4,24 17:13

**11/6**
6:23

**113**
100:13 104:3

**12**
29:2,4 30:15

**12/1**
17:13

**12/1/2014**
47:13 48:13

**12/4**
17:10

**12/9**
55:6

**12th**
8:7

**139**
25:4

**13th**
6:5

## 15

23:2 110:14,
23 113:24
115:17

**19th**
15:14

**1st**
13:14 18:14
85:12

## 2

**2**
59:14 98:6
100:5 101:18
102:3,7,9,15
103:8

**20**
37:19

**2010**
6:1,5

**2011**
9:3,7

**2012**
54:22 55:6,12

**2013**
8:7,17,22

**2014**
6:23 7:11,19
8:6 13:14
14:5,24 17:6,
11,13 18:14
19:14,23
55:13

**2018**
10:6 11:16

**208**
15:7

**26**

8:17

**27**
95:6

**29**
92:7

## 3

**3**
34:19 35:17,
23 81:21 85:6
99:16 106:11

**30**
91:24 92:1,9

**30-second**
92:11

**309**
19:19 20:3

**325**
19:24

**330**
19:24

**337.14**
68:25

**34**
37:14

**341**
34:24 82:6
112:17

**36**
13:18,24 17:9
78:15

**381**
99:16 110:18,
21

**39**
37:15

## 4

**4**
35:8,9 81:21

**41**
68:25

**465**
37:14

**47**
12:24 13:11

**48**
94:19

**4:53**
35:18

**4:53:13**
37:9,17 38:3

**4:53:24**
38:3

**4:53:34**
37:10,13 38:3

**4:53:39**
37:18

**4:55:29**
23:10 24:5,9
91:21

**4:55:38**
23:10

**4:55:54**
23:12 24:5

**4:55:59**
24:6,9 91:22

**4th**
17:5

## 5

**5**
34:8,10,11,

12,14,19 35:3
76:4 81:15,17
85:5 98:24
112:13

**501**
60:6

**54**
92:4,8

**585**
15:7

**59**
92:5

**5:17**
63:8

**5:25**
63:8

**5:44**
80:2

**5:45**
80:2

---
**6**
---

**6**
34:11 98:18
100:7 103:16

**6/29/2014**
7:21

**6:08:25**
43:24

**6:11**
44:3,4

**6:14:56**
99:13

**6:15**
109:19

**6:15:47**
76:15 83:3
99:17 105:2,

11 106:23
107:7 109:15
110:11,19
113:11,16,17
114:15,22
115:10,21

**6:15:56**
35:11,13
36:7,21 37:6
76:5 81:25
82:21 98:25
99:5,12,24
109:24 110:5
112:17 113:5

**6:16:53**
36:22,25 37:7
83:16 99:20
107:8

**6:16:56**
36:9

**6:18**
105:23

**6:20**
105:23

**6:22**
54:8,10

**6:22:42**
84:1 111:3

**6:26:58**
54:11

**6:32**
116:5

**6:47**
110:13 113:23
114:4,6,24
115:12

**6:53:13**
36:14

**6:53:24**
36:14

**6:53:34**
36:14

---
**8**
---

**8**
59:15 85:13,
14

---
**9**
---

**9**
63:11 103:21

---
**A**
---

**ability**
44:11 93:1

**absence**
68:24 69:3

**academy**
19:5 45:1

**access**
89:10

**accident**
9:1,3,5 66:1

**accordance**
68:25

**accurate**
35:20 42:15
104:20

**accurately**
104:22 112:21

**acid**
68:3

**act**
56:1

**acted**
47:4,10

**acting**
67:24

**action**
6:6 7:2,9,14

**actions**
9:20 11:8
39:3

**active**
78:5

**actively**
86:9 87:22

**activities**
19:7

**acts**
68:1

**add**
37:10,14

**added**
92:3

**adding**
61:21

**addition**
58:4

**administered**
77:11,13

**advance**
51:21 52:13

**affect**
28:20

**affected**
111:24

**affecting**
28:3

**agency**
8:25 14:22
16:2,12 72:22

89:18

**agree**
  36:13 45:20,
  23 46:5 77:12
  98:16,18
  108:22 109:8

**ahead**
  28:13 31:4
  36:18 39:21
  41:8 44:15
  46:10 56:9
  62:17 65:21
  80:25 95:10,
  18 101:7
  102:21 104:17

**ahold**
  107:11

**alive**
  54:13

**allegations**
  7:7

**alleged**
  7:9 10:8

**allowed**
  49:4 53:3

**ambulance**
  65:8 90:7
  94:6

**Anderson**
  42:17 43:2,5
  45:19,25
  46:16,17
  95:22,23,25

**Andy**
  12:22 13:16
  18:4 28:2,20
  34:9 64:13
  101:23 102:10

**ankles**

**27:18**

**answering**
  8:3

**anticipate**
  51:21

**anymore**
  43:14

**anytime**
  89:16

**appears**
  83:5 85:23

**applicable**
  63:23

**applications**
  38:20 58:22

**applied**
  56:24

**applies**
  108:19

**approximately**
  28:14 31:18
  90:22

**area**
  60:20 72:25
  73:3

**Argumentative**
  62:15

**arm**
  22:10,11

**arrest**
  106:2,5

**arrested**
  105:25

**arrival**
  42:12,13
  81:13 102:25
  110:5,8

**arrive**
  35:10 43:19
  81:24 109:18,
  23 110:24,25

**arrived**
  34:22 35:1
  36:6 37:6
  41:11 44:4
  46:1,4,17
  54:10 62:22
  75:25 76:1,5,
  9 81:25 82:20
  83:6 84:8,24
  85:2 86:5,7
  90:13 98:25
  99:5,9,12,13,
  24,25 109:2,
  19 112:13

**arriving**
  35:13 36:22

**ASP**
  57:19,20,22
  58:3,13

**assaulted**
  63:13,16

**assigned**
  89:17

**assist**
  46:12 86:15
  90:14

**assisted**
  46:20,21 87:2

**associate's**
  19:5

**assuming**
  78:21

**attached**
  27:19

**attempted**

**7:21 8:8**

**attempting**
  25:14 87:10
  88:3

**attention**
  81:20

**attorney**
  11:4 14:16
  74:6,7,10

**authorize**
  50:8

**authorized**
  48:3,13 50:2,
  13 52:19

**aware**
  54:20 55:2,7
  63:19,23
  73:17 79:1

---

**B**

---

**back**
  7:11 13:13
  14:10 19:14,
  22 20:6,12,
  14,17,20,22
  21:7,9,11,18,
  19 22:7,14,
  17,23,25
  23:7,9,24
  24:10,16,24
  25:1,7,23
  26:1,3,5,9,14
  27:3,21 28:7,
  25 32:12
  35:12 42:20
  43:3,8 51:14,
  17,22 54:21
  60:21,24
  64:13 80:5

81:8,10 85:4
86:4 88:1,18
91:16 92:14
96:1,10,25
97:5,6,9,18,
20,22 98:3
101:23,25
114:2,12
115:2,22

**background**
18:24

**backup**
60:19

**banging**
86:9

**based**
40:13 46:5,
11,21 108:1

**baton**
57:19,20,23
58:4,13

**Beard**
21:25 22:1,8
23:3 24:17,
18,23,25
25:15,17
26:15 40:20
41:10,18,22
42:18 44:4
45:14,17
47:12 50:19,
20,22 55:24
57:14,22
58:9,12
60:11,13
61:16,25
62:12,18
65:16 66:20
69:2,9 72:18
74:21 75:2,10

80:9 82:11,
14,24 83:6,
11,12,23
84:3,10,13,18
85:7 86:8
87:3 89:19,
20,23,25
90:7,15
93:18,24 94:6
95:22,24
98:22 100:18
102:14 103:6,
17 104:4
110:22 111:6,
13 112:4,5,9

**Beard's**
23:20 58:8
59:20,25 61:7
78:11 86:11
93:3

**beaten**
109:12

**began**
71:15

**begin**
93:9

**believed**
48:25 49:1

**belt**
58:8,9,10
88:5 94:17

**beltline**
88:6,15,16

**big**
25:2 102:9

**bit**
29:7 36:25

**blades**
21:22,24

**block**
45:2

**boards**
9:24

**bottom**
106:11

**boy**
98:10

**break**
63:2,5,7
79:24 85:24
113:25

**breaks**
85:25

**breathe**
93:1

**breathing**
32:24 33:5,
11,12 45:13,
14 46:16,19
54:9,17,18,19
65:4 77:19,25

**bring**
30:11 87:6

**brought**
106:1

**burned**
67:9

**business**
10:15

**buttock**
92:14

**buttocks**
21:19 26:5
67:18 88:2,16
94:16 96:3
97:1,2,8,21,
25 98:3

---

**C**

**cables**
61:4

**CAD**
35:7 76:7,14
106:24 108:25
109:2

**call**
18:21 34:23,
24 38:21 40:6
44:11 45:9
60:15,19
61:12 75:16,
22 80:9 81:18
82:11,17,18,
19 83:2,6
84:2 90:3
99:14,19
101:9,15
105:14
106:23,24
107:7,9,10,
19,20,22,23
110:15,16,18
111:2,5,7,13,
19,20 112:5,9
114:17

**called**
18:21 26:24,
25 33:24
37:21 38:4,
15,25 39:24
43:20 44:9,
16,18 59:18
60:23 75:15
82:9,24
84:10,13,18
98:6,7,20
101:3 102:24

103:7 112:8

**calling**
80:12,16
82:15 98:12

**calls**
40:6 60:21
107:15

**camera**
27:16 72:16
80:20,22,24
81:16

**canceled**
60:13,16

**canvassed**
73:3

**canvassing**
72:25

**car**
26:15 48:5,16
49:5,10,12
50:9 51:15,
17,18,22
52:6,14,15
53:3

**care**
6:24

**carried**
58:5,6

**carry**
58:7

**carrying**
57:11,15

**cartridge**
61:5

**cartridges**
15:20

**case**
10:9 42:7

**catch**
8:8

**caught**
86:20

**caused**
61:3

**certification**
19:4

**certified**
16:4

**chains**
27:25

**chance**
59:8 114:1

**change**
45:6 55:9,11

**changed**
16:8 55:6,16,
19,20 71:19
114:2 115:22

**charge**
106:5

**charges**
106:1

**check**
14:6,9,10
49:13,17,20

**checked**
17:14 45:14,
16,17 48:17
49:2

**Cherokee**
60:7

**chest**
33:11,13,15,
16 40:21
41:10,18,23,
24 42:11

54:12,14,16
62:21 93:9

**chief**
6:2

**circumstance**
48:4

**clarify**
78:13 106:22
107:6,21

**class**
16:3

**classes**
19:3

**clear**
30:4 96:19
102:6

**client**
79:25 80:18

**close**
67:11 93:2

**closer**
30:15

**Cody**
18:16 47:2
65:15,24
66:8,16 70:12
71:1 74:22
75:2,11 80:11
88:22 89:21,
24 90:11 91:2
92:20 93:19,
24 110:1,4

**comfortable**
81:3

**comments**
61:7

**complete**
8:18

**completed**
64:20

**compression**
40:21 54:12
62:21

**compressions**
41:11,19,23,
24 42:11
54:14,16
93:10

**concluded**
116:5

**confer**
105:18

**connection**
110:1,4

**conscious**
88:23

**considerable**
25:2

**consistent**
47:4,10 101:1

**consistently**
12:3

**contact**
46:17 55:25
76:17,18
83:18 107:16

**contacted**
18:19,20
39:16 40:3,
10,11,15 44:4
83:12 100:18
102:4,25
103:13 104:14
111:16

**contacting**
111:17

contaminate
59:5

continued
33:7

contrast
97:12,17

control
22:15 59:9
86:22,23
87:6,7,22
89:6 91:8

conveniently
62:11

conversation
54:25

copy
13:19 34:5,7
61:25 62:3

cord
26:16 42:19
95:24

correct
24:15 32:22
35:5 39:22
40:2 43:7,15
46:11 49:23
52:1,10,16
54:19 56:2,5
57:8 58:17,19
59:13 62:3
63:25 70:20
71:2,19 72:6
73:8 74:22,23
78:2 83:10,13
85:7 89:17
97:5,10 99:22
100:1,2,3
104:17,18
107:24 108:13
113:6

Corrections
54:5,7

correctly
109:2

counsel
93:13 94:15
114:1

counseling
8:1,3,11 9:4

counselor
69:25 71:4

counts
106:10

county
6:3 10:14
53:10 56:15
70:9,15

couple
6:21 34:4
63:10 74:17
79:23

court
18:2 81:9
115:5

CPR
40:21 41:18,
24 46:1,4,12,
20 62:21
77:11,12,23

crash
8:23

create
64:5

created
64:5

crime
100:13 104:3

criminal

7:9 12:1

crisis
44:8,11,17,
18,19 45:9

criticizing
91:13

cross
30:6 63:6
101:24 102:1

cross-
examination
30:5 74:19
80:3

cuffed
25:16

cuffs
103:23

custody
6:10

customs
47:5,11

cut
61:7

cycle
92:7

D

daily
12:5 14:6,9
89:9

data
15:4,10,11
78:16 79:1,2,
9,15

date
14:3 17:3,5,
8,10 75:16

dates
17:2

David
9:21 10:18,19

day
58:13

days
9:7,13 10:23

de-escalate
44:23 45:6

de-escalation
45:4

dealing
66:6,20 89:21
90:1

dealt
16:14 54:22

death
71:1 109:13

debriefing
69:19,23

December
8:7,17 13:14
17:5 18:14
19:22 55:13
85:12

decision-maker
56:4

deductive
78:18

defense
12:1

defer
79:18

degree
19:5

delay
99:11 108:3,

10

**delirium**
68:9,15

**department**
16:13 42:6
54:4,20 55:8
79:19 81:19
89:13

**deployed**
64:3

**deposition**
31:8 34:3
115:17 116:4

**deputies**
46:19 90:14

**deputy**
21:25 22:1,7
23:3 24:18,22
25:15,17
26:14 42:17,
18 43:2,5,17
45:14,17,19,
25 46:15,17
50:20 56:19,
22 58:8,9
60:13 62:12
66:20 69:9
73:7 74:21
75:2,10 78:10
80:5,9 82:11,
24 85:7 86:8,
11 87:2 89:9,
19,20,23,25
90:7,15
95:21,22,23,
24 107:22
110:22 111:6

**Describe**
86:17

**designates**
76:16

**detail**
73:12

**details**
71:12

**detain**
59:2 86:8,10,
15

**detectable**
93:10

**determined**
8:25 14:8
76:1

**died**
64:25 69:16

**difference**
66:15 83:5
85:15 98:14
106:23 107:6

**difficulty**
45:13

**direct**
30:5 107:16

**directing**
29:21

**direction**
90:14

**directly**
66:12 82:14,
15 111:25

**disagree**
23:21,22
29:13,15
96:23

**discharge**
85:19,21,24
109:25 110:3

**discharged**
64:1 110:7
111:8

**discharges**
85:16 87:9

**disciplinary**
6:6 7:2,14
9:20,24 12:20

**discipline**
10:22 12:11,
12 47:15

**disciplined**
6:9 7:19 8:1,
6 9:1 47:1

**discretion**
55:25

**discuss**
79:24

**discussing**
91:14

**discussion**
81:12

**disfigured**
67:12

**dislodging**
61:5

**dispatch**
7:20,22 18:20
34:1,2 40:5,6
82:18 99:8,
12,20,25
107:9,11,19,
20,23 108:4,
10 112:5

**dispatched**
60:6,8,10,12,
14,18

**dispatcher**
83:12,14,17

98:21 111:18

**disregard**
6:25 7:17

**disseminated**
10:8

**distance**
27:5,15 28:15
93:4

**doctor**
71:24 72:3

**document**
13:17 17:10,
17 30:10
34:16,21,25
35:2,6 60:3
81:21 82:24
83:21 85:4
95:4 100:11,
21 101:18
102:3 107:13
115:21

**documentation**
14:17 76:21

**documents**
6:17 12:22,25
30:9,11 82:8
101:14

**door**
51:20

**doors**
48:6 53:4

**DORS**
12:5

**download**
15:9,10 17:3,
4,5,8 23:19

**DRBS**
9:24

drive
18:15 21:10,
11,22,23
22:5,8,13,24
23:3,4,6,7,8,
11,25 24:10,
14,17,25
25:13 31:21,
24 32:2

dual
19:2

due
47:14 48:17,
23 59:1 60:18
105:7,14

duties
7:1

duty
6:25 7:16 9:8
69:8,10,18,22
70:14,21
71:4,15 72:8
73:12

——————————

E

——————————

earlier
77:23 100:2

easier
98:11

easily
97:7

ECSO
76:7

education
19:6

educational
18:24

effective
28:15 58:23

effectively
22:12 59:6
107:22

else's
101:21 102:8

employed
70:8

employee
72:8

employment
71:15

EMS
18:20,21
33:23 35:13
37:1,6,21
38:4,15,21,24
39:6,10,16,23
40:3,7,8,9,
11,15 41:1,
11,17,22,24
43:20 44:3
46:1,4,13,17,
20 48:18
49:2,13,17,19
50:1,8 54:8,
10 62:21
75:15 76:8,13
82:9,11,13,
15,19,25
83:9,15,18,23
84:3,6,11,13,
18 90:13,15
98:6,12,20
99:16,17,20
100:12,18
101:1,3
102:4,15,23,
25 103:7,12,
16 104:2,9,13
106:23 107:7,
8,11,13,17,

20,24 110:19
111:3,7,13,
16,17,18
112:6

EMS's
42:12,13

encountered
86:17

end
77:6,7 92:7

endangering
7:1 9:8

enforcement
13:2 19:4,5
42:6,10

enrolled
19:2

entered
109:2

entering
108:3,11

entire
25:23

entirety
23:24

entries
108:2

entry
78:17 107:8

Escambia
6:3 53:10
56:15 70:9,14

escaped
6:10 9:11

essence
56:3

establish
64:11

evaluation
69:6 70:5,8,
13 72:5

event
13:6 22:22

events
40:14 47:2
107:24 108:4,
11

exact
93:4

exam
30:5 72:6

EXAMINATION
93:15 111:11
115:14

excited
68:9,15

Excuse
51:12 80:17

exhibit
12:22,24
13:11,18,24
17:9 34:8,10,
11,12,14,19
35:3,17,21,
23,25 36:3
59:14 63:11
76:4 78:15
81:15,16
85:5,6 91:1
94:19,22,24
98:5,19,24
100:5 101:18
102:3,7,8,9,
15 103:8
112:13

exhibited
91:2

exist
79:6

existence
74:9

exists
73:18

exiting
86:14

expect
104:19

expert
79:4

explanation
79:15,16

extension
6:13 9:14

extent
63:18 64:9,
18,22 70:17

extra
73:12 92:4

extremely
29:6 77:5
86:20

**F**

face
80:23

fact
39:24 44:1
47:14 48:17,
23 59:1 96:9
105:7,14

failed
8:17

failure
6:14,16 7:20

fair
109:6

fast
77:5 88:10

fast-paced
76:25

faster
77:6

FDLE
42:6,10,25
46:6 94:23,25
95:4,12 96:2,
15,24 97:7,12

feel
45:16

feels
81:3

feet
27:3,6,18,23
28:7,9 32:11
54:6 93:5

fellow
29:6 60:21

felt
77:3

Ferman
6:2

fight
48:19,23

fighting
43:14

figure
52:14

file
13:3

filed
13:1

fill
70:18,22

filled
64:12

filming
72:10,14,19

final
56:3,4

find
14:14 20:22

finding
68:14

fine
18:11 105:20

finish
17:20 18:1,2
115:3

finished
63:3

fire
67:9,13

firearm
64:1

fit
71:23

fitness
69:8,10,18,22
70:13,21
71:3,14 72:8

fitness-for-
duty
69:5 70:4,7
72:5

Florida
19:2 42:6

focus
81:20 85:6
88:20

follow-up
93:13

football
19:9

force
54:22 55:14,
15 90:19

form
8:1 9:4 23:17
26:22 27:10
28:4,10
29:12,17
30:18 37:24
38:6,12,17
39:2,11,19
40:16,24
41:2,3,13
42:1,2,21
43:11,22,25
44:13 45:21,
22 46:7,8,22,
23 47:7,24
48:8,15 49:7,
15,22 50:3,
15,25 51:8,25
52:8,20 53:7,
11,17 54:2
56:7 57:17,24
58:24,25
61:10 62:8,
14,15 63:13
64:4 65:1,6,
18 66:23
67:15 68:6,16
71:7 74:24
75:4,12
76:11,20
77:8,15,20
78:1,24 79:10
84:15,21,25
88:10 91:3

93:21 94:1,9
96:5,12 97:13
101:5 102:11,
18 103:2
104:6,15
105:3,6,13
108:6,12
109:4,7,20
112:2,23
115:11

**formatting**
64:7

**found**
33:4 45:17
68:21,22
75:10

**foundation**
36:15

**four-page**
34:16

**fourth**
82:2 103:24
112:12

**freely**
93:1

**front**
13:21 20:9,11
27:16 30:8
76:2 78:9,15
95:17 106:25
107:1,3,5
108:25

**FTO**
12:2,4,9

---

G

**gain**
89:6 91:8

**gander**
108:22

**Gardner**
72:13,19
73:15

**gave**
12:5 46:6
96:15 101:2

**general**
9:4 19:6
78:13

**generate**
110:16

**give**
34:9 44:7
58:20 61:13,
22,23 63:4
90:10 92:25
95:1 106:24
112:14 115:4

**giving**
42:5 90:13

**good**
81:5 108:21,
22

**goose**
108:21

**grab**
106:25

**great**
102:1

**Greene**
56:18 73:2,6

**Greensboro**
19:1,2,10

**ground**
20:6 26:2
43:3 88:19
92:13 95:25

**guess**
14:7 28:14
40:4 69:11
92:1,3

**guy**
70:11

---

H

**Haber**
43:17 45:15

**half**
25:8

**hand**
22:10,11,15
25:14,15
86:12

**handcuff**
20:19 21:2
22:12 88:3

**handcuffed**
20:11,12,19,
21 21:12 32:8

**handcuffing**
21:9 95:22

**handcuffs**
20:9,16 25:16
27:22 87:10

**handled**
47:12

**handling**
12:4

**hands**
26:19 27:2,6,
15,21,23
28:6,8 29:20,
23,24 30:14
32:11 88:2,3

**Hang**

34:7 99:1

**happen**
31:8 62:2

**happened**
7:3 8:7,17
9:17 10:21
29:21 47:2
53:14 104:23

**happening**
53:16 86:5

**hard**
86:25

**He'll**
116:2

**head**
29:7

**Healey**
7:4 18:16
20:5,25 25:4
31:21 39:25
40:14 41:11,
19 42:17 43:6
45:13,14,
16,19 46:12,
16,18 47:2,6,
12 48:12
52:4,12,24
53:5 54:13
56:1,5 57:6
59:2,8 62:6
64:23 65:15,
24 66:8,16
67:3,8,12
68:15 69:6,16
70:12 71:1
74:22 75:2
77:2,24 78:4,
6 80:11 86:8,
16,18 87:10,
13 88:22

89:21,24
90:3,5,11
91:2,9 92:20
93:19,24 94:5
95:23 100:20
101:3 104:14,
23 105:25
110:1,4

**Healey's**
27:6 40:20
43:3 45:18
61:3 66:12
67:2 68:20
75:11 91:15
96:1,25 97:5

**hear**
18:9 77:21
80:14 81:7
90:15 110:13
111:19 112:9
113:23

**heard**
53:16 80:9
103:3 110:12
111:13 112:5
114:3

**height**
19:12

**held**
42:17,19
95:23

**helped**
25:16

**helpful**
81:22 91:13

**high**
18:25 19:1,8,
10 59:4

**history**
75:17,22

81:18 99:14
114:17

**hobble**
24:19 25:17
26:16,24
27:1,2,24
32:9 33:2
42:18 43:13
47:18,22
48:3,12 49:14
50:1,9,18
51:2,6,23
52:4,5,7,18,
23 53:2,21,24
95:24

**hobbles**
33:6 51:17

**Hold**
20:23 42:15
106:3

**holding**
88:2 101:10

**holster**
18:18

**home**
66:13,22
68:20,21,22,
23

**honestly**
22:19 32:19
33:22 58:14
64:4

**hospital**
6:9 12:17
65:9

**hour**
63:1

**house**
65:16 67:2,6

75:11 94:7

**huge**
103:22

**hundred**
93:5

---

**I**

**IA**
12:14

**idea**
34:6

**identified**
74:22 75:2
89:20 90:16

**identifies**
110:18

**identify**
66:6,19,21

**illegal**
67:21

**immediately**
33:6

**inappropriate**
11:10

**inches**
27:9 28:16,19
29:2,4,10
30:14,16,17,
22 31:18

**incident**
6:8 7:3 8:7,
17 9:16 10:3,
5 16:25 43:20
44:16,18
47:15 55:22
65:25 67:2
69:6,13 75:9,
16 90:18,24

94:10 95:13
105:8

**incidents**
62:5

**independently**
50:22

**index**
10:5,11,12,13
12:18

**indicating**
28:14

**indication**
90:10

**individual**
76:17,19 90:1

**inference**
47:14

**information**
10:9 13:2
14:18 66:17
72:2 79:11
108:1

**informed**
107:14

**ingested**
67:21 68:3

**inhibit**
59:5

**initial**
61:23 92:6

**initialized**
15:5,11 79:9,
15

**initiated**
91:22

**injured**
64:9

injuries
65:12

injury
63:12,16,18
64:9,18,22

inside
68:21

instructions
115:5

interact
56:5

interacting
89:24

interaction
76:24,25 77:1
80:10

interactions
47:6

interrupt
18:10

intervention
44:8,12,17,
18,20 45:9,10

investigation
95:13

investigations
12:14

investigative
94:22,24

invite
98:14

involved
8:22 10:5
70:22 73:1
90:24

involvement
77:1

issue
10:7 14:8,13,
15 15:6 16:5

issued
9:4 16:22

items
8:19 58:6
68:21

J

James
11:14,24

Jo
114:25 116:1

Joanna
57:3

jobs
59:6

John
25:15

Join
28:11 36:16
102:19

jumping
114:12

June
7:19

Justice
54:20

K

Katrina
72:13,19
73:14

kick
48:5 52:15

kicking

43:14 51:14,
20 52:6 53:4

killed
63:13

kind
11:25 41:18
45:3 54:12
62:20,21
69:10 70:13
71:22

kinds
61:6

knee
20:6,13,17,
20,22 21:7,8,
11,17 22:2,7,
14,25 25:1
26:2,3,9
42:19 43:2,3,
8 88:1,5,6,
17,18,19,21
92:13 95:25
96:3,24,25
97:2,4,18,22
98:2

knew
49:4 58:21
59:3 65:16,24
66:3,10,16
90:11,15
93:19

knowledge
36:20 68:18
69:4 70:24
71:25 89:14,
18 103:13
110:3,8

Kyle
43:17 45:15

L

labored
32:24 33:5,
11,12 54:17,
19

lag
40:7

laid
33:14,16,20

law
13:2 19:4
42:6,9

lawyer
30:22 68:12
111:25

lay
33:7

laying
20:14 33:13

leading
75:4

learn
74:9

leave
68:24 69:3

left
12:16 22:10,
11 88:19,21
92:13 93:24
94:5

leg
24:19,23
25:19 26:15,
18 27:22
42:18 61:6
103:23

legs

26:19 54:6
61:4 95:24

**less-lethal**
58:6

**letter**
8:16 54:21

**life**
40:21

**likelihood**
59:4

**limp**
31:22,25
32:3,5 87:13,
14,19,21
88:23,25

**located**
88:15

**log**
23:9,19,23
30:10 34:1,2
35:16 36:10
62:6 75:17,22
76:14,16
78:8,9,10,11,
14,16,17
79:3,7 85:7
89:9,10 99:19
101:9,16
105:14 106:24
108:3,10,25
109:3 110:15,
16,18 114:9,
12,13

**logs**
108:5

**long**
22:18,23 23:2
24:16,18,21,
22 32:14,15,
19 33:14,16,

20 45:19
83:20 85:14
91:15 101:25

**longer**
15:25 25:10,
11 32:17
85:24

**looked**
30:15 34:4

**lost**
8:19 19:17
34:8

**lot**
27:13 98:11
107:1,3

**lots**
81:13

**loud**
18:6

**lower**
21:19 26:5
88:1,18 91:16
92:14

---

## M

**M26**
13:15 15:23
16:8,16

**M26s**
16:1,11

**Madam**
81:8

**made**
46:17 73:17
89:5 111:7

**main**
59:21

**make**

21:16 24:6
66:15 70:1
76:17,18
98:11

**makes**
111:5

**making**
62:1

**man**
25:2,5 86:19

**manner**
6:15

**Marie**
12:25 15:12
42:22 62:25
95:2 96:19
98:9 100:21
101:21 108:16
115:4,23

**mark**
12:19,21
92:7,8 94:21,
23

**marked**
13:11,18 17:9
63:11 94:19

**master**
10:4,10,12,13
12:18

**math**
91:12

**matter**
78:12 96:9

**Mattox**
12:19 13:5,
12,16,22
15:15,17,22
16:23 17:23
18:4,12,13

21:15 23:18
26:23 27:14,
20 28:2,5,12,
20,25 29:3,
15,22 30:4,7,
20,25 31:3,
11,19 34:6,
13,17,18
35:23 36:2,5,
17 37:1,4
38:1,10,14,23
39:5,14,20
40:18,25
41:4,7,16
42:4,23
43:12,23
44:14 45:24
46:9,25 47:9
48:1,9,21
49:8,18,24
50:6,12,17
51:1,11 52:2,
11,22 53:8,
15,19 54:3
55:3 56:8
57:18 58:1
59:7 61:14
62:10,16
63:3,7,9
64:13,17
65:3,7,20
66:25 67:19
68:8,19 71:8,
13 73:25
74:8,14 75:4,
12 76:11,20
77:8,15,20
78:1,24 79:10
80:14 81:6
83:9 84:5,15,
21,25 85:9
87:12 88:10

91:7 93:14,
16,22 94:3,
11,20 95:3,6,
9,11,19 96:6,
14,22 97:15
98:16,17
99:3,4 100:25
101:6,17,22
102:2,10,13,
20 103:5
104:8,16
105:4,9,16,
19,24 106:14
108:6,12,14,
17,21 109:4,
7,21 110:6
111:12,23
112:3,16,24
114:18,25
115:11,15,25

**maximum**
79:6

**meaning**
40:21

**means**
78:18,22
79:17,19

**meant**
87:21

**medically**
40:21

**meet**
27:23

**meeting**
28:8

**mention**
103:25

**mentioned**
82:20 88:22
91:11 92:16

**message**
79:19

**messed**
98:19

**middle**
63:22

**milliseconds**
115:19

**mine**
35:2 78:15

**minor**
63:16 64:10,
18,23 65:11

**minute**
11:21 13:23
25:8 37:3,5,
7,21 43:9
69:25 83:18
95:1 97:17
99:21 105:21
112:14

**minutes**
22:21 32:18,
20,21 63:4
80:1

**mishear**
113:22

**misheard**
113:20

**misstated**
16:18

**misunderstood**
115:16

**misuse**
10:4,10,12
12:17

**mixed**
36:25

**mode**
18:15,16

**moment**
105:19

**monitoring**
7:25 90:6

**month**
7:3

**months**
90:21

**Morgan**
9:18,21

**morning**
86:6

**moved**
16:2 29:8,20,
23,24

**movement**
61:3

**multiple**
15:7 38:20,25
39:7,10,16,25

_____

_____
N

**nature**
60:18

**needed**
54:15,16
77:12,18,24
99:17 106:23
107:7 108:17

**needing**
48:17

**neglect**
6:25 7:1,16
9:8,9

**negligence**
9:8

**night**
80:13

**notation**
84:2

**note**
32:14

**noted**
17:16 62:22

**notes**
103:6 107:13

**notice**
7:2 33:9

**noticed**
32:23 45:12

**notification**
83:11 107:10

**notified**
16:10,12,16,
21 35:13
37:2,6 39:6,9
54:9 76:8,13
82:13 83:10
84:6 98:21
99:16,17,20
107:7,13

**notify**
40:4 83:14

**notifying**
98:12

**November**
15:14

**number**
13:17 34:23,
24 62:11 79:6
82:6 89:8
100:13 103:18
112:20 113:5

**numbered**
12:21,24

94:21,24

**numbers**
36:24 115:19

**numerous**
97:24

---

O

---

**oath**
96:16

**object**
28:10 29:16
30:18,25
41:2,6 42:1,
21 43:22
44:13 45:21
46:7,22 52:8
53:11 56:7
58:24 64:16
65:18 75:6
91:3 101:11
102:10,18
104:6 109:20
111:22 112:1
115:11

**objection**
21:13 29:11,
19 30:19,24
31:7 36:15
37:23 38:7,18
39:1,12,18
40:23 48:7,14
49:6 50:4,11,
14 51:7,24
52:9 53:6,12
56:6 61:9
62:13 64:11
65:5,19 67:14
68:5,17 71:6,
10 96:4 110:6

**objections**
28:4 29:16
102:12 108:16

**observe**
14:12

**observed**
86:5,7

**OC**
57:6,15 58:3,
16,18 59:1,4,
11

**occasions**
34:4

**occur**
77:17,23
84:7,10 89:3
110:4,13
113:17

**occurred**
22:24,25 23:9
35:19 36:12
38:4 47:22
55:14 67:2
84:6 102:16
104:2 105:1,
2,10 108:4,11
109:14 110:11
113:10,12,15
114:14,16,21
115:9

**occurring**
86:2

**occurs**
110:23

**offender**
63:19,23
64:2,8,9

**offenses**
6:25

**offering**
96:11

**office**
6:4,7 45:2,10
47:5,11,17,
19,23 53:10,
25 54:23 55:5
56:15 69:11
70:9,15 72:3
73:7

**officer**
12:3 51:16
53:10 60:19,
20,21 63:13,
16,19,23
106:12

**officers**
13:2 16:2
53:1,2 60:22
72:25

**omitted**
26:12

**on-team**
46:19

**open-hand**
86:23 87:6,7

**opportunity**
59:24

**order**
22:15 55:25

**ordered**
116:3

**originally**
72:7

---

P

---

**p.m.**
63:8 80:2
105:23 116:5

**pages**
15:7 81:21

**paper**
20:23

**papers**
107:1,3

**paragraph**
95:20,21
103:16,22
104:11

**part**
58:15 78:5
103:21 108:4

**participated**
42:24 95:22

**passed**
70:12 71:23

**passing**
71:23

**passport**
8:19

**past**
7:25

**paste**
61:7

**Pat**
19:4

**patrol**
16:14 51:15,
22 73:13

**Pensacola**
11:11

**people**
61:19 98:12

**period**
14:24 22:20
23:1 24:22
55:11,17,20

60:14 72:24
91:24 92:12

**periods**
91:7

**person**
10:14 11:2
18:19 43:18
51:5,14,16,
17,20,21
57:11,15,20,
23 60:10,12,
18 64:12
66:19 89:17

**personal**
10:15 13:1

**personnel**
90:13,15

**pertaining**
63:12

**phase**
12:2

**place**
48:16 80:7
87:10

**plan**
81:3

**play**
19:7

**played**
19:9

**point**
20:5,13 21:3,
21 28:18
29:24,25 30:3
31:22 32:5,23
45:12 49:2
51:15 74:21
75:10 86:11
87:12,18,19

88:23 89:20
90:7,10

**pointing**
114:8

**police**
7:8

**policies**
47:5,11,17
48:2 49:25
55:4

**policy**
8:13 14:7
38:20 39:6
48:3,13 49:4
50:7 51:5,19
52:19 53:3
55:9,13 58:7
68:25

**policy-maker**
56:4

**portion**
81:10

**position**
21:1,2,12,17
32:15 33:10
56:17 92:18
93:2 94:13

**positioned**
87:25 91:15

**positions**
56:24

**possibilities**
41:21

**possibility**
40:12 41:20
53:13 60:1

**possibly**
15:6 39:3
45:6

**pounds**
19:19 25:4

**practice**
89:9

**practices**
55:5

**precise**
98:13

**preparation**
59:25

**prepared**
98:22

**present**
109:25

**presenting**
76:3

**pretty**
23:14 45:5
58:5 102:9

**preventable**
8:25 9:3,5

**previously**
75:24 77:17
92:12 101:2

**print**
34:7

**printing**
34:9

**prior**
16:15 42:12
76:8 79:7
80:13 102:24,
25 104:14
105:2,10

**prisoner**
9:11 10:3

**prisoners**
12:4

**privileged**
10:10

**probation**
6:13 9:14

**probes**
61:6

**problem**
15:1 16:11,16
18:6

**problems**
12:3 16:7
54:9

**procedures**
55:5

**processes**
78:16

**produced**
12:23

**program**
12:2 61:18

**progressed**
77:4

**prone**
20:25 21:2,
12,17 33:10

**prong**
18:15 36:14

**prongs**
36:19 58:22

**properly**
53:21,24

**property**
8:18 9:9

**provide**
79:14,16

**provided**
14:16 76:21

psychologist
69:12

pull
27:22 89:16

pulled
14:18 79:7

pulling
34:15 61:5

pulse
45:14,16,17
77:19,25
93:10

pursue
8:8

pursuit
8:13

put
20:6,13,17
26:1,6,18
28:23 30:2
32:8 43:5
48:4 49:10,
11,25 50:9
51:17,22
52:3,7,13
62:5 64:3,10,
15,22 65:11
68:24 69:3
99:25 104:22
107:12

puts
61:25

putting
29:18 30:1
42:19 49:20
99:12 103:22

---

## Q

qualitatively

71:16

quantitatively
71:16

question
17:21 18:1
29:20 31:5,
13,14 78:12
80:18,23 84:7
102:11 104:7
109:16 110:12
112:2

questioning
98:10 101:11,
23

questions
29:1 31:10
64:14 71:25
74:15,18 75:4
79:22,23
80:19 81:2
87:13,16 89:8
93:12,13
106:17,19
115:2,4,13,25

quick
74:18

quickly
106:18

quote
100:12

---

## R

radio
7:25 8:4
82:6,24 103:3

Ramos
56:12 57:3

Ramsey
74:16 75:7

106:16

ran
24:23,24
25:17 86:15

Randolph
56:18 73:6

ranked
56:24

reach
7:21

read
12:20 42:15
47:17 48:2
81:8,10 94:25
95:20,21
96:16 100:10
116:2

reading
61:15,17
78:21 95:7,8,
9

ready
63:2

real
28:15 74:18

reason
10:15,16 16:8
23:21,22
38:24 39:15,
24 43:20
58:20 84:23

reasoning
78:18

recall
21:6 38:3
42:14 46:20
55:16,18
109:15

recalled
16:11

receipt
8:18

received
7:10 10:23
19:3 44:25
47:15 80:8,12

receiving
7:2

recess
63:8 80:2
105:23

recognized
89:25

recollection
22:3,6 23:12
40:14 72:14

recommended
10:22

record
14:7 15:4,11
28:22 29:19,
21 30:2 79:9,
15 81:18
83:22 114:17
115:24

recorded
15:4,11
112:21

records
12:20

RECROSS-
EXAMINATION
106:20 109:10
114:19

REDIRECT
93:15 111:11
115:14

reference
7:8

references
100:18

referring
102:7,8

refers
82:4

refresh
23:12

regain
87:21

regard
77:11 78:8
91:7

regulations
6:24

relation
88:4 99:15

release
49:16

released
33:6

relevant
85:12

relieved
73:12

remain
24:16

remainder
100:10

remained
22:17

remediation
12:8

remember
6:22 7:1 9:9
11:1,13,15,

20,22 17:2
23:13 27:12
41:22 42:5,9,
25 46:14,24
47:25 58:14
62:9,18
69:12,15
72:11,15 86:2
87:16 91:12,
18 102:23
103:4 113:12,
14,19 114:8,
11

remembered
62:11

remind
13:6

removed
33:21 45:18

rephrase
73:11

report
6:14 7:9 21:5
26:6,12 42:17
46:14 59:15,
17,18,19,20,
21,25 60:14
61:1,8,11,12,
13,16,17,19,
20,21 62:1,2,
23 63:13
64:12,20,21
76:7 80:12,16
94:22 98:22
100:23 102:22
103:9,10,20
104:18,19,24
106:3 114:13

reporter
18:2 81:9

115:5

reports
6:17

represent
24:4 107:4

reprimand
8:16,23

request
83:22,25

requested
81:10 82:11
84:13 100:12
102:15 103:16
104:3,10

requesting
111:3

require
60:22

required
58:7

requires
39:6

resist
106:12

resistance
78:5

resisting
87:22,25 89:1
106:1,5

respect
55:14 88:14

respond
7:20 81:1
110:10

responded
7:22

response
78:5 79:8,11

80:24 103:17
104:10

restrain
48:12 55:15

restrained
24:24 43:13
45:20 90:5

restraining
26:24

restraint
27:1,2,24
32:9 33:2
49:14 51:23
53:21,24

restraints
24:19,23
25:19 26:15,
18 27:22
33:21 45:18
47:19,22
48:3,19,24
49:1,11,16
50:1,10,18
51:2,6 52:4,
5,7,18,23
53:2 92:21,24

result
67:12 69:3

results
54:25

retracted
113:9

retrospect
54:8,11

return
93:6

REVELL
18:9 23:17
26:22 27:10

28:10 29:12
30:18 36:16
37:24 38:6,
12,17 39:2,
11,19 40:16,
24 41:3,13
42:2 43:11,
22,25 45:22
46:8,23 47:24
48:8,15 49:7,
15,22 50:3,
15,25 51:8,25
52:8,20 53:7,
11,17 54:2
56:7 57:17,24
58:25 61:10
62:8,14 65:1,
6,18 66:23
67:15 68:6,16
71:7 74:17,
20,25 75:8,14
76:6,12,23
77:10,16,22
78:3,25
79:13,21
93:21 94:1,9
96:5,12 97:13
101:5 102:18
103:2 104:15
105:3,6,13
106:18,21
108:8,23
109:5,9
112:23

**review**
9:24 34:5
59:24

**reviewed**
34:2

**Richardson**
6:2

**right-hand**
82:1

**risk**
59:11

**Robert**
56:18 73:5

**rolled**
33:17 92:25

**rolling**
61:3

**room**
27:8,12 54:5

**rules**
6:24

**run**
17:10

**running**
115:6

---

**S**

---

**safely**
30:13

**safety**
12:3 48:25
49:1

**save**
40:20

**scene**
35:9,10 55:21
80:10 81:24,
25 83:7
84:14,19,24
85:2 86:6,7
93:18,23 94:5
100:13 104:3
109:2

**school**
18:25 19:1,8,

10

**score**
12:5 70:23
71:22

**scored**
72:2

**screen**
14:10 76:8

**seal**
13:4

**seconds**
23:2 24:5,7,
13 37:11,14,
17,19 83:5,6
91:24 92:1,4,
5,9,16
110:23,24
115:19

**secured**
92:20,24

**seek**
82:25

**sending**
80:9

**separate**
107:15,23,24
108:2

**September**
6:5 54:21
55:12

**sergeant**
57:4 100:12
104:2

**serial**
95:6

**series**
87:12,16

**servicing**

15:25

**set**
81:21

**shackles**
42:18 95:24

**share**
75:19

**She'll**
31:13

**sheet**
82:1

**sheriff**
9:15,16,17,23
54:21

**sheriff's**
6:4,7 45:2,10
47:5,11,17,
19,23 53:10,
25 54:22 55:5
56:15 69:11
70:9,15 72:3
73:7 81:19

**shift**
8:20 43:18
73:11,13

**shin**
88:1,7,15
97:21,25 98:3

**shirt**
67:16

**short**
22:20 23:1
86:19

**shortly**
35:13

**shoulder**
21:22,24

**show**

24:7 27:15
81:14 101:10,
19

**showed**
15:10 62:7

**showing**
29:9 114:9

**shown**
36:22

**shows**
23:19,20
35:17 63:11
98:25 99:5
112:17

**side**
33:7,17,20
81:22 92:25

**sign**
16:4 89:25

**signs**
14:11

**similar**
61:2

**single**
6:22 51:21

**sir**
13:13,24
18:14 28:6
30:8,21 31:4,
15 34:21
41:17 82:3,
16,22 83:1,8,
19,24 84:4,
16,20 85:8,
10,18 86:1,3,
13,24 87:1,4,
8,11,17 88:9,
24 89:2,4,7,
22 90:2,4,9,

12,17,25
91:4,10,17,
19,23,25
92:2,10,15,
19,22 93:8
95:14 96:7,23
101:7 102:14
105:25 109:17
110:2,17,20
111:1,4,9,13
114:23,25
115:16

**sitting**
22:4

**situation**
45:7 51:9,10,
13,14

**situations**
44:23

**six-five**
19:25 20:3

**Six-foot-five**
19:21

**six-month**
6:13 9:14

**sixth**
95:20 103:25

**slight**
55:8

**slow**
77:4,9

**slow-motion**
76:25

**small**
25:5

**solely**
77:18

**sooner**
77:18,24

**sort**
31:9 91:14

**sound**
30:23

**sounds**
30:16 71:3

**source**
73:23,24
74:1,4 75:1

**space**
28:8 29:9
64:2

**span**
92:6

**spark**
14:9

**speaking**
29:16,18 72:1
102:12 108:16

**speaks**
100:21

**specific**
69:21 98:15

**speculate**
27:11 44:1,5,
6

**speed**
111:20

**spoke**
9:15

**spoken**
11:9

**sporting**
19:7

**spray**
57:6,15 58:3,
16,18 59:1,12

**sprint**
93:6

**standards**
6:24

**start**
46:1 80:7

**started**
29:9 42:12
43:21 45:13
46:4 62:20
70:14 92:8

**starts**
59:15

**state**
12:1 19:3

**stated**
50:5

**statement**
42:5,25 46:5,
11 94:22
101:21 102:8

**states**
38:20

**stature**
86:19

**stay**
33:20 92:21

**stayed**
25:7,23 26:14
32:15

**step**
54:9 84:3
103:17 104:10
112:10

**stomach**
33:10

**stopped**
46:19 51:15

65:4 87:22,25
89:1

**store**
79:3

**straight**
80:25

**Street**
60:7

**strength**
68:2 86:21
91:2

**strictly**
51:4

**strong**
86:20

**stuff**
68:22

**stun**
18:15 21:10,
11,22,23
22:5,8,13,24
23:3,11,25
24:11,14,17,
25 25:13
31:21,24 32:2

**stunned**
23:4,6

**stuns**
23:7,8

**subject**
54:9 75:16

**submit**
6:16

**substance**
68:3

**substances**
67:21

**suffered**

68:15

**suggested**
50:18

**summary**
94:24 95:7,9
96:20,23

**superhuman**
68:2

**supervision**
9:12

**supervisor**
55:21,25
56:11,14 73:3

**supplement**
61:23 63:13

**supplemental**
59:18,19

**surprise**
86:20

**suspect**
6:8 8:9 12:16
59:2 86:8,16,
17

**suspects**
12:4

**suspended**
9:7

**suspension**
7:10 10:24

**sustained**
7:11

**sworn**
42:24

---

**T**

---

**Tahoe**
24:23 25:22
86:9 93:3,6

**taker**
61:12,13,17,
21 62:2

**takers**
64:21

**taking**
116:4

**Talbert**
12:25 13:8,19
14:16 15:12,
16 16:19
17:20,25
18:10 21:13
27:17,25
28:11,18,22
29:11,13,18,
25 30:19,24
31:1,5,10,13,
17 34:11,15
35:21,24
36:15,24
37:23 38:7,18
39:1,12,18
40:23 41:2,6
42:1,21 44:13
45:21 46:7,22
47:7 48:7,14
49:6 50:4,11,
14 51:7,24
52:9 53:6,12
54:24 56:6
58:24 61:9
62:13,15,25
63:5 64:11,15
65:5,19 67:14
68:5,17 71:6,
10 73:21
74:4,15 76:3
79:23 80:4,21
81:8,11
84:17,22 85:3

88:12,13 91:5
93:12 95:1,4,
7,10,17 96:4,
19 98:9 99:1
100:21
101:13,20,25
102:6,19
104:6 105:17,
20,22 106:16
108:15,18
109:11,20,22
110:9 111:10,
22 112:1,14
114:20 115:3,
7,13,23 116:2

**talk**
45:5 69:25
70:1,12 71:4
91:20 94:12
114:1

**talked**
69:13 71:17
73:22 80:6

**talking**
6:16 27:17,20
36:1 41:21
68:12 70:11
83:20 98:11
101:14

**talks**
103:22

**tall**
19:20

**TANNER**
74:24 80:17
91:3 105:18,
21

**tape**
115:1,6

**Tase**
22:5,24
24:14,17
31:21,24 32:2

**Tased**
21:1,3,6,10,
11,20 23:25
24:11 39:25
40:9,11,15
46:18 62:6
78:4 87:15
89:3 100:19
101:4 102:5
104:14

**Taser**
13:13 14:4,
15,17,19,20,
23 15:2,6,9,
14,19 16:2,5,
10,12 17:3,7,
8,14 18:15,17
23:3,19,20
24:6 30:10
35:16 36:10,
19 38:20
58:4,22 59:9,
12 61:2,4,5,6
62:6 64:3
76:16,18
78:8,9,10,11,
13,16,17
79:3,4,5
85:7,24 86:11
87:9 89:9,10
91:21 110:1,
4,7 111:8

**Tasers**
14:21 76:17

**Tases**
92:7

**Tasing**
21:23 22:8
24:25 25:13
37:9 84:6,7,
10,24 85:1,23
89:5 103:7,23

**Tasings**
22:13,14
36:12,14
38:2,15,25
39:7,10,17
62:12 102:16
104:1 105:1
109:14
110:10,13
113:10 115:9

**TCC**
19:3

**team**
13:9 45:10

**technically**
60:9

**telephone**
72:11

**telling**
28:22 29:19
105:15

**ten**
24:13 92:16

**term**
82:12

**terms**
30:9 47:18
77:3 82:8

**test**
14:9 16:4
70:18 71:24
72:4

**testified**

42:16,22
92:11 94:15
95:12 103:11,
12

**testifying**
114:10

**testimony**
28:3,21 80:6
96:11,15,20
97:11 101:2
111:24 113:9
114:2 115:22

**testing**
72:1

**tests**
70:19,22,23
71:22

**therapist**
69:12 71:17

**thing**
6:22 13:20
44:1 71:19

**things**
6:21 17:2
18:5 27:18
45:5 63:10
70:19 77:4
114:13

**Thomas**
19:4

**thought**
18:11 67:23
93:17 108:15
113:23 114:23
115:12

**three-quarters**
100:9

**tied**
26:19 27:3

28:1 32:11

**time**
6:15 9:18
14:24 15:9
16:15 17:6,7
20:5,10 21:7
22:2,5,19,20,
22 23:1,25
24:9,22 25:24
31:20 32:23
33:22 34:22,
24,25 35:4,7,
8,10,19 36:6,
21,23 37:1,5,
6 40:4,9,11,
15,19 41:18
42:3,12 45:18
46:15 48:25
49:2 52:17
54:10 55:11,
17,20 56:11
57:12,15
58:12 59:21
60:14 61:3,
16,20,23
72:24 75:15,
24,25 76:8,13
77:3 78:4
79:3 81:12,24
82:6,9,11,13,
24 83:2,9,14,
21,25 85:15,
19 87:14,15,
25 89:23
90:18 91:6,8
92:6,12
98:19,20
99:8,24,25
100:12,18,23
101:3 102:4,
15 103:6,15,
23,24,25

104:2,13
105:7,22
107:8 108:2,
4,11 109:1,
18,23 111:8,
19,20 112:8,
9,13,21 113:4
115:18

**timely**
6:15

**times**
15:4 21:3
24:1,2 35:19
39:25 67:1
79:6 81:13
83:4 91:20
94:7 97:24
100:19,20
101:4 102:5
106:24 107:4

**timing**
41:14

**title**
69:13

**today**
19:14,16,18
20:3 30:11
32:17 34:3
41:22 96:11
97:11,16

**told**
39:23 42:9
46:18 47:4,10
66:3 69:21
70:11 73:20,
22 93:17,18,
24 94:4,6,7,
25 96:9,24
97:4,7,12,17
112:12,25

113:11,18
115:9

**top**
92:21

**total**
92:6,9

**trade**
15:23

**traffic**
8:23

**train**
18:11

**trained**
15:21 33:8
44:19,22 45:8
47:16,18
53:20,24
93:9,11

**training**
16:3 33:8
44:25 45:1,2,
3 47:21 55:8
68:13 89:12,
14

**transport**
51:4,5

**transported**
49:3

**treat**
56:1

**triggers**
79:8

**trouble**
45:13

**Troy**
19:6

**true**
99:23

**truthfully**
95:12

**turn**
80:23 82:18

**turned**
80:10

**type**
91:1

**types**
61:13

**typing**
61:21

_____

### U

**uncertain**
41:9,14 69:20
71:11 72:2
99:14 105:7

**understand**
21:16 49:19
61:24 83:10
113:20 115:8

**understanding**
48:22 108:5

**unit**
35:7

**University**
19:6

**unnatural**
80:25

**usage**
58:15 76:18

_____

### V

**vantage**
28:18 29:24,
25 30:3

**vehicle**
8:9 49:3,21
86:14

**verbally**
7:24 61:13
62:1

**versus**
98:20

**video**
73:14,17
74:9,12

**violated**
8:13

**violation**
6:23,24

**violations**
7:11

**violence**
106:2,6,7,12

_____

### W

**wait**
48:18 50:1

**waited**
90:6

**waiting**
90:6

**wanted**
80:5 81:13
83:21 91:6

**warned**
7:24

**warning**
14:11

**watch**
22:21 29:22
105:8 113:1,
2,3

watching
29:22

weak
45:15,17

weapon
63:19,20,23,
24

wear
88:4

weigh
19:18,22 20:3

weight
19:13,16,17
25:2 26:1
43:6 88:20

whispering
18:7

wide
29:6

wider
29:7

wife
11:4,9

willful
6:25 7:16

Wilson
56:12 57:3
73:3 100:13
104:3

windows
48:5 53:4

witness's
28:21

witnesses
75:5

woman
72:10

word
55:19

wording
55:9 61:2
69:22 97:18

words
55:20

work
11:25 13:9
54:7 99:15

worked
9:22 11:4
56:20 60:20
73:9,11,13

working
60:13 70:14

works
61:19 64:7

wrapped
61:4

write
59:17 108:20

writing
60:2

written
6:14,20 8:23
60:3 72:6

wrong
28:24

wrote
13:20 102:14

---

**X**

X26
15:19,21,24
16:1,8,15,24

---

**Y**

y'all
32:8 39:9
40:4 44:12
48:12 66:17
71:4 72:11
93:18,23 94:4

y'all's
75:5

year
10:6

years
11:18,19
71:20 90:19,
20,21

you-all
87:5 90:5
92:23 93:2