## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**REBECCA BRIDGES, individually,
and as personal representative of the
estate of CODY HEALEY, deceased,
for the benefit of his survivors and
estate,**

        **CASE NO.: 3:18-cv-406-RV-CJK**

      **Plaintiff,**

**vs.**

**DAVID MORGAN, as SHERIFF of
ESCAMBIA COUNTY, FLORIDA,
DEPUTY SHERIFF JOHN BEARD,
And DEPUTY SHERIFF ERIC
ANDERSON**

      **Defendants.**
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Rebecca Bridges, individually, and as personal representative of the

estate of Cody Healey, deceased, for the benefit of his survivors and estate, responds

in opposition to Defendants' – David Morgan, as Sheriff of Escambia County,

Florida; Deputy Sheriff John Beard; and Deputy Sheriff Eric Anderson – Motions

for Summary Judgment [Doc. 83; Doc. 84; Doc. 87], and states the following:

## BRIEF INTRODUCTION

"I can't breathe." This helpless exclamation has become an all-too-familiar headline, recently becoming an international battle cry in the wake of George Floyd's death on Memorial Day just this year, the most recent in a series of high-profile events where suspects died at the hands of law enforcement following excessive uses of force.[1] Asphyxia and death from police restraints – be it through physical force or actual restraints – is an increasingly common occurrence. Such is the case here.

In the early morning hours of December 1, 2014, several concerned citizens contacted the Escambia County Sheriff's Office to report a man in or near the Sherwood Elementary School parking lot, twirling around, acting erratically, and not wearing any pants. The man in question was Cody Healey. Mr. Healey is now dead.

Deputy John Beard, 215 pounds and over six feet tall, arrived on scene soon after the call, and almost immediately engaged Mr. Healey in a physical confrontation, reaching out and grabbing his wrist in an attempt to turn Mr. Healey around and handcuff him. Mr. Healey was quite obviously under the influence of drugs or suffering from a mental illness, yet Deputy Beard made no attempt to further deescalate the situation, or wait for EMS support. Instead, within minutes, Deputy Eric Anderson, 325 pounds and just shy of six and a half feet tall, arrived on scene

---

[1] See Ex. 52.

and joined the physical altercation taking place between Deputy Beard and Mr. Healey.

Deputy Beard pulled his Taser from his belt, and used it three times in rapid succession on Mr. Healey. The Deputies were able to get Mr. Healey face down on the ground, and Deputy Anderson held Mr. Healey down by placing his knee on Mr. Healey's back. Mr. Healey was five feet, seven inches tall, and weighed barely 135 pounds. Despite having a man nearly 200 pounds heavier pressing him to the ground, Deputy Beard tased Mr. Healey three more times, before the deputies placed him in hand cuffs and leg restraints, and then tied a hobble cord between the two to pull his hands and feet close together behind his back. Despite noticing his labored breathing and weak pulse, neither deputy performed CPR until after EMS arrived on scene almost ten minutes later.

Mr. Healey was transported to the hospital, and died two weeks later. The county medical examiner ruled his death a homicide, and found the physical altercation with restraints to be a contributing factor in Mr. Healey's untimely death. There was no justification for this use of excessive force and deliberate indifference to Healey's obvious medical needs that violated Healey's constitutional rights and resulted in his death, and as shown below, summary judgment must be denied.

## STATEMENT OF DISPUTED FACTS MATERIAL
## TO PLAINTIFF'S CLAIMS

Two years prior to Cody Healey's untimely death, the United States Department of Justice investigated the Escambia County Sheriff's Office and issued a Technical Assistance Letter, finding that "there are systemic deficiencies relating to the way in which ECSO officer use force, that if left unaddressed, may result in civil rights violations." [Ex. 14]. That letter recommended that ESCO policies should accurately state the constitutional standard for permissible force, and should also include additional guidance concerning de-escalation and when not to use force. [Id., pg. 2].

Perhaps most important, the letter found that ESCO should adopt new policies for "ECWs" or electronic control weapons, such as Tasers. [Ex. 14, pg. 4]. The letter notes that

> Since roughly 2004, there have been allegations of ESCO deputies misusing ECWs. These allegations are consistent with the observations of our experts. They found that ESCO deputies are still too quick to resort to using ECWs, often employing them in the course of seizing passive subjects.

[Ex. 14, pg. 4]. These findings are critical to the matter at hand. Moreover, the DOJ instructed ESCO to adopt new policies related to ECWs, including specifically that the restraints used after the deployment of an ECW must not impair a subject's breathing. [Ex. 14, pg. 4]. Despite the review of numerous egregious misuses of

force by the DOJ, two years later, Cody Healey died at the hands of two ESCO deputies, who tased him six times, hobble tied him, and left him to suffocate on the ground.

In the two years that followed the DOJ letter, Deputy John Beard responded to Healey's home on two occasions, yet Beard denied any knowledge that Healey's was a veteran discharged for mental health reasons[2], or that Healey had suffered significant traumatic burns. [Doc. 83-1, 27:16-25; Doc. 83-14, 9:12-22; Ex. 15]. In his report regarding the July 24, 2013, visit to Healey's home, Beard reported that Healey had informed him that he broken a beer bottle over his head to scare off an intruder. [Doc. 83-1, 28:18-25, 31:12-22; Ex. 15; Ex. 16]. Curiously, Beard testified, however, that although he found that behavior odd for someone like himself, he did not know if that behavior was odd for Healey. [Id.]. Beard then responded to Healey's home in August 2013. [Doc. 83-1, 36:15-20; Ex. 15; Ex. 16].

*Initial Reports to the Escambia County Sheriff's Office*

At approximately 6:00am on December 1, 2014, several individuals – including Tiffany Harvey, Debra Parkerson, Valerie Beede, Carol Morris, and Katrina Gardner – observed Healey in or near the parking lot of Sherwood

---

[2] Cody Healey was medically discharged from the United States Air Force after being found to be "unfit for further military service." The Air Force diagnosed Cody Healey as an airman that suffers from a personality disorder and mental retardation. [Ex. 50, pg. 7].

Elementary School. Several of those individuals called 911 to report a man or boy running around, jumping, performing summersaults, and cursing, while wearing nothing more than a tee shirt. Due to the early hour, there were no children at the school at the time of the incident nor were they expected to arrive until after 7:00 a.m.. [Doc. 83-4, 5:4-13; Doc. 83-5, 7:3-9; Doc. 83-9, 11:9-22][3].

Harvey arrived on campus and observed Healey striking a silver Ford SUV, with no pants on, and contacted the Sheriff's Office. [Doc. 83-5, 10:16-11:13, 12:10-13:3; Ex. 1]. Harvey testified that she had never seen anyone act like Healey did in her life, and that Healey would run fast across the parking lot, run through the trees and hedges, and roll around on the concrete shouting things. [Doc. 83-5, 13:8-14:3]

Parkerson described Healey similarly, stating that he was doing flips and rolling around in the grass. [Doc. 83-4, 10:6-16]. He did not have any pants on, and was banging on the window of an SUV. [Doc. 83-4, 11:11-24]. Parkerson then called Beede from her vehicle and said there was a naked man in the school parking lot. [Doc. 83-9, 8:15-22; Ex. 35]. Beede went to the parking lot and observed Healey running around the lot, jumping, doing summersaults, punching trees, and screaming obscenities. [Doc. 83-9, 9:7-23]. Beede thought Healey was a younger boy, and that

---

[3] Despite this testimony, Beard claimed that he "knew" children were present because busses were on campus, and thus he reported that Healey had exposed himself to children. [Doc. 83-1, 83:7-85:1].  As the record in this case shows, this is a false statement.

perhaps someone had hurt him. [Doc. 83-9, 17:2-11]. She further believed he was under the influence of some substance, and had never observed behavior like that before. [Doc. 83-9, 17:12-17].

Morris, who lived across the street, observed Healey running around half naked, screaming obscenities and rolling on the ground, and also striking a neighbors vehicle. [Doc. 83-7, 19:13-22]. She alerted her daughter, Katrina Gardner, who not only witnessed the events preceding the arrival of law enforcement, but she witnessed the entire encounter. [Doc. 83-6, 8:24-9:5, 20:9-19; Ex. 28]. Gardner testified that initially she found Healey's conduct humorous, as he was running around naked acting crazy. [Doc. 83-6, 42:9-43:20]. She recognized him as a neighbor, and testified that he was clearly on something, and was running around with no pants on while counting out loud. [Id.]. It was clear he was not going to harm anyone. [Id.].

### Arrival of Beard and Anderson on Scene, and Taser Use

Beard arrived on scene at 6:11:54, and Anderson arrived several minutes later. [Doc. 83-1, 32:2-7; Doc. 83-10, 35:8-15, 60:10-25; Ex. 5, pg. 3]. He observed Healey on school property, without any pants on. [Doc. 83-1, 48:2-14]. Despite Healey's behavior, Beard testified that he "couldn't say . . . exactly" that Healey was acting "crazy." [Doc. 83-1, 48:11-24]. Beard did admit that Healey's behavior was "not normal for a law-abiding citizen." [Id.]. Beard further testified that he thought

Healey might be on drugs, or suffering from a mental illness, and that "something was out of the ordinary." [Doc. 83-1, 49:3-20]. However, he also testified that he acted consistent with his training to first restrain Healey, then determine whether he was mentally impaired. [Doc. 83-1, 91:8-12]. Anderson believed, based on Healey's conduct, that he had likely ingested an illegal substance. [Doc. 83-10, 67:20-68:7].

However, accepted police standards indicate that Beard should have first contacted EMS. Plaintiff's expert witnesses, Darrin Porcher and Dr. Kris Sperry, each opined that Healey's conduct, appearance, and actions all indicated that he was an emotionally disturbed individual. [Ex. 49, pg. 2; Ex. 50, pg. 6]. Moreover, both note that he was not a danger to anyone at the time Beard first encountered Healey. [Ex. 49, pgs. 2-3; Ex. 50, pg. 7]. Indeed, Porcher opined that Beard disregarded the telltale signs of mentally illness exhibited by Healey and elected to embark upon a campaign of physical restraint prior to requesting additional resources. [Ex. 50, pg. 9].

Beard did not contact EMS, despite Healey's clearly altered mental state, until 6:15:47. [Doc. 83-10, 76:7-15; Ex. 5, pg. 4]. Beard claims that he could not call for EMS and wait with Healey, because Healey exhibited "violent behavior" by waving his arms around. [Doc. 83-1, 76:1-25]. However, Beard admitted that Healey did not react until after he called Healey over and reached out to grab him. [Doc. 83-1, 78:4-18]. Moreover, despite acknowledging the parameters of the Baker and Marchman

Act Policy and their likely applicability to Healey's condition at the time, Beard did not take any steps to comply with the policy. [Doc. 83-1, 50:6-52:2, 39:18-39:10, 55:10-59:2; Ex. 19]. Critically, Beard testified that Healey exhibited self-control that would not implicate the acts, but then, as shown below, tased Healey six times. [Id.].

At the time of the incident, Anderson weighted between 325 and 330 pounds. [Doc. 83-10, 19:12-24]. He is 6 feet, five inches tall. [Id.]. Beard weighed approximately 215 pounds in 2014. [Doc. 83-1, 17:1-3]. He is six feet, one inch tall. [Id.]. Healey, however, was five feet, seven inches tall, and weighed approximately 135 pounds. [Doc. 83-1, 89:3-7]. Anderson testified that despite Healey's small stature, he and Beard together were unable to bring Healey under control using open-hand control. [Doc. 83-10, 87:5-8].

Because of their inability to bring Mr. Healey under control, Beard used his Taser on Healey. [Doc. 83-1, 46:10-13; Ex. 55, Roberts Dep. 62:16-20, 64:10-13; Ex. 3, pg. 8]. The first three applications, using the Taser prongs, came within twenty one seconds of each other, with an eleven second delay between the first and second uses, and ten seconds between the second and third. [Doc. 83-10, 23:8-16; Ex. 55, Roberts Dep. 64:14-24; Ex. 3]. At that point, Healey rolled, dislodging the wires from Beard's taser. [Ex. 55, Roberts Dep. 64:14-65:24; Ex. 2].

The deputies were able to get Healey onto his stomach on the ground at which point Anderson held him to the ground by placing his knee on Healey's back. [Doc.

83-10, 20:5-21:9]. Anderson testified that Beard "drive stunned" Healey with the Taser between the shoulder blades, all while prone on the ground with Anderson's knee on his back. [Id.]. During this time, Anderson had Healey's left arm and was trying to bring his other arm around to handcuff him. [Doc. 83-10, 22:7-16]. Importantly, Anderson omitted placing his knee on Healey's back from his report. [Doc. 83-10, 26:3-13]. However, he informed FDLE that he had his knee across Healey's back, but testified in his deposition than his knee was on Healey's beltline and buttocks. [Doc. 83-10, 95:20-97:24; Ex. 48].

Indeed, just shy of two minutes after the first three Taser uses, Beard drive stunned the Taser directly into Healey's back. [Ex. 55, Roberts Dep. 66:2-6]. Within thirty seconds, Beard tased Healey two more times, with nine seconds passing between the fourth and fifth uses, and sixteen seconds between the fifth and sixth uses. [Ex. 55, Roberts Dep. 66:14-25; Ex. 3, pg. 8]. At this point, Anderson remained on Healey's back while Beard went to his vehicle to retrieve leg restraints. [Doc. 83-10, 25:7-26:5]. They then "hobbled" Healey, which involves handcuffing the suspect behind his back and tying his hands to his feet, which are bound. [Doc. 83-10, 27:2-13, 29:2]. The distance between Healey's hands and the bound feet was a matter of inches. [Id.].

Policy requires contacting EMS when a suspect is repeatedly tased. [Doc. 83-10, 39:6-13]. Thus, at 6:15:47, Beard contacted dispatch to request EMS. [Doc. 83-

1, 102:16-23; Doc. 83-10, 40:8-17, 104:1-25]. For the next eight minutes, Healey began to experience difficulty breathing and labored breathing, and turned a blueish-white color, signifying a serious and progressively worsening lack of oxygen in his body. [Doc. 86-1, 143:18-146:11].

Neither deputy identified the amount of time that passed, but at some point, Anderson noticed that Healey went limp, his breathing was labored, he was a blueish-white color, and had a weak pulse. [Doc. 83-1, 138:1-19; Doc. 83-10, 32:20-33:3]. The deputies then released the hobbles and placed Healey on his side. [Doc. 83-10, 33:4-34:1]. At 6:22:42, eight minutes after tasing and hobble-tying Healey, Beard contacted dispatch and requested that EMS "step it up" based on those observations. [Doc. 83-1, 131:11-18; Ex. 2]. Shockingly, despite requirements to carry a valid CPR certification, neither deputy performed any sort of life-saving measures until after EMS arrived. [Doc. 83-1, 24:1-25:2; Doc. 83-10, 41:21-42:3, 45:25-46:11; Ex. 55, Roberts Dep. 21:14-25, 23:11-16].

Defendant asserts that "Plaintiff's own expert testified the injury to the decedent could have occurred in the two-minute span between the last time that Deputy Beard checked for and found a pulse just before EMS arrived, and when EMS was at the decedent's side two minutes later." [Doc. 87, pg. 27]. Although convenient, this statement ignores vast amounts of Dr. Kris Sperry's testimony.

First and foremost, at the point Healey began to experience labored breathing, CPR was appropriate. [Doc. 86-1, 118:13-19, 180:12-181:14]. Sperry did testify that after two minutes of complete oxygen deprivation, irreversible brain damage occurs. [Doc. 86-1, 116:7-24]. However, after an intense struggle that depletes the body of oxygen, brain damage can begin in under two minutes. [Id.]. He further agrees that had Beard found a pulse within two minutes of EMS arriving on scene, Healey could have suffered an anoxic brain injury and gone into cardiac arrest. [Doc. 86-1, 118:1-11]. This, however, was an *assumption*, rather critically, that Beard checked Healey's pulse within that time frame, which is not established in this record.

There is indeed a much greater gap in time present here. At the time the deputies hobble-tied Healey, they requested EMS. [Doc. 86-1, 143:18-146:11]. Six minutes later, the deputies noticed that Healey's breathing was labored and that he had changed colors, and then requested that EMS step it up. [Id.]. Sperry testified that "you never make a mistake by initiating CPR" and that since Healey was changing color, that in and of itself is objective information that Healey was not receiving enough oxygen. [Id.]. The initiation of rescue breathing and potentially even external cardiac massage would "be completely appropriate." [Id.]. Instead, an additional four minutes passed until EMS arrived, and the deputies begin CPR. [Doc. 86-1, 146:13-147:7]. These increments of time are far greater than the one to two minutes that would result in irreversible brain damage.

12

Sperry then testified, consistent with his report and within a reasonable degree of medical certainty, that performing CPR – rescue breathing and external cardiac massage – during those critical minutes, would "more probably than not" have resulted in Healey's survival. [Doc. 86-1, 147:23-148:18].

*EMS Arrival and Response*

When Paramedic Christopher Perham arrived on scene, he found Healey to be unresponsive. [Doc. 83-13, 14:3-24; Ex. 32, HEA9-13]. He did not have a pulse, was in cardiac arrest, and had no motor function. [Id.]. Healey's pupils were large and unreactive, indicating a possible injury to the brain. [Doc. 83-13, 42:3-14]. Only after EMS arrived on scene and assessed Healey did Beard assist with CPR, at Perham's instruction. [Doc. 83-1, 23:8-12; Doc. 83-13, 17:16-18:6, 37:14-22].

In addition to CPR, EMS placed Healey on a cardiac monitor to check his heart rhythm, and established an intraosseous line by drilling into one of Healey's bones to deliver epinephrine to restart his heart. [Doc. 83-13, 24:18-26:2]. Despite these interventions, it took approximately five minutes to restart Healey's heart. [Doc. 83-13, 26:15-27:25; Ex. 32, HEA9-15]. He did not resume breathing until ten minutes after CPR was started. [Doc. 83-13, 28:4-18]. Healey was then intubated, and placed on a backboard for transport, and during transport to the hospital, EMS initiated hypothermia to attempt to preserve brain function, in addition to other drugs

13

and medications prior to transferring him to the care of the emergency room receiving physician. [Doc. 83-13, 24:18-26:2].

It was at this point, following the incident, that Beard told Anderson that he knew the individual was Cody Healey, and had been to his house before. [Doc. 83-10, 65:14-66:25]. Beard informed Anderson that he had been to Healey's house on two prior occasions. [Doc. 83-10, 94:4-10]. Surprisingly, when completing their reports after the incident, both deputies listed the injuries to Healey as "minor." [Doc. 83-1, 161:1-24; Doc. 83-10, 64:18-65:13; Ex. 8]. Beard testified that Healey's difficulty breathing and faint heartbeat were not injuries. [Doc. 83-1, 161:1-24].

_Witness Observations_

Beard's in-car camera did not record the incident, and Anderson's camera was not turned on. [Ex. 57, Gilmore Dep. 18:4-19:19; Ex. 27]. However, bystanders observed that when the deputies arrived on scene, Healey continued to act irrationally and scream, which he did throughout the encounter. [Doc. 83-4, 18:15-22]. Beede testified that she observed Healey flopping on the ground and occasionally evading physical restraint. [Doc. 83-9, 13:18-14:7]. She witnessed the tasings, and then Healey reacting afterwards, continuing to struggle. [Id.]. Beede described the incident as "terrible," noting that she had a fifteen-year-old son at the time. [Doc. 83-9, 20:8-13].

Similarly, Gardner was so traumatized by the events and the possibility of retaliation by the Sheriff's department that she struggled to answer questions during her deposition. [Doc. 83-6, 14:20-15:13, 19:1-21]. She testified that at one point she observed the deputies checking for Healey's pulse, but that she herself was the one to tell them to do so. [Doc. 83-6, 46:19-21].

Gardner was between twenty and thirty feet away from the altercation. [Doc. 83-6, 8:24-9:5, 12:13-18]. She reported that Healey continued to yell and count to four while the deputies attempted to subdue him. [Ex. 28, pg. 1]. Although she observed that Healey kicked one of his legs at one time, he never swung at the deputies or attempted to hurt them. [Id.]. She then heard a deputy tell Healey to get on the ground, which he did, but then he rolled away and began counting again. [Id.].

Gardner then began to record a video on her phone, and one of the deputies shot Healey with the Taser prongs. [Ex. 28, pg. 2]. She turned her camera off because "it started to get real" and she did not want to get in trouble. [Id.]. The deputy continued to use the Taser and Healey yelled for them to stop. [Id.]. Healey was finally pinned to the ground, and a deputy took the Taser and held it to Healey's back for an extended period of time, telling Healey to put his hands behind his back. [Id.]. Healey was unresponsive, and one of the deputies placed him in handcuffs. [Id.]. Gardner witnessed the other deputy run to his vehicle for additional restraints,

15

at which point Healey's legs were bound and then tied to his hands, which she described as a "hogtie." [Id.].

Gardner did not leave the scene, but told the deputies that Healey was unresponsive. [Ex. 28, pgs. 2-3]. She told them that Healey was turning purple, and one deputy asked for her name while the other used his foot to push Healey's "lifeless body" over. [Ex. 28, pg. 3]. She stated that she "knew this young man was dead" and he was "unresponsive for several minutes before they even checked his pulse." [Id.].

At this point the deputies removed the tie between his hands and feet, and rolled Healey onto his side to check for a pulse. [Ex. 28, pg. 3]. The deputies removed the hand and leg cuffs, and rolled him onto his back. [Id.]. At this point Healey's face was "completely purple." [Id.]. Neither deputy performed CPR, but just stood there as more deputies and finally EMS arrived on scene. [Id.]. She observed that EMS was unable to revive Healey, and loaded him into the ambulance. [Id.].

### *Healey's Hospitalization and Death*

By the time EMS arrived, Healey was dead: he had no pulse and was not breathing. [Doc. 83-9, 21:23-22:11]. Although EMS was successful in restarting Healey's heart, he never regained consciousness, and after extensive neurological

testing, his family decided to withdraw life support, and on December 15, 2014, Healey died. [Ex. 2A].

Andrea Minyard, at the time the County Medical Examiner, ruled Healey's death a homicide, and included physical altercation with restraints as a contributing factor. [Ex. 53, Minyard Dep. 4:19-24, 23:16-24:17]. Homicide in this context is death at the hands of another or due to their actions. [Ex. 53, Minyard Dep. 25:13-18]. She concluded that the manner of death was homicide because of the actions taken by the deputies. [Ex. 53, Minyard Dep. 35:25-36:4].

The toxicology report did not show the presence of any illegal substances in Healey's system, however after fourteen days in the hospital, it is possible those substances left the body. [Ex. 53, Minyard Dep. 8:15-21, 10:13-21]. Dr. Minyard's conclusion that synthetic cannabinoids were involved in Healey's death was not based on any objective medical finding, but rather were based on the bag presented to her that was allegedly Healey's, which contained synthetic cannabinoids. [Ex. 53, Minyard Dep. 16:3-19].

Dr. Minyard noted that Healey suffered from cerebral edema, which is swelling in the brain, and anoxic encephalopathy, which is a lack of oxygen to the brain that comes prior to the swelling. [Ex. 53, Minyard Dep. 13:5-14:1]. Healey also displayed conjunctival petechial hemorrhages, which are small capillaries within the eye that burst under pressure, likely thoracic pressure on the chest from

something that blocked the flow of blood to the head. [Ex. 53, Minyard Dep. 15:7-23]. These hemorrhages could have been caused by a much heavier person sitting on Healey. [Ex. 53, Minyard Dep. 15:24-16:2]. Similarly, the anoxic encephalopathy could have been cause in the same way. [Ex. 53, Minyard Dep. 18:7-10].

Dr. Minyard determined thus that the physical altercation with restraints contributed to Healey's death. [Ex. 53, Minyard Dep. 12:14-25]. According to her, physically restraining an individual already under the influence of drugs could exacerbate the situation. [Id.]. Although she knew Healey was cuffed, Dr. Minyard was not told that Healey was hobbled. [Ex. 53, Minyard Dep. 11:16-22]. However, she testified that positional asphyxiation is when a person is put into a position where their mouth, nose, or both, are covered, and there is essentially a "kink" in the airway and not enough air is able to go in and out during respiration. [Ex. 53, Minyard Dep. 21:16-24]. Mechanical asphyxia is where someone prohibits the chest from being able to expand so that breathing does not occur. [Ex. 53, Minyard Dep. 22:15-18]. Mechanical asphyxia can also result in anoxic encephalopathy that results in cerebral edema. [Ex. 53, Minyard Dep. 22:19-23].

Sperry agreed with these conclusions, finding that the actions of the deputies caused Healey's death. [Ex. 49]. Defendant Sheriff Morgan attempted to mischaracterize Sperry's testimony, claiming that:

> Plaintiff's own expert stated that: (1) neither placing the
> decedent in a prone position nor applying a hobble cord

18

> ("hogtie") contributed to his death; that no scientific
> studies demonstrate that "hogtying" restricts a person's
> breathing; and, that there would have been no science to
> alert the Deputies or Sheriff Morgan that hobbling would
> be detrimental to decedent's health."

However, a review of Sperry's testimony shows that he testified that these elements *alone* would likely not cause death. [Doc. 86-1, 173:21-176:18]. He further testified that instances of death have decreased where hobble-tying is no longer practiced. [Id.]. Moreover, he testified that the studies on hobble-tying were conducted on healthy individuals and did not involve any of the elements present in this case. [Id.]. Sperry also testified that the hobble position causes physiological issues for an individual who was recently involved in an intense struggle and who is exhibiting signs of mental illness or drug intoxication. [Doc. 86-1, 57:7-58:17].

Sperry is again in agreement with Dr. Minyard's testimony that, the substantial weight of Anderson's body mass placed on Healey's back would cause a decrease in oxygen ("mechanical asphyxiation"), further exacerbating the acidosis buildup in Healey's body that affects cardiac function. [Doc. 86-1, 61:17-62:9; Ex. 49]. Thus, Sperry concluded that in his opinion, "but for the intense struggle, repeated application of the Taser and placement in the hogtie position, Cody Healey would not have died more probably than not," is based on that the cumulative effect of each ultimately leading to Healey's death. [Doc. 86-1, 76:1-15].

*Aftermath, Repercussions, and ESCO Policies*

19

Sgt. Ramos testified that the deputies were not disciplined because, according to her, they acted consistent with the policies and customs of the Sheriff's Office in performing their duties. [Doc. 83-1, 20:22-21:25; Doc. 83-10, 47:1-3; Doc. 83-11, 13:21-14:1][4]. Similarly, neither was placed on a leave of absence pending an investigation. [Doc. 83-10, 68:24-69:4]. Beard testified that he never heard a "word otherwise" about the entire situation. [Doc. 83-1, 20:22-21:25]. Moreover, despite Healey's obviously impaired state, Beard charged him with knowingly and intentionally committing the offenses of battery of a law enforcement officer. [Doc. 83-1, 81:13-82:1].

All officers go through an annual recertification and training on the use of a Taser. [Ex. 55, Roberts Dep. 47:1-7]. Thus, Beard was trained to use a Taser and received a certification through the Sheriff's Office. [Doc. 83-1, 37:13-38:25]. Importantly, a deputy is required to carry two less lethal options on their duty gear, one being a Taser, if the deputy is certified, and the other being either OC spray or an ASP baton. [Doc. 83-1, 95:11-98:5; Ex. 17, pg. 8; Ex. 55, Roberts Dep. 78:16-79:24]. All deputies go through OC spray use and training during their basic training. [Ex. 55, Roberts Dep. 80:10-13]. OC spray is an irritant that disorients a subject and

---

[4] There was no supervisor on scene, and the deputies were the decision-makers and did not need to consult supervisors for how to treat Healey. [Doc. 83-10, 55:21-56:7]. However, the repeated tasings constituted a "use of force," and thus also at 6:22 while requesting that EMS "step it up," Beard requested the presence of Sgt. Ramos, his supervisor. [Doc. 83-1, 43:21-44:6, 45:14-46:7; Ex. 6].

helps deputies take control. [Ex. 55, Roberts Dep. 39:3-7, 40:10-19]. Beard's secondary less lethal implement was a baton, but did not use that on Healey either. [Doc. 83-1, 98:6-15]. He also did not use OC spray. [Id.].

When a deputy utilizes the Taser prongs, an air cartridge deploys, projecting the prongs into a suspect's body, and then the Taser runs a five second current cycle. [Ex. 55, Roberts Dep. 48:11-49:3]. No matter the type of use, each lasts five seconds. [Doc. 83-1, 93:12-17].

Beard used the Taser six times during his encounter with Healey. [Doc. 83-9, 30:1-24; Ex. 55, Roberts Dep. 62:16-20, 64:10-13; Ex. 3, pg. 8][5]. The first three applications came within twenty-one seconds of each other, with an eleven second delay between the first and second uses, and ten seconds between the second and third. [Ex. 55, Roberts Dep. 64:14-24; Ex. 3]. At that point, Healey rolled, dislodging the wires from Beard's taser. [Ex. 55, Roberts Dep. 64:14-65:24; Ex. 2]. Just shy of two minutes later, Beard again used his Taser on Healey, this time as a drive stun, directly into Healey's back. [Ex. 55, Roberts Dep. 66:2-6]. Again, within thirty seconds, Beard tased Healey two more times, with nine seconds passing between the

---

[5] Although Shelly Dill, the crime scene investigator, was supposed to collect Beard's Taser cartridge and place it in evidence, she was never able to collect it, and was only given a single Taser prong recovered by hospital staff. [Ex. 56, Dill Dep. 9:19-10:16].

fourth and fifth uses, and sixteen seconds between the fifth and sixth uses. [Ex. 55, Roberts Dep. 66:14-25; Ex. 3, pg. 8].

There are no guidelines or restrictions on the number of times a suspect may be Tased. [Ex. 55, Roberts Dep. 43:10-17]. However, deputies are trained that the continued use of a Taser must help achieve the desired effect of controlling the suspect. [Ex. 55, Roberts Dep. 69:8-21]. The probe deployment provides muscle incapacitation to subdue a suspect; the drive stun application only causes pain, essentially ensuring suspect compliance and control through continued applications of pain. [Id.].

Beard testified that there is no difference in current between using the probes and performing a drive stun directly to the skin, yet ultimately admitted that the purpose of drive stun tasing is to inflict pain to gain compliance. [Doc. 83-1, 121:3-18, 171:21-24]. Critically, Beard has never before used his Taser on a suspect three times. [Doc. 83-1, 124:3-12]. In fact, he testified that he could not recall any incident where he used a Taser more than one time on any particular suspect. [Doc. 83-1, 124:18-20]. Of note, Beard learned in training that one sign a suspect may be under the influence of drugs or mentally ill is that a Taser seems to have no effect[6]. [Doc.

_____

[6] Additionally, when it became obvious that the repeated Taser applications had no effect on Healey, Beard should have utilized alternative non-lethal weapons such as OC spray or an ASP baton, which both deputies were equipped with.

83-1, 104:5-23; Doc. 86-1, 83:2-17]. Another such indicator was Healey's apparent "superhuman" strength. [Doc. 83-1, 114:22-115:10].

Although ESCO policies do not specific a maximum number of Taser uses, policy is clear that the only time hobble restraints are called for is when a suspect is in inside a patrol vehicle, attempting to kick windows and doors. [Doc. 83-10, 48:2-49:12; Ex. 58, Greene Dep. 13:10-24, 15:11-16:3]. As described above specific to Healey's confinement, hobble restraints bring the suspect's hands and feet close together behind the back. [Doc. 83-1, 134:2-13]. Anderson testified that he believes the deputies used the hobble restraints because Healey was allegedly dangerous. [Doc. 83-10, 48:2-49:12]. Instead, per policy, Healey should not have been hobble-restrained until after EMS checked him over. [Doc. 83-10, 50:7-16]. Anderson has never used hobble restraints in the manner used on Healey. [Doc. 83-10, 52:23-25]. Moreover, Anderson testified that he did not receive any training on how to use hobble restraints, nor does he know of anyone who was so trained. [Doc. 83-10, 47:16-25, 53:20-54:1].

As far as "de-escalation techniques," Anderson was only trained to deescalate situations at the academy and through basic on the job training, and he does not know of anyone who received crisis intervention training. [Doc. 83-10, 45:3-11]. Beard underwent training in de-escalation prior to this incident. [Doc. 83-1, 66:20-67:4]. Beard testified that he utilized these techniques by "talking calmly" to Healey,

before ultimately grabbing his wrist and escalating the situation. [Doc. 83-1, 142:16-143:11].

### *Anderson and Beard's History and Discipline*

Although they were not disciplined for Healey's homicide, Beard and Anderson each have a disciplinary history with the Sheriff's Office, under Sheriff David Morgan. [Doc. 83-10, 9:20-23]. Beard entered law enforcement in 2012, working for ECSO. [Doc. 83-1, 5:18-24]. His initial FTO training period was extended on two occasions. [Doc. 83-1, 18:6-21]. Given the extensions, Beard was a relatively new officer on patrol at the time of the Healey incident. [Doc. 83-1, 19:15-20]. Prior to the incident, he received a write-up for damaging his county vehicle when he backed into a pole. [Doc. 83-1, 13:24-14:9]. Within the last year, Beard received a verbal warning for failing to turn on his belt microphone. [Doc. 83-1, 14:10-21].

Eric Anderson has worked for the Escambia County Sheriff's Office for just shy of ten years, beginning his employment in September 2010. [Doc. 83-10, 5:1-6, 6:3-5]. He previously worked for several months with the Quincy Police Department, serving in law enforcement for a total of ten years. [Id.]. During Anderson's field training, in phase three, he consistently had difficulties with officer safety, as well as handling suspects and prisoners. [Doc. 83-10, 12:2-10]. His Field

Training Officer gave him daily scores of ones and twos on his daily reports, and Anderson was sent to remediation. [Id.].

Anderson was disciplined on several occasions. [Ex. 47]. In 2011, Anderson was supposed to be suspended for four days for neglect of duty, negligence, and endangering others or property through neglect, when a prisoner escaped his custody at the hospital. [Doc. 83-10, 9:7-16]. He was disciplined, however, for failing to timely report the incident, not the incident itself. [Doc. 83-10, 6:6-18].

He received a written reprimand in May 2013 after his involvement in a traffic crash. [Doc. 83-10, 8:22-9:2]. The Sheriff's Office determined it was a preventable crash. [Id.]. He was issued a general counseling in 2011 for a similar preventable accident. [Doc. 83-10, 9:3-6]. Anderson was given a Letter of Reprimand for an incident on December 12, 2013, for violating the pursuit policy and pursuing a suspect vehicle when he should not have. [Doc. 83-10, 8:6-15]. He soon after received a Letter of Reprimand for failing to complete a property receipt for items seized during a search on December 26, 2013, and he lost one of the seized items, a passport, during his shift. [Doc. 83-10, 8:16-21].

In June 2014, Anderson was verbally disciplined and then written up for failing to respond to dispatch on June 29, 2014. [Doc. 83-10, 7:19-8:5]. Approximately one month before Healey's death, on or about November 6, 2014, Anderson received a written notice of disciplinary action for violating the standard

of care, neglect of duty offenses, willful disregard of duties, and neglect. [Doc. 83-10, 6:23-7:18]. He was suspended, for not preparing a police report despite allegations of criminal actions. [Id.].

Anderson has been before two Disciplinary Review Boards. [Doc. 83-10, 9:24-11:17]. One related to the incident with the escaped prison, the other was for misusing the Master Name Index to look up the attorney his wife worked for. [Id.]. For the latter, which occurred in 2018, he was suspended for two days. [Id.]. He was subjected to Internal Affairs investigations for both incidents. [Doc. 83-10, 12:14-18].

## MEMORANDUM OF LAW

### I.    Summary Judgment Standard

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Tippens v. Celotex, 805 F.2d 949, 952-53 (11th Cir. 1986). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(a). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). In deciding whether a genuine issue of material fact exists, the Court must accept the

truth of Plaintiff's allegations and evidence and "must draw all reasonable inferences in Plaintiff's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996). In ruling on a motion for summary judgment, the court "may not weigh conflicting evidence or make credibility determination of our own. If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (citations omitted).

In order to withstand a summary judgment motion, the non-moving party must establish that based on the evidence in the record there can be more than one reasonable conclusion as to the proper verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

As the Eleventh Circuit has explained the standard:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from the undisputed facts, then the court should deny summary judgment.

Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting

Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations

omitted).

## II.   Plaintiff's Claims Against Deputies Anderson and Beard

Deputies Anderson and Beard insist that they are entitled to summary

judgment on Counts V, VI, and VII of Plaintiff's Fifth Amended Complaint because

they used necessary and reasonable force to detain Healey, EMS was called before

and after deploying the Taser, CPR was rendered, and Healey went to the hospital.

[Doc. 83, pg. 1; Doc. 84, pg. 1]. They further insist that they are entitled to both

qualified and sovereign immunity. [Doc. 83, pg. 2; Doc. 84, pg. 2]. However, as the

material facts clearly show, nothing could be further from the truth, and this Court

must deny summary judgment.

### A.   The deputies are not entitled to qualified immunity.

Beard and Anderson argue that they are entitled to qualified immunity because

they did not violate Healey's constitutional rights, and even if they did, the law was

not clearly established. See Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also,

Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (acknowledging Pearson and

applying two prong sequence of Saucier). However, as shown below, not only did

the deputies violate Healey's rights, both via the excessive use of force and

deliberate indifference to his serious medical needs, those rights were clearly established in December 2014.

**1.    Anderson and Beard violated Healey's constitutional rights.**

Here, there are multiple instances where the deputies violated Healey's constitutional rights.

**(a)    Anderson and Beard used excessive force in their interactions with Healey.**

First, with regards to the use of excessive force, while the deputies focus only on the six uses of a Taser on Healey, the record also shows that Anderson unnecessarily placed his significant body weight onto Healey's back while physically restraining him and the deputies unnecessarily hobble-tied Healey.

To determine whether the deputies used a proper or excessive amount of force on Healey, the Court must balance relevant factors, including: the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight; the need for the application of force; the relationship between the need and amount of force used; and ... the extent of the injury inflicted." Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015) (internal citations omitted) (quoting the first three factors from Graham v. Connor, 490 U.S. 386, 396 (1989), and last factors from Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002)). At times, the Eleventh Circuit has evaluated the excessive force only in

light of the first three <u>Graham</u> factors. <u>See</u>, <u>e.g.</u>, <u>Stephens v. DeGiovanni</u>, 852 F.3d 1298, 1321-22 (11th Cir. 2017).

Moreover, "the Eleventh Circuit has consistently held that the gratuitous use of force when a criminal suspect is restrained and not resisting arrest constitutes excessive force." <u>Holloway v. Diaz</u>, 2013 U.S. Dist. LEXIS 141637, *21 (S.D. Fla. June 18, 2013); <u>see also</u> <u>Reese v. Herbert</u>, 527 F.3d 1253, 1274 (11th Cir. 2008) (rejecting qualified immunity where the plaintiff was lying face down on the ground, not suspected of committing a serious crime, not a threat to anyone and not actively resisting arrest); <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1348-1349 (11th Cir. 2002) (finding that officer's use of pepper spray on a restrained suspect held in the back of a police car was excessive and "wholly unnecessary" where the suspect was accused of a minor crime, not a threat to the officer, and not resisting arrest). Here, although Beard later charged Healey with knowingly and intentionally committing the offenses of battery of a law enforcement officer, the record is clear that Healey, at most, flailed in an attempt to free himself and was utterly confused about the entire encounter, due to his mental state or the potential presence of an intoxicant.

At best, Healey committed a minor, non-violent crime, and in his substantially impaired state, did not have the capacity to understand his interactions with the deputies. Once on the ground and confined under the substantial weight of Anderson, Beard drive-stun tased Healey three additional times. Anderson continued to press

his weight onto Healey's back, such that Dr. Minyard observed petechial hemorrhaging commonly associated with physical compression or mechanical asphyxiation. Instead of using only handcuffs and leg shackles, Beard returned to his vehicle to secure a hobble cord – clearly unconcerned that Healey could escape again as he was underneath Anderson following six uses of a Taser on his body. Despite showing no further signs that he would flee or flail, the deputies hobble-tied him, and left him on the ground to die.

Here, the deputies rely on Mann v. Taser International, Inc., focusing only on the issue of excessive Taser usage. 588 F.3d 1291, 1305 (11th Cir. 2009). In Mann, a hysterical and delusional arrestee (apparently high on methamphetamine) was handcuffed and shackled after extreme resistance, but continued to "kick uncontrollably" in the patrol car, shattering a rear window and bending the steel door frame. Id. at 1300. The deputy's command to stop went unheeded, and the arrestee started "slamming her head up against the opposite door." Id. When the officers opened the rear door furthest from the plaintiff, she "propelled herself out of the open door of the squad car, landing on her head and neck." Id. This continued behavior resulted in the deputy tasing the plaintiff three times. Id. An hour-and-a-half later, she died at a hospital after suffering cardiac arrest. Id. at 1301. The administratrix of the arrestee's estate and survivors brought a § 1983 excessive force action against the deputy who tased her. Ultimately, the Eleventh Circuit held that

"[t]he nature and quality of the intrusion here, namely use of a taser, was appropriate given the countervailing government interest of safety and compliance." <u>Id</u>. at 1306. Namely, the arrestee refused to comply with the deputy's warning to stop her "violent" and "aggressive" behavior, and she was "clearly a danger to herself and others." <u>Id</u>. There was, thus, no genuine issue with respect to the § 1983 excessive force claim. <u>Id</u>.

The facts of <u>Mann</u>, although analogous in the deputies' minds, is in no way instructive here. The arrestee in <u>Mann</u> engaged in such violent and egregious conduct, the court had to conclude that her behavior and the danger she presented justified the use of force. Here, however, there is not one fact in this record to support a similar finding.

This matter is actually analogous to <u>Borton v. City of Dothan</u>, where the Middle District of Alabama evaluated the five factors and determined that there was no crime, the incident was more along the lines of a mental health welfare check; three times Ms. Borton was tased occurred while she was lying face down with her arms and feet secured to a gurney, and there was no evidence that she posed a danger to herself or others, she was no longer a flight risk, and was incapable of physically fighting with others; she sustained injuries beyond soreness and bruising; and the only conceivable justification for the three tasings would have been to silence Ms. Borton's continued screams. 734 F. Supp. 2d 1237, 1249-50 (M.D. Ala. 2010).

32

Further, the court concluded that a reasonable jury could determine based on the facts that Ms. Borton was not tased in good faith, but maliciously and to intentionally cause pain. <u>Id</u>.

The factors outlined in <u>Graham</u> must be weighed based upon Healey's account of the tasing, not the officers. <u>Borton v. City of Dothan</u>, 734 F. Supp. 2d at 1249 (M.D. Ala. 2010). Here, we have only medical evidence, and the testimony of Garner and Perham as to what they witnessed at the scene. Applying the <u>Graham</u> and <u>Lee</u> factors to the present facts, we find that: Healey did not commit a crime, nor was he suspected of anything more than extremely odd and concerning behavior, which were possibly the result of a mental illness or intoxicant; the final three tasings, Anderson's physical force in pressing Healey to the ground, and hobble-tying Healey were unnecessary in light of Healey's physical inability to get out from underneath Anderson, and as further shown in Beard's actions of leaving the immediate scene to return to his car; Healey sustained massive injuries beyond soreness and bruising, and is, in fact, dead; the only possible reason for continuing to tase Healey and eventually hobble-tie his limp body was to inflict further pain.

Following <u>Vineyard</u> and <u>Borton</u>[7], the evidence is clear that Anderson and Beard used excessive force in their interactions with Healey, violating his

---

[7] <u>See also</u>, <u>Wate v. Kubler</u>, 839 F.3d 1012 (11th Cir. 2016) (holding that the deputy was not entitled to qualified immunity and his conduct amount to excessive force where a suspect who died as a result of asphyxia and blunt trauma two days after

constitutional rights and ultimately ending his life. Summary judgment must be denied.

---

being restrained and subjected to multiple shocks from stun gun by law enforcement officers).

### (a) Anderson and Beard were deliberately indifferent to Healey's obvious medical needs.

Second, with regards to the failure to provide medical care and the deputies' deliberate indifference to Healey's obvious medical need, the record is clear that Anderson and Beard were well aware of Healey's need for treatment, and ignored that need for ten full minutes, leading to Healey's brain death.

To prevail, Plaintiff must present record evidence of a serious medical need, Beard's deliberate indifference to that need and causation between Beard's deliberate indifference and Healey's serious medical need. Mann, 588 F.3d at 1306-07; Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). There is no dispute that Healey had a serious medical need. [Doc. 83, pg. 23].

To establish deliberate indifference, Plaintiff must show that the deputies were not only aware of a risk of serious harm, but also that they disregarded the risk by conduct that is more than mere negligence. Hoffer v. Jones, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017); Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004); Goebert, 510 F.3d at 1326-27. The Eleventh Circuit recognizes several examples of conduct that is considered more than mere negligence, including:

> (1) knowledge of a serious medical need and failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical treatment that is so cursory as to amount to no treatment at all.

Goebert, 510 F.3d at 1326-27; Baez v. Rogers, 522 F. App'x 819, 821 (11th Cir. 2013). The first and fourth examples are particularly relevant here. Simply because the deputies provided some care, such pushing Healey over with their foot and telling EMS to "step it up", does not mean this presents constitutionally adequate treatment. De'lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013); see also Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016) (". . . even where some care is provided, 'deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier by less effective course of treatment."). Indeed, there is no dispute that Healey was so deprived of oxygen that he turned a completely unnatural color, and there is no dispute that the deputies failed to provide the simple medical care that they were specifically trained to perform, CPR. Their ten-minute delay, waiting to take any action until EMS arrived, rises to the level of deliberately indifferent, and ended Healey's life. Moreover, multiple experts opined that not only should the deputies have administered CPR prior to the arrival of EMS, had they done so, it is likely that Healey would not have died.

On these facts, Plaintiff has established that the deputies violated Healey's constitutional rights by acting deliberately indifferent to his serious medical needs. Summary judgment must be denied.

### 2.     The law was clearly established at the time of the incident.

As it relates to Plaintiff's excessive force claim, as shown above, this case is analogous to Borton v. City of Dothan. 734 F. Supp. 2d at 1249 (relying on Vinyard v. Wilson, 311 F.3d 1340, 1348-1349 (11th Cir. 2002) (finding that officer's use of pepper spray on a restrained suspect held in the back of a police car was excessive and "wholly unnecessary" where the suspect was accused of a minor crime, not a threat to the officer, and not resisting arrest)). As these cases predate the December 1, 2014, encounter between the deputies and Healey, his rights were clearly established, and neither deputy is entitled to qualified immunity with respect to Plaintiff's excessive force claims.

As to whether Healey's rights were clearly established with regards to the deliberate indifference claim, the deputies rely on Adams v. Custer. 2016 WL 155081, at *17 (S.D. Fla., January 12, 2016). However, Adams was decided *after* December 1, 2014, and relies substantially on Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986), and not Eleventh Circuit precedent. Critically, as of 2014, the knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference. See, e.g., Ancata v. Prison Health Services, 769 F.2d 700, 704 (11th Cir. 1985); Carswell v. Bay County, 854 F.2d 454, 457 (11th Cir. 1988) (sufficient evidence existed for jury to find deliberate indifference where prison

medical staff treated some of plaintiff's health problems but ignored others). Further, as of 2014, the law was clear that delays in medical treatment are actionable under § 1983 when the delay was objectively sufficiently serious, for example, it must result in the denial of the minimal civilized measures of life's necessities. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

### B.     The deputies are not entitled to sovereign immunity

Anderson and Beard further argue that Pursuant to § 768.28(9)(a), Fla. Stat., no officer "shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event or omission of action in the scope of her or his employment or function, unless such officer, employee or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Their arguments in favor of sovereign immunity fail, however, and the Court should deny summary judgment with respect to Plaintiff's battery and negligence claims against the deputies.

### 1.     Battery

There is little disagreement that battery is defined as "the intentional infliction of a harmful or offensive contact upon the person of another." Sullivan v. Atl. Fed. Sav. & Loan Ass'n, 454 So. 2d 52, 54 (Fla. 4th DCA 1984). Further, law enforcement officers "receive a presumption of good faith in Florida, and they are

liable for battery only if they use excessive force." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). The deputies further note that the analysis of whether the force was clearly excessive is the same as a claim for excessive force under federal law. Sanchez v. Obando-Echeverry, 716 F.Supp.2d 1195, 1195 (S.D. Fla. 2010).

However, contrary to the deputies' assertions, the record supports a finding that they used constitutionally prohibited excessive force against Healey, resulting in his death. Accordingly, this Court should also deny summary judgment on Plaintiff's state-law battery claim, and find that the deputies are not entitled to sovereign immunity.

### 2.    Negligence

The elements of cause of action for wrongful death based on negligence are: (1) a legal duty owed to the decedent; (2) breach of that duty; (3) that the legal or proximate cause of death was the breach; and (4) consequential damages. William v. Davis, 974 So. 2d 1052, 1056 (Fla. 2007). Similarly, a negligence claim has four elements: (1) the existence of a duty of care; (2) breach of that duty; (3) legal or proximate cause; and (4) actual damages. Wallace v. Dean, 3 So. 3d 1035, 1046 n. 18 (Fla. 2009). The deputies undertake no analysis on the actual factors pertaining to Plaintiff's negligence claim, arguing only that they are entitled to sovereign immunity.

To overcome sovereign immunity, Plaintiff must also show the actions of the deputies were "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat. Without citation to any authority, the deputies simply claim that "the record evidence refute [*sic*] such an unsupported assertion." [Doc. 83, pg. 34; Doc. 84, pg. Doc. 84, pg. 34].

Here, critically, the record reflects the exact opposite, that the deputies' conduct constituted a wanton and willful disregard of human rights, safety, or property. Indeed, expert witness Porcher concluded that the deputies acted in exactly such a manner. [Ex. 50, pg. 6]. The record supports this conclusion. Well over five hundred pounds of deputy sheriffs were unable to subdue a 135 pound suspect, so Beard tased him three times. After the first three tases, the two wrestled Healey to the ground, and Anderson placed his knee across Healey's back. Healey was never a threat, and certainly underneath a man 200 pounds heavier than him, he was incapacitated. This is evidenced by Beard's intentional act in leaving the immediate scene to secure the unnecessary hobble cord, which the deputies knew was not to be used in this particular application in the first place. They then hobble-tied Healey, and left him for dead until EMS arrived and the paramedic insisted that Beard begin CPR.

Accordingly, the deputies are not entitled to sovereign immunity, and summary judgment is due to be denied.

### 3.    William Healey's Damages

Plaintiff agrees that pursuant to Florida's Wrongful Death Act (and relative to all claims against all Defendants), Healey's father, William Healey, cannot recover lost support and services, mental pain and suffering, or punitive damages, as Healey was married with a child at the time of his death, and William Healey did not receive support from his son. §§ 768.18 and 768.21, Fla. Stat.

## III.    Plaintiff's Claims against Sheriff Morgan

As shown above, at Section II(A) (1), pursuant to the <u>Graham</u> factors, Anderson and Beard violated Healey's constitutional rights.[8] Sheriff Morgan is liable under §1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . .." <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978). Only deprivations undertaken pursuant to governmental "custom" or "policy" may lead to the imposition of governmental liability.

---

[8] This showing further supports Plaintiff's claims of common law battery and wrongful death against Sheriff Morgan, which are not discussed or analyzed separately in Sheriff Morgan's Amended Motion for Summary Judgment. [Doc. 87, sec. V].

41

Sheriff Morgan is liable under §1983 if Plaintiff establishes that his constitutional deprivations were the result of: (1) the Sheriff's policies or customs or (2) the Sheriff's final policymaker(s) acted with deliberate indifference to a constitutional deprivation, or (3) the Sheriff's final policymaker(s) delegated authority to a subordinate who, in turn, caused a constitutional deprivation, or (4) the Sheriff's final policymakers ratified a constitutionally impermissible decision or recommendation of a subordinate employee. Sherrod v. Palm Beach County School District, 424 F.Supp.2d 1341, 1344 (S.D. Fla. 2006).

### A.   Sheriff Morgan had a policy or custom in place that resulted in Healey's constitutional deprivation.

In Monell, the Supreme Court held that municipal liability may be predicated upon a showing that the unconstitutional action of a government employee implements or executes a city policy or city custom "even though such custom has not received formal approval through the body's official decision-making channels." 436 U.S. 658, 690-91 (1978). To support city liability, the policy or custom must be the moving force behind the constitutional violation. City of Oklahoma City v. Tuttle, 471 U.S. 808, 820 (1985).

Moreover, Plaintiff need not prove widespread abuse to hold the Sheriff liable for his unconstitutional custom or policy. Even a "single incident of unconstitutional activity" may be sufficient to hold Defendant liable. Tuttle, 471 U.S. at 823-24 (1985). Additionally, any novelty regarding Plaintiff's claim as to t is no excuse for

42

his inadequate custom or policy. See Trezevant v. City of Tampa, 741 F.2d 336, 340 (11th Cir. 1984). Beard's action of tasering Healey six times, three of which occurred after Anderson had pinned him to the ground, is sufficient enough for a jury to find that the Sheriff had a practice that resulted in Healey's injury. Further, that the DOJ had already reviewed complaints beginning in 2004, and determined that there was a pattern of improper Taser use, further supports a finding that the Sheriff had a custom or policy that resulted in the deprivation of Healey's constitutional rights.

**B.    Sheriff Morgan acted with deliberate indifference to Healey's constitutional deprivation.**

"One method of attributing conduct to the municipality is for plaintiff to show that the policy maker was aware of the subordinates' unconstitutional actions and consciously chose to ignore them." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2005) (citing Sorlucco v. New York City Police Dep't., 971 F.2d 864, 870-71 (2d Cir. 1992) (stating that municipal liability lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials"). Where a policy-making official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction, constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city 'policy or custom' that is actionable under §1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). Neither Anderson nor Beard was disciplined, suspended, placed on leave, or even verbally counseled about

the altercation with Healey that led to his death. Sgt. Ramos testified that they acted in accordance with policy and did nothing wrong. Beard testified that he never heard another word on the matter. That implicit ratification is more than sufficient to attach § 1983 liability to Sheriff Morgan.

### C.   Sheriff Morgan ratified Anderson and Beard's constitutionally impermissible decision.

The Eleventh Circuit has explicitly recognized and approved the ratification method of proving official capacity claims under §1983 in Mandel v. Doe, 888 F. 2d 783 (11th Cir. 1989). In Mandel, the defendant argued that the plaintiff failed to prove a custom or policy by showing a pattern of unconstitutional acts. Id. at 791. The Court in Mandel rejected the defendant's argument by pointing out that the plaintiff had proceeded on an altogether different method of proving custom or policy: "the delegation of final policymaking authority from one official to another and the ratification of a subordinate's actions by a final policymaker." Id. (citing Tuttle, 471 U.S. at 834 (1985) (Brennan, J., concurring in part and concurring in the judgment) ("there may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right."). The court in Mandel also discussed a number of Supreme Court cases in which alternative theories were addressed holding local governments liable under § 1983 for a single decision by a government policymaker.

44

For example, in <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986), the Court upheld a finding of municipal liability based on a single decision by a municipal policymaker. And in <u>City of St. Louis v. Praprotnik</u>, in an effort to clarify when a decision on a single occasion may be enough to establish an unconstitutional municipal policy, the Court reasoned that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality . . .". 485 U.S. 112 (1988).

Here, similar to his deliberate indifference, Sheriff Morgan ratified Beard and Anderson's unconstitutional decisions with regards to the treatment of Healey. They were never disciplined, and their supervisor, Sgt. Ramos, testified that they acted appropriately, despite the clear violations of Healey's constitutional rights.

> **D.** **<u>Sheriff Morgan failed to train or supervise his deputies.</u>**

Recognizing that the "failure to train" and "failure to supervise" are often interrelated omissions, the Eleventh Circuit explained that the court's proper focus in addressing these interrelated claims is on the "element common to both claims: the alleged failure to train." <u>Kerr v. City of West Palm Beach</u>, 875 F.2d 1546, 1555 (11th Cir. 1989); <u>Stephens v. City of Tarrant</u>, 2017 WL 2797080, at *5 (N.D. Ala. June 28, 2017). A sheriff's failure to train a police officer rises to the level of a municipal custom or policy only in the "limited circumstances" when its failure shows a " 'deliberate indifference' to the rights of its inhabitants" and the sheriff's

policy causes the employees to violate a citizen's constitutional rights. <u>City of Canton v. Harris</u>, 489 U.S. 378, 387, 389-91 (1989); <u>see also</u> <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) ("Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, ... a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants."). To establish deliberate indifference, a plaintiff must show "'that the municipality knew of a need to train ... in a particular area and the municipality made a deliberate choice not to take any action.'" <u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting <u>Gold</u>, 151 F.3d at 1350) (emphasis supplied).

The mere fact that deputies may be inadequately trained does not implicate municipal liability; to be deliberately indifferent, the Sheriff must have had notice prior to the acts at issue here of a need to train or supervise, and yet, failed to train and supervise despite that notice. <u>Stephens</u>, 2017 WL 2797080, at *6. A plaintiff may show notice and deliberate indifference in a failure to train case in two ways: she may show "a widespread pattern of similar constitutional violations by untrained employees"; or she may show that the need for training, or different training, was "so obvious that a municipality's failure to train its employees would result in a constitutional violation." <u>Mingo v. City of Mobile</u>, 592 Fed.Appx. 793, 799 (11th

Cir. 2014) (citing Connick v. Thompson, 563 U.S. 51, 62 (2011)); see also Gold, 151 F.3d at 1350-52 (same).

Here, the Department of Justice provided ESCO with a Technical Assistant Letter two years prior to Healey's death, noting numerous instances where DOJ determined that deputies had engaged in excessive uses of force with Tasers. [Ex. 14]. DOJ "conclude[d] that there are systemic deficiencies relating to the way in which ESCO officers use force" and made further specific findings about ESCO's use of Tasers. [Ex. 14, pgs. 1, 4]. DOJ reported that its investigators had confirmed that since 2004, ESCO engaged in the improper use of Tasers, and that deputies needed considerable additional guidance on the proper use of Tasers, as well as more clarity about the constitutional standards for permissible force in general. [Ex. 14, pgs. 2, 4].

A combination of ineffective policies, inappropriate customs and practices, a failure to train and supervisor, together with Sheriff Morgan's deliberate indifference to and ratification of the deputies' conduct, led to the deprivation of Healey's constitutional rights and ultimately, his death. There are numerous bases upon which to hold Sheriff Morgan liable, and summary judgment should be denied.

## CONCLUSION

Disputed issues of material fact remain, necessitating resolution by the jury. Accordingly, this Court should deny summary judgment.

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendants' Motions for Summary Judgment.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with Local Rule 7.1(F), that this response complies with the format requirements specified in the Local Rules and that this response contains 11,112 words, in accordance with Plaintiff's Motion to Exceed the Word Count.

/s/  Marie A. Mattox
Marie A. Mattox

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished by CM/ECF to all counsel of record this 5th day of August, 2020.


/s/  Marie A. Mattox
Marie A. Mattox